## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. MARTIN FLANAGAN | : | Civil Action No. |
| | : | |
| Plaintiff | : | FILED UNDER SEAL |
| | : | Pursuant to 31 U.S.C. 3729 *et. seq.* |
| v. | : | |
| FRESENIUS MEDICAL CARE HOLDINGS, INC., d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | ...oOo... | |

LAW OFFICES
ASHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

## COMPLAINT

Plaintiff and *qui tam* Relator Martin Flanagan, through his counsel and on behalf of the United States of America, in this Complaint against defendant Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America ("FMCNA" or "Fresenius"), alleges based upon personal knowledge and relevant documents, as follows:

## I. INTRODUCTION

1. This action is brought by Relator Martin Flanagan on behalf of the United States of America, to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729, *et seq.* ("the FCA" or "the Act"). It seeks to recover damages and penalties arising from FMCNA's fraud upon federal and state governments in connection with defendant's improper, fraudulent, and unlawful claims for reimbursement submitted by it to Medicare, state

Medicaid agencies, the Department of Veterans Affairs, the Department of Defense, and other federal and state agencies (collectively, "federal and state health care programs").

2. FMCNA is a wholly-owned subsidiary of German-based Fresenius Medical Care AG & Co. K_GaA, the world's largest provider of medical products and services for persons undergoing dialysis treatment. FMCNA reported revenue of over $7 billion in 2008 and is America's largest dialysis services provider.

3. As a Medicare approved dialysis provider, FMCNA is generally entitled to reimbursement from federal and state health care programs for costs associated with treating the more than 100,000 end-stage renal disease ("ESRD") patients undergoing dialysis at its chain of free standing dialysis clinics in the U.S. In addition to composite payment from Medicare and other federal and state health care programs for the dialysis treatment regime patients undergo at these clinics, FMCNA was, during a part of the time covered by this Complaint (that is up until January 1, 2011), entitled to bill these programs separately for reimbursement of certain injectable medications it purchased and separately administered to dialysis patients. Medicare also pays dialysis providers separately for certain laboratory tests, if those tests are medically necessary in a number greater than is included in the composite rate on a monthly basis.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions, such as this, brought pursuant to 31 U.S.C. § 3730(b) for violations of Section 3729. Within the meaning of 31 U.S.C. §3730(e)(4)(A), there has been no public disclosure of the "allegations or transactions" in this Complaint. In the alternative, if the Court were to find a

LAW OFFICES
3HCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

public disclosure, Relator Flanagan is an original source under 31 U.S.C. § 3730(e)(4)(B), with independent knowledge that materially adds to any public disclosure which was provided to the Government prior to filing this action.

5.   This Court has personal jurisdiction over the defendant and is a proper venue pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).  The defendant can be found in, resides, transacts, or has transacted business in the State of Maryland.  Fresenius has a total of 39 freestanding dialysis clinics in the State of Maryland.  Venue is proper because, at all times relevant to this Complaint, the defendant has regularly conducted substantial business within the District of Maryland and has generated significant revenue within the District. 31 U.S.C. § 3732(a).

### III. PARTIES

6.   Plaintiff-Relator Martin Flanagan is a resident of the state of Texas.   Mr. Flanagan was employed by Fresenius for twenty nine years.   His last title was Director of Acute Market Development for the Fresenius Western Business Unit.  In that role, Mr. Flanagan was responsible, among other duties, for negotiating contracts under which FMCNA provided dialysis treatment to hospital inpatients.

7.   Defendant FMCNA is a wholly-owned subsidiary of Fresenius Medical Care AG & Co. KGaA, which is located in Bad Homburg, Germany.  Fresenius Medical Care AG & Co. KGaA is a registered partnership.  FMCNA is headquartered in Waltham, Massachusetts. According to its websites, FMCNA employs over 40,000 employees and treats nearly 130,000 patients at its roughly 2,000 outpatient dialysis clinics in the United States, including several in this District.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

## IV. BACKGROUND

### A. End-Stage Renal Disease (ESRD) and Dialysis

8. Chronic kidney disease (also termed chronic renal disease) refers to the progressive loss of a person's kidney function. It is often detected among those with high blood pressure or diabetes, and it can lead to cardiovascular disease or anemia. Anemia is a decrease in the normal number of red-blood cells and/or hemoglobin in a person's blood.

9. A person with chronic kidney disease is typically classified into one of five stages of severity, with stage 5 being the most dire. At stage 5, a patient is considered to have end-stage renal disease, also called chronic kidney failure. The treatment options available to persons suffering ESRD are usually limited to dialysis treatment or a kidney transplant.

10. Several hundred thousand Americans regularly undergo a regimen of dialysis treatments to combat ESRD. Dialysis (from the Greek "dialusis," meaning dissolution) refers now to a treatment regimen aimed at artificially replacing some of the functions performed by a healthy kidney. Dialysis, however, is an imperfect substitute for healthy kidney function. Healthy kidneys both help excrete end products from the body and are part of the endocrine system; they produce erythropoietin and calcitriol, which affect red-blood cell production and bone formation, respectively. Dialysis helps with waste and fluid removal, but does not substitute for the kidney's endocrine functions.

11. Roughly 90 percent of all dialysis patients undergo hemodialysis at a dialysis clinic three times per week. For these patients, in addition to the dialyzer treatment described above, separately injectable medications including Epogen (a brand name for a synthetic form of erythropoietin) and Vitamin D analogs such as Zemplar (the brand name for paricalcitol, the

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
3 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

4

dominant analog product) are usually administered, along with other injectable medications to treat side-effects of ESRD, including anemia and vitamin deficiencies.

### B. Medicare Program Reimbursements for Treatment of ESRD

12.   Modern dialysis to treat ESRD was beyond the financial reach of most Americans until a 1972 amendment to the Social Security Act extended Medicare dialysis coverage to nearly all ESRD patients regardless of age or other factors.  Medicare has since been the primary payor for more than 80% of the roughly 500,000 ESRD patients in the United States.

13.   According to Congress and the U.S. Renal Data System, ESRD expenditures by Medicare exceeded $5 billion annually by 1991, and now exceed $20 billion annually.

14.   Since 1983, Medicare has reimbursed providers a composite rate for outpatient maintenance dialysis services, which most patients receive three times per week at clinics such as those owned by defendant.  This composite rate reimburses average provider costs associated with a single dialysis treatment, including nursing and other clinical services, social services, supplies, equipment, and some laboratory tests and drugs. 42 U.S.C. § 1395rr.  Certain injectable drugs remained outside the composite payment until January 1, 2011. *See* Medicare Claims Processing Manual, "Separately Billable ESRD Items and Services," Chapter 8 § 60 ("An item or service is separately billable if its cost was specifically excluded from cost data used to calculate the composite rate.").   After January 1, 2011, those previously separately billable drugs were bundled into the composite rate, and the composite rate was increased to take into account the providers costs for these drugs.  Medicare also pays separately for medically necessary laboratory tests in excess of the frequency taken into account in setting the composite rate.

LAW OFFICES
ASHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
10 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

15.   The Medicare ESRD program is administered through the Centers for Medicare and Medicaid Services ("CMS").  CMS-contracted fiscal intermediaries process and pay Medicare Part B reimbursement claims to providers such as FMCNA for dialysis treatments, separately billed injectable drugs and laboratory tests. 42 C.F.R. § 413.174(f).

16.   Typically, a provider such as FMCNA will submit one reimbursement claim bill per month for a given patient, including the charges for several dialysis treatments, any separately billable laboratory services, and separately billable drugs.

17.   Additionally, as an independent renal dialysis facility, FMCNA is required to annually submit Medicare cost reports (CMS-Form-265-94) which disclose cost data and include an express certification of compliance with all applicable laws as a condition of coverage by Medicare. 42 C.F.R. § 413.20.  Medicaid and other federal and state health care programs also require the annual submission of cost reports.

18.   Medicare pays 80% of the treatment costs for ESRD patients covered by Medicare. In addition to Medicare, other federal health benefit programs, CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces, which provides ESRD benefits to covered beneficiaries.  CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disabilities and provides ESRD benefits to covered beneficiaries.

19.   Medicaid, a federal- and state-funded health care program administered separately by each state, provides health coverage for individuals with incomes below a certain level.  In many

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

states, Medicaid pays for treatment costs, including medicines, for ESRD patients who do not qualify for Medicare and/or pays for the 20% of treatment costs not covered by Medicare.

## V.  STATUTORY BACKGROUND

### A.  The Federal False Claims Act

20.  The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties which range between $5,500 and $11,000 per claim.  31 U.S.C. § 3729(a);  28 C.F.R. § 85.3.  For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, …(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  *Id.* at § (b).  "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA.  *Id.*

### B.  The Anti-Kickback Statute

21.  The federal Anti-Kickback Statute ("AKS") prohibits the payment, in any form, whether direct or indirect, made in part or in whole to induce or reward the referral or generation of federal health care business.  The AKS prohibits the offer or payment of "anything of value" in return for referrals.  A "thing of value" is defined broadly to include payment in cash or kind. The AKS extends equally to the solicitation or acceptance of payments and to offers to pay and to actual payments for referrals.  Under the AKS, both criminal and civil penalties apply, including civil monetary penalties, and the sanction of exclusion from federal health benefit

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036
———
202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311
———
703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852
———
301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785
———
301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202
———
410-539-1122
FAX: 410-547-1261

programs.  The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization, affect medical judgment, and restrict competition, ultimately resulting in poor quality of care being delivered to patients.

22.  In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Medicare any claim for referrals that are induced by kickbacks.  In 2010, the AKS was amended to provide that a claim that includes items or services resulting from kickback violations are deemed "false" under the FCA.  42 U.S.C. § 1320a-7b(g).

23.  The AKS has statutory and regulatory "Safe Harbors" that identify specific arrangements that do not violate the statute if all terms of the Safe Harbors are observed by the parties.  For example, as potentially relevant here, the "personal services" Safe Harbor permits compensation arrangements between a principal and an agent if: (1) there is a written agreement between the parties that is signed by the parties; (2) the term of the agreement is at least one year; (3) the agreement covers all of the services to be provided by the agent and sets forth his or her duties with specificity; (4) the aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with Fair Market Value in an arms-length transaction, and is not determined by the volume or value of any referrals or business otherwise generated between the principal and the agent.  42 C.F.R. § 1001.952(d).  The contracts between Fresenius and the hospitals for the provision of in-patient dialysis treatment do not meet the requirement of the personal services Safe Harbor.  That Safe Harbor requires that if the agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.  42 C.F.R.

LAW OFFICES
SHCRAFT & GEREL, LLP
SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036
202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311
703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852
301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785
301-459-8400
FAX: 301-459-1364

SUITE 1212
0 EAST BALTIMORE STREET
BALTIMORE, MD 21202
410-539-1122
FAX: 410-547-1261

1001.952(d)(3). The requirements for the personal services Safe Harbor are also not fulfilled here because: (1) the agreements between Fresenius and the hospitals do not cover all of the services to be provided by Fresenius; (2) the amount to be paid to Fresenius by the hospital is not determined in advance; (3) the amount paid to Fresenius by the hospitals is not consistent with Fair Market Value; and (4) the contracts are not commercially reasonable.

24. Another AKS Safe Harbor potentially relevant here is the Discount Safe Harbor. 42 C.F.R. § 1001.952(h). That provision protects discounts on items or services for which payment may be made under a federal health benefit program so long as the discount is made at the time of the sale of the good or service or disclosed in writing to the buyer at the time of the initial sale and reported appropriately to Medicare. The Discount Safe Harbor does not apply to the transactions because the provision of goods and services at no charge does not constitute a "discount" for purposes of the Discount Safe Harbor. A "discount" is defined by that Safe Harbor as "a reduction in the amount a buyer…is charged for an item or service based on an arms-length transaction. The Discount Safe Harbor also does not apply because the discount is not made at the time the service is "sold" to the hospital (i.e., when the contract between Fresenius and the hospital is signed) but rather is made, and differs, for each service provided under the contract, and the discount is not appropriately reported to Medicare. The discount Safe Harbor also does not apply, by its terms, to "personal services contracts," and the arrangements between Fresenius and the hospitals are personal service contracts.

## VI. ALLEGATIONS

25. The Plaintiff/Relator, Martin Flanagan, was employed by Fresenius for twenty nine years. His last title was Director of Acute Market Development for the Fresenius Western

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

Business Unit.  In that role, Mr. Flanagan was responsible, among other duties, for negotiating contracts under which FMCNA provided dialysis treatment to hospital inpatients.  Mr. Flanagan's central allegation is that FMCNA provided dialysis services to hospitals below cost, in order to capture referrals of patients from the hospitals to Fresenius free-standing clinics, where patients continue their dialysis treatment post-discharge.  The provision of services below cost in exchange for the referral of patients whose treatment will be reimbursed by Medicare implicates the Anti-kickback Statute.  Mr. Flanagan also alleges that Fresenius entered into improper remuneration relationships with nephrologists who were hired to serve as medical directors at Fresenius clinics.

26.  Mr. Flanagan has first-hand knowledge that Fresenius made a calculated business decision to offer dialysis services to hospitals well below cost in order to capture referrals. Fresenius' willingness to lose money on acute programs is explained by the competition for new patients between FMCNA and its leading competitor, Davita.  As background, the dialysis industry has become increasingly concentrated in the hands of these two companies, as they each have acquired other dialysis chains over the past decade.  While in 2004 there were four major dialysis chains – Davita, Gambro, Fresenius and the Renal Care Group -- by the end of 2005 ownership of free-standing dialysis clinics was concentrated in the hands of Davita and Fresenius.  In 2005, Davita purchased Gambro, acquiring an additional 1200 clinics in North America.  In that same year, Fresenius acquired the Renal Care Group, adding a total of 425 clinics and 210 outpatient clinics to its rosters.  Fresenius has a total of 1800 clinics in the United States where they treat about 100,000 Medicare patients per year.  Opportunities for further acquisitions were limited, simply by virtue of the fact that very few large dialysis providers

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

remained (although Fresenius acquired Liberty Dialysis in 2012, adding another 260 clinics in North America).

27.   Beginning in the period from 2007-2008, Fresenius increasingly realized that the Company's organic growth (growth from new patients and not acquisitions) was almost non-existent.   Fresenius decided that the key to capturing new patients was through relationships with hospitals.   FMCNA began to seek exclusive contracts to provide dialysis care in the hospital setting.   Approximately fifty percent of all ESRD patients begin dialysis emergently, when they experience acute complications from kidney failure.   Fresenius knew that patients would be more likely to continue their care with a company they knew and trusted from their hospital stay.   The Bridge Program, which Fresenius initiated in the 2007-2008 period, reflects this decision. Through that Program, Fresenius sought to have Fresenius employees work closely with discharge planners at local hospitals to encourage dialysis patients to continue treatment at a Fresenius clinic, at times placing a full-time Fresenius employee in the hospital to accomplish this goal.

28.   Because the dialysis industry is concentrated, Fresenius was well aware that it directly competed with Davita to obtain hospital contracts and to capture hospital referrals.   It was Mr. Flanagan's experience that the hospitals were also aware of the competition between Fresenius and Davita, and played the two companies against each other to secure the best financial deal for acute care contracts.   Mr. Flanagan remembers that in his discussions with hospital executives there was little, if any, talk about "costs" or "fair market value."   What the hospital negotiators wanted was a "number," one that they could compare favorably or unfavorably to the other bidder, which almost always was Davita.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

29.  Despite compliance concerns and concerns about financial losses that would detract from the overall performance of the area or region for which they were responsible, Fresenius mid-level managers cooperated in the effort to obtain hospital contracts at any cost.  The explanation for this lies in the fact that area and regional managers were tasked with growing their patient base by at least 4% each year, and, in some cases, up to 13% a year.  Bonuses, which could be in the five figures, and performance evaluations for mid-level managers were tied to growth of clinics, among other factors.  Regional and area managers understood that in the long run, it was better to capture a new patient, even at a loss, for the long-term benefit of their regions and their own pocketbooks.

30.  Internal Fresenius documents, i.e. Excel spreadsheets entitled "Acute Programs w/Negative EBIT" and "Acute Txts & Program EBIT vs. Budget," show that Fresenius actually budgeted for losses in the acute programs at many of the larger hospitals.  Frequently, hospitals' losses exceeded those originally budgeted.  For example, a spreadsheet entitled "Acute Programs w/Negative EBIT" shows that of the eighteen hospitals listed, ten had been budgeted for losses. By September 2010, all of the hospitals listed were losing money, many well in excess of their budgeted losses.  According to Mr. Flanagan, Fresenius did not try to recoup these losses, even though some of the losses exceeded a million dollars per year.

31.  It is important to understand that the anticipated losses reflected on these spreadsheets were approved in advance by corporate management as part of an annual budget cycle that began in June or July and concluded after the New Year.  Regional managers proposed budgets to corporate headquarters that included planned losses from hospital contracts.  Those losses would be approved by corporate as part of the regions' budgets for the year.  The spreadsheets referenced in Paragraph 30 showing hospitals with negative EBIT were prepared on

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

a monthly basis by a financial analyst in Fresenius' Waltham, Massachusetts headquarters. The spreadsheets were reviewed by mid-level and upper management, from regional managers to the Business Unit's Vice President in corporate headquarters. While the spreadsheets referenced in Mr. Flanagan's possession are from the Western Business Unit, Mr. Flanagan knows through conversations with his colleagues who held equivalent positions in the other Business Units that the decision to run hospital programs at a loss was a nationwide program, and that other spreadsheets for other geographical regions will show the same budgeted losses.

32.  The losses resulted from the fact that FMCNA chose not to charge the hospitals for many of the costs it incurred in delivering services. For example, although the standard was to charge nursing fees at $40 per hour, in many regions FMCNA would  incur costs of up to $75 an hour, which the Company did not pass on to the hospitals. And, Fresenius was frequently required to pay for additional nursing time while nurses were waiting for doctors' orders to begin treatments, costs that were also not charged to the hospital. Fresenius routinely waived ancillary fees, such as for tubing, dialysis equipment, treatment cancellation fees, removal of dialysis catheters and other ancillary services.

33.  If Mr. Flanagan tried to include fees for the ancillary services in proposed hospital contracts, his proposal would frequently be vetoed by the Regional Vice Presidents ("RVP") who were responsible for approving the terms of hospital contracts. Eventually, Mr. Flanagan asked the RVPs to simply tell him what they were willing to charge the hospitals, which usually translated into the provision of services substantially below costs. Mr. Flanagan would then negotiate those rates instead of following the prices set forth in the sample contract.  As noted, these RVPs had an incentive to accept a loss in a hospital contract that would result in more growth for individual clinics, ultimately bringing in much more revenue.  Fresenius also

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036
———
202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311
———
703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852
———
301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785
———
301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202
———
410-539-1122
FAX: 410-547-1261

routinely waived escalator provisions in contracts that called for cost increases upon renewal. FMCNA made a calculated decision not to charge for these services and supplies, because their main interest was generating patient referrals and revenue for outpatient clinics from the hospitals, not making money from the hospital contracts themselves.

34.   Mr. Flanagan and other market development directors learned in Fresenius compliance training that all services had to be provided at fair market value ("FMV") and that providing free services in exchange for referrals was against Company policy, and would likely be considered a kickback.  When Mr. Flanagan discussed his concerns about pricing hospital contracts below cost with management, he was told that this was the Company's "policy" and he was urged to go along with that policy.  FMCNA knew that the hospital contracts resulted in referrals, as the free-standing clinics all were required to track the source of their new patients in Proton (a dialysis electronic medical record system which may now be referred to as "Chairside") and other electronic databases used by Fresenius to track treatment information, including AMI and eCube Clinicals.

35.   The information in these databases, which also included information about referrals generated by Fresenius' medical directors, was reported to FMCNA headquarters.   There was no separate report tracking admissions specifically by inpatient program, a reflection, Mr. Flanagan believes, of Fresenius' understanding that providing inpatient dialysis services below cost was illegal under the AKS.  But mid-level management (Regional, Area and District Managers) kept close tabs on where new patient admissions originated, through frequent calls with clinic managers.  Through these conversations, management was well aware of which clinics were adding patients from hospital programs serviced by Fresenius.

LAW OFFICES
ASHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
3 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

36. There were many hospitals in the Western Business Unit that ran at a loss. Mr. Flanagan estimates that up to 65% of the hospitals at any given time were in the red. FMCNA was not concerned about these losses as long as the hospital programs generated new patient referrals. Mr. Flanagan remembers one incident in particular where he discovered losses of one million dollars ($1,000,000) above those budgeted in a hospital contract that was set to renew in 2007 or 2008. Mr. Flanagan brought this discrepancy to the attention of Regional VP Susan Raulie and told her that he would try to recoup the money from the hospital. Ms. Raulie told him not to do that. Instead, she informed the hospital that if it renewed the contract, FMCNA would waive the fees that were owed. Although the hospital ultimately did not renew the contract, this incident shows how important keeping the hospital contracts, and the referrals they generated, was to Fresenius' bottom line.

37. As noted, profits and losses from the largest hospital programs were reported in a separate spreadsheet that was prepared at headquarters and circulated among upper management at Fresenius. Other hospital program losses existed, but may not be as obvious, because some of the smaller acute programs were buried in regional profit and loss statements for Fresenius' free-standing clinics. The numbers (revenues and costs) for each clinic or acute program will not necessarily be broken out separately on these spreadsheets. The losses would have to be tracked by comparing patient records to the charges billed to the hospital. (Patient treatment logs will reflect services and supplies rendered to the individual patients.) The patient records will reveal services rendered but not billed to the hospital. The inclusion of acute programs in profit and loss statements for free-standing clinics would be consistent with Mr. Flanagan's understanding that Fresenius was not as concerned about profit or losses as it was with growing the patient population. It is interesting to note that Fresenius does report the hospital business as a separate

LAW OFFICES
3HCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

line item on its financial reports to shareholders, with revenues of approximately $400 million in 2012. This suggests that Fresenius has the capacity to track revenue separately for the acute program and that, in turn, may mean that the Company does, in fact, track losses for all of these acute programs as well, not just for those hospitals reflected on the spreadsheets referenced in Paragraph 30.

38. Mr. Flanagan recalls that the pressure to secure and retain hospital contracts became especially intense in late 2009 to early 2010. In January, 2010, there were open discussions within his group about management's decree that Fresenius "will not lose another hospital contract at any cost." There were overt reminders from Donna McCarthy, Fresenius Senior Vice President of Operations and President West Division, and others to the marketing directors that "if you lose a hospital, we lose referrals." According to Mr. Flanagan, Marketing Directors were instructed to concentrate their efforts on hospitals that performed significant numbers of dialysis treatments every year, such as those hospitals listed on an Excel spreadsheet entitled "West Top Hospital By Volume 2009." Fresenius also concentrated on securing exclusive contracts at hospitals where Fresenius medical directors had privileges, as patients would be more likely to follow their doctors to a dialysis clinic after they were discharged.

39. Mr. Flanagan also alleges that Fresenius is involved in improper remuneration relationships with physicians who serve as medical directors at Fresenius clinics. These problematic physician relationships generally break down into two areas. First, private nephrologists whose patients will eventually require dialysis are asked to serve as medical directors of Fresenius clinics. Based upon Mr. Flanagan's observations, these physicians were generally paid in excess of fair market value for the services they actually rendered, in return for a promise to refer all of their patients to Fresenius clinics. For example, medical directors

LAW OFFICES

SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

frequently did not even attend monthly staff meetings at the clinics they supposedly directed and their involvement was often limited to monthly review of documents that required a medical director's signature.

40.   Second, these same doctors are often provided with opportunities to rent office space that they own to Fresenius at above or at the very top of fair market value, and with leases that are guaranteed for 15 years whether or not the Fresenius clinic continues in business, an arrangement that is not commercially reasonable.   In fact, the vast majority of Fresenius clinics are located in physician buildings.   These two remuneration opportunities taken together provide a substantial inducement to these physicians to make the expected referrals.   The medical director agreements include provisions that the physicians may not serve as medical director of a competing (Davita or other) clinic within a certain geographic area.   The contracts also provide that if Fresenius opens another clinic within that area, the physicians have the right of first refusal to serve as medical director of the second clinic.

41.   The proof that Fresenius is paying above fair market value and that the medical director contracts were designed to secure referrals is two-fold.   First, medical director compensation is tied indirectly to the number of patients enrolled in the Fresenius clinic.   The medical director's compensation will be higher if the number of patients and the number of shifts per day at the clinic is higher.   More patients and more shifts obviously translate into more revenue to Fresenius.   This provides the medical directors with a clear incentive to place more patients into the Fresenius clinics they supervise.   Furthermore, Fresenius pays more for medical director compensation at clinics that are not joint ventures with physicians.   The fact that medical director compensation is lower where the physician actually shares the cost of his or her compensation through his or her joint venture (ownership) agreement shows that where there are

LAW OFFICES
SHCRAFT & GEREL, LLP
SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

17

arms-length negotiations between two more or less equal parties, a lower compensation rate results. Another barometer of FMV can be found through comparison with Davita, which, on average, pays much less to medical directors and has a much higher number of joint ventures with physicians.

42. The above FMV rentals and extended guaranteed lease agreement payments are other ways for Fresenius to give physicians an incentive to refer patients to Fresenius clinics. These arrangements also have the effect of discouraging physicians from insisting on joint ventures, a business form that Fresenius has been reluctant to employ. Through the high medical director compensation and favorable lease agreements, Fresenius can buy loyalty without having to split profits in the dialysis business with physicians through joint ventures.

43. Mr. Flanagan notes that Fresenius has been very generous with payments to medical directors, often paying the physicians for months, and sometimes years, before a clinic is fully operational. Medical directors can be paid at their full contract rate for up to two years before Medicare certifies a clinic, during which time the medical director may only be supervising the care of a small number of commercial pay patients (Medicare patients may not be admitted until the clinic is certified). Mr. Flanagan specifically recalls a case in Abilene, Tx, where Fresenius paid a doctor for a long period of time before the clinics where he was to serve as medical director opened. That also happened in Maryland, where FMCNA paid a doctor for up to a year before the clinic was approved and operational. Mr. Flanagan believes there are other examples where FMCNA may have provided loans to physician groups or paid their start-up expenses in order to insure their loyalty and patient referrals. The physicians' referrals were all tracked in the same way as the referrals from hospital programs, through entries in Proton and frequent conversations between mid-level managers and clinic managers.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

44. As with the hospital contracts, there were explicit conversations among Fresenius top management, linking payments to medical directors to referrals.  Mr. Flanagan recalls both Donna McCarthy and Brian Gauger, Fresenius Senior Vice President for Physician Strategies, commenting that "we are paying these doctors good money and they should be growing our clinics," or words to that effect.  Mr. Flanagan has also learned from a former Fresenius colleague that there were specific discussions, and even may be emails, reflecting Tony Lafata's, (Fresenius Vice President for Physician Strategies) efforts to bring Dr. Morgan, a nephrologist in Bryant, Texas, on board as a medical director in that town in order to secure the referral of his patients to a new Fresenius clinic.  Those efforts included the payment to Dr. Morgan of $95,000 a year for the two year period before the clinic was actually up and running.

45. There is no question that this kickback scheme resulted in billings to Medicare, and to other federal health benefit programs.  As noted, 70 to 75% of the patients treated at Fresenius clinics had their dialysis treatment paid for by Medicare and nearly all ESRD patients become Medicare patients after a 30 month coordination of benefits period.   The entire rationale for the provision of below cost services to hospitals is to induce the referral of patients to Fresenius clinics.

46. Fresenius' filings with the SEC show that in the years relevant to this Complaint, over 50% of Fresenius' total revenue came from Medicare and Medicaid combined.  In 2008, 57.40% of Fresenius' revenue (in North America) came from those payors; in 2009 the total was 53.60%; in 2010 the total was 52.80%; 2011 52.10% and in 2012 52.50%.  Fresenius' net revenues for dialysis treatments for the same years ranged from $6 billion to $8 billion.  Medicare and Medicaid contributed between $3 billion to $4 billion to Fresenius' bottom line each year during the years relevant to this Complaint.  A percentage of that revenue directly

LAW OFFICES

SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

resulted from the submission of claims that were tainted by the kickback scheme described above.

47.   There is also no question that the kickback scheme results in the submission of false claims to Medicare and Medicaid.  As Mr. Flanagan personally knows, Fresenius enters all information about the treatment of a particular patient on a particular day in one of several computer databases maintained by Fresenius, after the patient has finished his or her treatment for the day.  That information is then imported into another database called Medical Manager, which translates the treatment into standard CPT, HCPCS and Revenue Codes which is then submitted electronically to the fiscal intermediary for submission to Medicare and Medicaid.  An example of a typical claims form printed from Fresenius' electronic claims submission system is attached to this Complaint as Exhibit 1.

48.   As noted above, each Fresenius clinic enters into a Provider Agreement with Medicare which is entitled "Medicare Enrollment Application/ Institutional Providers CMS Form-855A."  That Provider Agreement informs the provider of criminal and civil penalties for falsifying information "contained in any communication supplying information to Medicare."  In signing the Agreement, the provider certifies that it "agree[s] to abide by the Medicare laws, regulations, and program instructions that apply to this provider . . . . [and] I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-kickback Statute and the Stark Law), and on the providers compliance with all applicable conditions of participation in Medicare."  Submission of a claim that violates the AKS is false as a matter of law.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
0 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

49. By virtue of the acts described above, Fresenius has violated the False Claims Act and the United States has been damaged.

**COUNT I**
**FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)**

50. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 49 of this Complaint.

51. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

52. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, and made, used or caused to be made or used false records and statements material to false claims. Each claim for reimbursement of defendant violated 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B) and caused the federal government to pay it funds to which it was not entitled.

53. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by the defendant, has paid and continues to pay the defendant for claims that are tainted by remuneration relationships that violate the AKS, reimbursement to which the Defendant is not entitled.

54. By reason of the defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
) EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261

## PRAYER

WHEREFORE, plaintiff-relator Flanagan respectfully requests that the Court enter judgment in his favor and in favor of the United States of America against defendant FMCNA, awarding treble damages, penalties of $10,000 per false claim, and awarding Relator twenty five percent of the recovery as well as his costs and attorneys fees incurred in this action, all together with prejudgment and post-judgment interest and such other further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, the United States of America, on relation of plaintiff-relator Flanagan, hereby demand trial by jury on all issues so triable.

Respectfully submitted,

Nathan M. Peak, Esq. (MD Bar #17061)
ASHCRAFT & GEREL, LLP
4301 Garden City Drive, Suite 301
Landover, MD  20785
Tel:  (301) 459-8400
Fax:  (301) 459-1364
npeak@ashcraftlaw.com

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
0 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX: 410-547-1261