## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **MARTIN FLANAGAN**<br>    **Plaintiff-Relator,**<br><br>**v.**<br><br>**FRESENIUS MEDICAL CARE HOLDINGS, INC., d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA,**<br><br>    **Defendant.** | **Civil Action Number**:  **14-cv-665-GLR**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(Jury Trial Demanded)** |

### FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................5

II.    JURISDICTION AND VENUE ................................................................7

III.   PARTIES ...................................................................................................8

IV.    BACKGROUND ........................................................................................9

       A.     End-Stage Renal Disease ("ESRD") and Dialysis...................................9

       B.     Medicare Program Reimbursements for Treatment of ESRD ...............10

       C.     Medicaid Program Reimbursements for Treatment of ESRD ...............14

V.     STATUTORY BACKGROUND .............................................................17

       A.     The Federal False Claims Act................................................................17

       B.     The Anti-Kickback Statute ...................................................................19

VI.    LEGAL GUIDANCE UNDER THE AKS ..............................................22

       A.     Below- or No-Cost Services to Hospitals to Obtain Referrals Violate the AKS...23

       B.     Physician Remuneration Intended to Induce Referrals Violates the AKS ...........25

       C.     Lease Arrangements Intended to Induce Referrals Violate the AKS ...................27

       D.     JVAs Intended to Induce Referrals Violate the AKS ...........................28

VII.   FRESENIUS' FRAUDULENT SCHEMES...........................................29

       A.     Fresenius Provides Below-Cost and No-Cost Services to Hospitals to Secure Patient Referrals..........................................................................29

              1.     Fresenius Enters into Unprofitable and Below-Cost Hospital Acute Dialysis Contracts in Order to Induce Patient Referrals ...........................29

              2.     Fresenius Provided Hospitals with Significant Free Services to Ensure a Steady Flow of Referrals ........................................................47

                     a.     Bridge Program to Induce Referrals ............................. 47

                     b.     Free TOPs Education Services to Induce Referrals.................. 56

                     c.     Other Free and Below-Cost Services Provided to Hospitals to Induce Referrals .............................................................. 56

|  | 3. | Fresenius Tracked the Success of Its Inpatient Acute Contracts in Inducing Referrals to Its Outpatient Clinics...................................................................59 |

B. Fresenius' Improper Remuneration Relationships with Physicians Who Served as Medical Directors in Fresenius Outpatient Clinics.................................................61

|  | 1. | The Role of the Medical Director in Dialysis Clinics................................62 |
|  | 2. | Fresenius Selected Medical Directors for Its Outpatient Clinics Based Upon the Number of Expected and Historical Referrals ...........................64 |
|  | 3. | Fresenius Paid Medical Directors at Its Dialysis Facilities Well Above FMV to Reward Referrals.........................................................................71 |
|  | 4. | Fresenius Made No Effort to Report or Verify Hours Spent by Medical Directors...................................................................................................78 |
|  | 5. | Fresenius Carefully Tracked Referrals from Medical Directors to Make Sure They Were Not Referring Patients to Competitors ...........................81 |
|  | 6. | Fresenius Required Medical Directors to Sign Onerous Non-Compete Agreements That Locked Them and Their Practices into Long-Term Illegal Remunerative Arrangements ........................................................85 |

C. Fresenius Used MDAs to Induce Referrals from Medical Directors and Their Practice Groups Around the United States ............................................................89

|  | 1. | MDAs Used to Induce Referrals in California .........................................89 |
|  |  | a. | Diablo Nephrology.........................................................................90 |
|  |  | b. | Balboa Nephrology Medical Group................................................93 |
|  |  | c. | South Bay Nephrology....................................................................94 |
|  | 2. | MDAs Used to Induce Referrals in Illinois ............................................95 |
|  | 3. | MDAs Used to Induce Referrals in Indiana...........................................101 |
|  | 4. | MDAs Used to Induce Referrals in North Carolina...............................105 |
|  | 5. | MDAs Used to Induce Referrals in Texas .............................................110 |
|  | 6. | MDAs Used to Induce Referrals in Washington State ...........................113 |

D. Free or Below-Cost Practice Management Services to Induce Referrals...........119

E. Favorable Leases with Medical Directors to Induce Referrals...........................124

F.    Fresenius Entered into JVAs with Referral Sources in Order to Further Induce Referrals ...................................................................................................................128

    1.    Fresenius Intentionally Chose Joint Venture Partners Based Upon Their Ability to Make Referrals to Fresenius Dialysis Clinics .........................130

    2.    Fresenius Manipulated the Valuation for Joint Ventures to Decrease Physicians' Contribution and Increase Their Profits ..............................139

    3.    Fresenius Locked Joint Ventures into Non-Competition Agreements to Ensure Patient Referrals ........................................................................140

COUNT I ............................................................................................................................142

COUNT II ...........................................................................................................................143

COUNT III ..........................................................................................................................144

PRAYER FOR RELIEF ....................................................................................................144

DEMAND FOR JURY TRIAL .........................................................................................145

Plaintiff and *qui tam* Relator Martin Flanagan ("Relator," "Plaintiff-Relator," or "Mr. Flanagan"), through his counsel and on behalf of the United States of America, in this First Amended Complaint against Defendant Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America ("Defendant," "FMCNA," "FKC," "FMC," or "Fresenius"), alleges as follows:

## I.   <u>INTRODUCTION</u>

1.     This action is brought by Relator Martin Flanagan on behalf of the United States of America to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*.  Relator seeks to recover damages and penalties arising from FMCNA's fraudulent claims for reimbursement submitted to Medicare and state Medicaid agencies (collectively, "Government Health Care Programs").

2.     Fresenius defrauded the government by, *inter alia*:

- Knowingly offering remuneration to hospitals in the form of no-cost or below-cost items and services (including but not limited to free discharge planners) in connection with the provision of inpatient dialysis care to ESRD patients, at least one purpose of which was to secure referrals from those hospitals for patients who would enter outpatient care at Fresenius dialysis clinics, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS") and which did not meet safe harbor requirements; and

- In violation of the AKS (and which did not meet safe harbor requirements), knowingly offering remuneration to physicians (at least one purpose of which was to reward or induce referrals from those physicians to Fresenius' network of outpatient clinics), including: medical director agreements ("MDAs") that were

well above fair market value ("FMV") or commercially unreasonable; free patient education services and/or free or below-cost practice management services (including free recruitment services for new nephrologists entering the workforce); lease agreements that were commercially unreasonable and not at FMV ; and joint venture agreements ("JVAs") in outpatient dialysis clinics that were commercially unreasonable and not at FMV.

3.     The AKS was intended to protect Federal health care program beneficiaries from the corrupting influence of money on medical decision-making and referral decisions. The statute is designed to guard Federal health benefit programs from anticompetitive arrangements which reduce patient choice, resulting in overutilization, increased cost of services, and poor quality of care.  Because these consequences may be difficult to trace, Congress enacted a blanket prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

4.     The AKS prohibits offering remuneration to referral sources when one purpose is to induce the referral of patients for services billed to a Federal health care program (defined at 42 U.S.C. § 1320a-7b(f)), even if the remuneration serves other, apparently legitimate purposes.  At least one purpose in Fresenius' offering hospitals free or below-market goods and services and entering into MDAs, JVAs, and other financial relationships with referring physicians that were not at FMV and/or were not commercially reasonable was to induce the referral of patients whose ESRD care would be billed to Federal health benefit programs in violation of the AKS.  At all relevant times, Fresenius had knowledge of and failed to abide by significant government guidance that warned against the very behavior in which it engaged.

5. Fresenius' use of financial inducements and rewards to gain referrals interfered with medical decision-making and patient choice, causing patients to be directed not to the care that was most beneficial for their overall health and well-being, but which was instead most beneficial to their providers' and Fresenius' bottom lines. Fresenius' various schemes, described in detail below, treated patients as chattel who could be directed to treatment options that were the most lucrative for it financially, and which preserved and enhanced its substantial financial relationships rather than the patients' choice.

6. Any claims submitted (or caused to be submitted) by Fresenius for services tainted by these illegal kickbacks are statutorily ineligible for reimbursement by the Medicare Program, Medicaid Program, or other Federal health care programs and, as such, were material to the Federal government's payment decision.

## II. **JURISDICTION AND VENUE**

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions, such as this, brought pursuant to 31 U.S.C. § 3730(b) for violations of § 3729.

8. Within the meaning of 31 U.S.C. §3730(e)(4)(A), there has been no public disclosure of the "allegations or transactions" in this First Amended Complaint. In the alternative, if the Court were to find a public disclosure, Relator Flanagan is an original source under 31 U.S.C. § 3730(e)(4)(B) with independent knowledge that materially adds to any public disclosure which was provided to the Government prior to filing this action.

9. This Court has personal jurisdiction over Fresenius and this judicial district is a proper venue pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Fresenius can be found

in, resides, transacts, and has transacted business in the state of Maryland.  Fresenius has thirty-nine freestanding dialysis clinics in the state of Maryland.

10.     Venue is proper because, at all times relevant to this First Amended Complaint, FMCNA has regularly conducted substantial business within the District of Maryland and has generated significant revenue within the District.  31 U.S.C. § 3732(a).

## III.    **PARTIES**

11.     Plaintiff-Relator Martin Flanagan is a resident of the state of Texas.  Mr. Flanagan was employed by Fresenius for twenty-nine years.  His last title was Director of Acute Market Development for the Fresenius Western Business Unit.  In that role, Mr. Flanagan was responsible for, among other duties, negotiating contracts under which FMCNA provided dialysis treatment to hospital inpatients.

12.     Plaintiff-Relator has direct knowledge of the conduct alleged in this First Amended Complaint and conducted an independent investigation to uncover false claims submitted to the United States.  Accordingly, Relator is an "original source" of the non-public information alleged in this First Amended Complaint within the meaning of the Federal FCA.

13.     FMCNA is a wholly-owned subsidiary of Fresenius Medical Care AG & Co. KGaA, which is located in Bad Homburg, Germany.  Fresenius Medical Care AG & Co. KGaA is a registered partnership.  FMCNA is headquartered in Waltham, Massachusetts.  FMCNA employs over 40,000 employees and treats nearly 190,000 patients at its roughly 2,400 outpatient dialysis clinics in the United States, including thirty-nine in this District.  FMCNA reported revenue of over $7 billion in 2008 and is America's largest dialysis services provider.

IV.    **BACKGROUND**

A.    **End-Stage Renal Disease ("ESRD") and Dialysis**

14.    Chronic kidney disease ("CKD," also termed "chronic renal disease") refers to the progressive loss of a person's kidney function.  The loss of kidney function is normally irreversible.  CKD is often detected among those with high blood pressure or diabetes, and it can lead to cardiovascular disease or anemia.  Anemia is a decrease in the normal number of red blood cells and/or hemoglobin in a person's blood.

15.    End-Stage Renal Disease ("ESRD") is the stage of advanced kidney impairment that requires either continued dialysis treatments or a kidney transplant to sustain life.  According to the United States Renal Data System, there were approximately 746,557 ESRD patients in the United States at the end of 2017.

16.    A person with CKD is typically classified into one of five stages of severity, with stage 5 being the most dire.  At stage 5, a patient is considered to have ESRD, also called chronic kidney failure.  The treatment options available to persons suffering ESRD are usually limited to dialysis treatment or a kidney transplant.

17.    Several hundred thousand Americans regularly undergo a regimen of dialysis treatments to combat ESRD.  Dialysis (from the Greek "dialusis," meaning dissolution) refers to a treatment regimen aimed at artificially replacing some of the functions performed by a healthy kidney.  During dialysis, a patient's blood is gradually pumped through a device called a dialyzer that filters out excess water, solutes, and toxins, before being returned to the body.

18.    Roughly ninety percent of all dialysis patients undergo hemodialysis at a dialysis clinic three times per week.  For these patients, in addition to the dialyzer treatment described above, separately injectable medications including Epogen (a brand name for a synthetic form of erythropoietin) and Vitamin D analogs such as Zemplar (the brand name for paricalcitol, the

dominant analog product) are usually administered, along with other injectable medications to treat side-effects of ESRD, including anemia and vitamin deficiencies.

**B.**     **Medicare Program Reimbursements for Treatment of ESRD**

19.     Medicare is a federally-funded health insurance program primarily benefitting the elderly, but also benefitting patients with ESRD.  The program pays for the costs of certain health care services and items for eligible beneficiaries based on age, disability, or affliction with ESRD. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted.

20.     The Medicare program has four parts: Part A, Part B, Part C, and Part D. The relevant parts in this case are Medicare Parts A and B.  Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, if the services are medically necessary and directly and personally provided by the provider.

21.     The Medicare program provides benefits for all patients with ESRD.  Individuals who are otherwise ineligible for Medicare become eligible when they develop ESRD.  Medicare Part B covers dialysis services provided in outpatient clinics.

22.     Modern dialysis to treat ESRD was beyond the financial reach of most Americans until a 1972 amendment to the Social Security Act extended Medicare dialysis coverage to nearly all ESRD patients regardless of age or other factors.  Medicare has since been the primary payor for more than 80% of the cost of dialysis treatment for nearly 800,000 ESRD patients in the United States.

23.     ESRD expenditures by Medicare exceed $40 billion annually.

24.     Since 1983, Medicare has reimbursed providers a composite rate for outpatient maintenance dialysis services, which most patients receive three times per week at clinics such as

those owned by Fresenius.  This composite rate reimburses average provider costs associated with a single dialysis treatment, including nursing and other clinical services, social services, supplies, equipment, and some laboratory tests and drugs.[1]  Certain injectable drugs remained outside the composite payment until January 1, 2011.[2]  After January 1, 2011, those previously separately billable drugs were bundled into the composite rate, and the composite rate was increased to take into account the providers' costs for these drugs.  Medicare also pays separately for medically necessary laboratory tests in excess of the frequency taken into account in setting the composite rate.

    25.    The Medicare ESRD program is administered through the Centers for Medicare & Medicaid Services ("CMS"), an agency within the Department of Health and Human Services ("HHS").  CMS-contracted fiscal intermediaries process and pay Medicare Part B reimbursement claims to providers such as FMCNA for dialysis treatments, separately billed injectable drugs, and laboratory tests.[3]

    26.    All ESRD-related services and supplies are paid to the ESRD facility through the ESRD prospective payment system.  Other entities providing ESRD related services, including laboratories, suppliers, and physicians billing for ESRD related drugs must look to the ESRD facility for payment.[4]

---

[1] 42 U.S.C. § 1395rr.

[2] *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Claims Processing Manual, Chapter 8 - Outpatient ESRD Hospital, Independent Facility, and Physician/Supplier Claims* (hereinafter "*Medicare Manual*") § 60 ("An item or service is separately billable if its cost was specifically excluded from cost data used to calculate the composite rate."), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c08.pdf.

[3] 42 C.F.R. § 413.174(f).

[4] *Medicare Manual*, *supra* note 2, § 10.

27.     There are two base composite rates: one for hospital-based ESRD facilities and a separate lower rate for independent facilities.  Each of these base rates is composed of a labor and a non-labor portion.  The facility's composite rate is a comprehensive payment for all modes of in-facility dialysis, hemofiltration, and home dialysis except for bad debts, physicians' patient care services, and certain laboratory services and drugs that are separately billable.  This payment is subject to the normal Part B deductible and coinsurance requirements and it must be accepted as payment in full for all items and services covered by the composite rate.[5]

28.     FMCNA clinics and other providers treating ESRD submit to the Government one reimbursement claim bill per month for each patient, including the charges for several dialysis treatments, any separately billable laboratory services, and separately billable drugs.

29.     A claim submitted to Medicare for the reimbursement of ESRD treatment contains various data, including the patient's identifying information and line items for each claim sought to be reimbursed.  Each line item includes a revenue code (a four-digit number identifying the category of services provided), a brief description of each procedure or service, a Healthcare Common Procedure Coding System ("HCPCS") code describing a particular procedure or service, the number of service units, and the total charges sought to be reimbursed for each line item.  Health care providers treating ESRD, including Fresenius clinics, universally submit claims to Government Health Care Programs using a Form UB-04 (or a substantially similar form), an example of which is appended to this First Amended Complaint as Exhibit A.

30.     Additionally, as an independent renal dialysis facility, FMCNA is required to submit annual Medicare cost reports (CMS-Form-265-2011, or "Form-265"), which disclose cost data and include an express certification of compliance with all applicable laws as a condition of

---

[5] *Id.* § 10.1.

coverage by Medicare.  Cost reports are due on or before the last day of the third month following the close of the period covered by the report.  Any ESRD facility failing to submit the cost reporting form within the specified time periods is subject to a suspension of its Medicare reimbursement.[6]  Medicaid and other Federal and state health care programs also require the annual submission of cost reports.

31.      The Form-265 cost report is required from all dialysis facilities that submit bills to and receive payment from the Federal government. The Form-265 cost report includes the following express certification of adherence to Federal laws and regulations:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL, AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL, AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.
>
> CERTIFICATION BY CHIEF FINANCIAL OFFICER OR ADMINISTRATOR OF PROVIDER
>
> I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by _____ {Provider Name(s) and Provider CCN(s)} for the cost reporting period beginning _____ and ending _____ and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.
>
> (Signed)
> Chief Financial Officer or Administrator of Provider
> Title
> Date

---

[6] *Id.* § 30.5.

32.     Among the items included on the Form-265 are the "Percentage of Customary Work Week Devoted to Business" that medical directors work each week at the dialysis center. According to Medicare Claims Processing Manual, Chapter 8 - Outpatient ESRD Hospital, Independent Facility, and Physician/Supplier Claims, section 40.6: "Based on Medicare program statistics, the median amount of time spent by physicians in ESRD facilities on administrative duties is 25 percent."[7]

33.     The tender of the cost data and the certification in Form-265 are conditions of coverage under the Medicare program.  42 C.F.R §§ 413.20(b), (e), 494.180(h)(3).

34.     Every FMCNA dialysis facility has submitted a Form-265 with the certifications identified above to Medicare every year during the time period relevant to this First Amended Complaint.

35.     Medicare pays 80% of the treatment costs for ESRD patients covered by Medicare. In addition to Medicare and Medicaid (discussed below), other Federal health benefit programs provide ESRD benefits.  CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces and provides ESRD benefits to covered beneficiaries.  CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disabilities and provides ESRD benefits to covered beneficiaries.

### C.     Medicaid Program Reimbursements for Treatment of ESRD

36.     In 1965, Congress established the Grants to States for Medical Assistance Programs, known as Medicaid, under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-

---

[7] *Id.* § 40.6.

1396w-2 ("Medicaid Program").  The Medicaid Program provides medical and health-related assistance for society's neediest and most vulnerable individuals.

37.    Medicaid is administered at the Federal level by the Secretary of HHS, through CMS, formerly known as the Health Care Financing Administration ("HCFA").  The Secretary promulgates rules and regulations for all participants, and monitors the states' compliance with these rules and regulations.

38.    Medicaid is a state-administered program where each state sets its own guidelines regarding eligibility and services, with funding coming jointly from the states and the United States.[8]

39.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily low-income and disabled persons.  The Federal involvement in Medicaid includes providing matching funds and ensuring that the states comply with minimum standards in the administration of the program.  The Federal share of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on each individual state's per capita income compared to the national average.  Among the states, the FMAP is at least 50 percent, and in some instances, as high as 77 percent.  To qualify for these Federal matching funds, each state must submit a plan to the Secretary of the Department of Health and Human Services for approval.[9]

40.    Through the FMAP process, state Medicaid administrators obtain the Federal government's share of the ECPs' reimbursements by submitting a quarterly Form 64 to CMS.  For

---

[8] *See* 42 U.S.C. § 1396b.
[9] *See* 42 C.F.R. § 430 Subpart B, and § 488.303.

this reason, claims submitted to state Medicaid agencies are presented to the Federal government within the meaning of the FCA.

41.     The Federal government also "approves" within the meaning of the FCA the claims submitted and paid through the Medicaid program.  When a state presents its Form 64 (*i.e.*, the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the state paid will be included in those reports.  Based on the information in the reports, CMS determines and approves whether the claims that the state paid with Federal funds were appropriate.  If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of the erroneously expended funds by reducing the amount of money provided to the state during the next quarter.

42.     Because the Form 64 constitutes the United States' means for approving and paying the amount of Federal funds expended by the state, these reports overstated the amount of Federal funds to which the state was entitled by the amount fraudulently paid as a result of the kickbacks paid by Fresenius.  They were, therefore, false records or statements that Fresenius caused to be made or used to get false claims paid and approved by the United States.

43.     Medicaid's general coverage parameters condition both participation and payment under the program upon compliance with certain laws intended to ensure the integrity of the program including the AKS.[10]  In addition, Medicaid's general coverage parameters also exclude items that are not "provided economically and only when, and to the extent, medically necessary."[11]

---

[10] 42 U.S.C. § 1320a-7(b), discussed *supra*.
[11] 42 U.S.C. § 1320c-5(a)(1).

44.     Submission of claims to Medicaid which were ineligible for payment because of violation of the AKS are actionable under the Federal FCA because the payments of those claims were made with Federal funds.

45.     In many states, Medicaid pays for treatment costs for ESRD patients who do not qualify for Medicare and/or pays for the 20% of treatment costs not covered by Medicare.

## V.     STATUTORY BACKGROUND

### A.     The Federal False Claims Act

46.     The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three times the amount of loss the Government sustained and penalties which range between eleven thousand six hundred sixty-five dollars ($11,665) and twenty-three thousand three hundred thirty-one dollars ($23,331) per claim.[12]  For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person … (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."[13] "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA.[14]

47.     The Federal FCA makes it unlawful for any person to defraud the Government and cause it to pay money it otherwise would not pay.[15]  Relator alleges liability under three of the FCA's seven liability provisions.

_____

[12] 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5.
[13] 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).
[14] *Id.* § 3729(b)(1)(B).
[15] *See* 31 U.S.C. § 3729 *et seq.*

48.     Fresenius is liable to the United States under the FCA's "presentment" provision,[16] which imposes liability when a defendant (1) made, or caused to be made, a claim, (2) that was false or fraudulent, (3) knowing of its falsity.

49.     Fresenius is also liable to the United States under the FCA's "false records or statements" provision,[17] which imposes liability where a defendant (1) made, used, or caused to be made or used, a record or statement, (2) that was knowingly false, and (3) that was material to a false or fraudulent claim.

50.     And, Fresenius is liable to the United States under the FCA's conspiracy provision,[18] for conspiring with the other persons and entities identified in this First Amended Complaint (and others), especially the physicians to whom it paid remuneration in exchange for referrals, to knowingly present, or cause to be presented, false or fraudulent claims to the Federal health care programs for payment or approval, and made, used, or caused to be made or used false records and statements material to false claims.

51.     Fresenius made, or caused health care providers to present, claims for payment to Federal health care programs, where the claims were "false or fraudulent" because they were the result of its having illegally induced the providers to refer patients to its dialysis clinics.[19]  In connection therewith, Fresenius made (or caused health care providers to make) false records or statements material to the false or fraudulent claims, in particular records or statements promising and/or certifying compliance with all applicable laws including the Anti-Kickback Statute.[20]

---

[16] *Id.* § 3729(a)(1)(A).
[17] *Id.* § 3729(a)(1)(B).
[18] *Id.* § 3729(a)(1)(C).
[19] *Id.* § 3729(a)(1)(A).
[20] *Id.* § 3729(a)(1)(B)

52.     The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government.[21]

53.     Fresenius acted knowingly within the meaning of the FCA.  As the architect of the fraudulent scheme, Fresenius knew at least one purpose of its payments to health care providers was to induce or reward referrals to its clinics.  Fresenius knew that statutory and regulatory requirements forbade this practice.  Nevertheless, Fresenius submitted claims (or caused others to submit claims) for reimbursement to Federal health care programs for services that were tainted by these unlawful kickbacks.

### B.     The Anti-Kickback Statute

54.     The Federal Anti-Kickback Statute ("AKS") prohibits the payment, in any form, whether direct or indirect, made in part or in whole to induce or reward the referral or generation of Federal health care business.

55.     The AKS prohibits the offer or payment of "anything of value" in return for referrals.  A "thing of value" is defined broadly to include payment in cash or kind.  The AKS extends equally to the solicitation or acceptance of payments and to offers to pay and to actual payments for referrals.  Under the AKS, both criminal and civil penalties apply, including civil monetary penalties, and the sanction of exclusion from Federal health benefit programs.  The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization, affect medical judgment, and restrict competition, ultimately resulting in poor quality of care being delivered to patients.

---

[21] *Id.* § 3729(b)(1).

56.     In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Federal health care programs any claim for referrals that are induced by kickbacks.

57.     "Although many compensation arrangements are legitimate, a compensation arrangement may violate the anti-kickback statute if even one purpose of the arrangement is to compensate a physician for his or her past or future referrals of Federal health care program business."[22]

58.     In enacting the Patient Protection and Affordable Care Act ("PPACA"),[23] Congress made clear that a claim to a Federal health care program that violates the AKS is *per se* a false or fraudulent claim under the FCA.[24]   Although the PPACA is not retroactive, it "clarified, but did not alter, existing law that claims for payment made pursuant to illegal kickbacks are false under the False Claims Act."[25]   In the context of an underlying AKS violation, "[t]he Government does not get what it bargained for when a defendant is paid … for services tainted by a kickback."[26]

---

[22] Dep't of Health & Human Servs., Office of Inspector Gen.,  *Fraud Alert: Physician Compensation Arrangements May Result in Significant Liability* 1 (2015), *available at* https://oig.hhs.gov/compliance/alerts/guidance/Fraud_Alert_Physician_Compensation_06092015.pdf; *accord Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019); *Dhaliwal v. Salix Pharm., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000).
[23] Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 757 (2010).
[24] *See* 42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section … , a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA].").
[25] *United States ex rel. Greenfield v. Medco Health Solutions*, 880 F.3d 89, 95 (3d Cir. 2018) (internal quotation, citation, and alterations omitted).
[26] *Id.* at 97.

59.     Indeed, even prior to enactment of the PPACA, numerous courts had held that compliance with the AKS is a condition of payment under Federal health care programs and that violations of the AKS were therefore actionable under the FCA.[27]

60.     The AKS is a criminal law, violation of which is a felony punishable by up to ten years in prison and fines of up to $100,000.[28]  A criminal conviction under the AKS requires that the violator be excluded from Federal health care programs (*i.e.*, not allowed to bill for services rendered) for at least five years.[29]  In addition, the Government has discretion to exclude from Federal health care programs an entity that violates the AKS, even without a criminal conviction.[30] The Government "routinely punishes AKS violations through criminal proceedings and civil proceedings to recoup funds."[31]

61.     Given the unique importance of the AKS, the widespread acknowledgement by courts that compliance with the AKS affects Federal health care reimbursement decisions, the enactment of Section 1320a-7b(g), and the statutory language precluding payment for claims that are tainted by kickbacks, violations of the AKS are material under the FCA as a matter of law.[32]

---

[27] *See, e.g., United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009); *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005); *United States ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 565 F. Supp. 2d 153, 159 (D.D.C. 2008).

[28] 42 U.S.C. § 1320a-7b(b)(2); *see also United States ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 363 (S.D.N.Y. 2014) ("AKS violations are serious and … not mere technicalities that the government would have forgiven in making reimbursement decisions."); *United States ex rel. Capshaw v. White*, No. 3:12-CV4457, 2018 WL 6068806, at *4 (N.D. Tex. Nov. 20, 2018) ("AKS violations are not the 'garden variety breaches of contract or regulatory violations' that the Supreme Court sought to shield from the wrath of the FCA.").

[29] 42. U.S.C. § 1320-7(a)(1).

[30] *Id.* § 1230-7(b)(7).

[31] *United States v. Berkeley Heartlab, Inc.*, No. CV 9:14-230-RMG, 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017).

[32] *See, e.g., Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019); *Capshaw*, 2018 WL 6068806, at *4; *Berkeley Heartlab*, 2017 WL 6015574, at *2; *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 818 (S.D.N.Y. 2017), *rev'd on other grounds*, 899 F.3d 163 (2d Cir. 2018).

## VI.   <u>LEGAL GUIDANCE UNDER THE AKS</u>

62.   The AKS has statutory and regulatory "safe harbors" that identify specific arrangements that do not violate the statute if all terms of the safe harbors are observed by the parties.   For example, the "personal services" safe harbor permits compensation arrangements between a principal and an agent if, *inter alia*: (1) there is a written agreement between the parties that is signed by the parties; (2) the term of the agreement is at least one year; (3) the agreement covers all of the services to be provided by the agent and sets forth his or her duties with specificity; (4) the aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with FMV in an arms-length transaction, and is not determined by the volume or value of any referrals or business otherwise generated between the principal and the agent; (5) if the agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals; and (6) the aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.[33]

63.   Fresenius' MDAs with physicians do not meet the requirements of the personal services safe harbor, because, *inter alia*, the MDAs are based upon the volume or value of referrals from physicians to Fresenius, are not at FMV for services actually rendered, do not specify exactly the schedule of such services, their precise length, and the exact charge for such intervals, and are not commercially reasonable. Fresenius' other remuneration relationships with physicians, including, but not limited to, JVAs, lease agreements, recruitment assistance, and practice

---

[33] 42 C.F.R. § 1001.952(d).

management services also violate the AKS and fail to meet the requirements of other statutory or regulatory safe harbors).

64.     Fresenius' no-cost or below-cost services to hospitals also do not fall within any statutory or regulatory safe harbor, and, to the extent that those services are designed to induce referrals, and are not offered at FMV, they violate the AKS.

A.      **Below- or No-Cost Services to Hospitals to Obtain Referrals Violate the AKS**

65.     Even a superficial review of Fresenius' hospital contracts demonstrates that they do not contain the legal and operational safeguards necessary for a below-market relationship to survive scrutiny under the AKS.  Fresenius has never completed any meaningful compliance review, FMV analysis, or commercial reasonableness analysis of the contracts at issue, and Fresenius systematically ignored complaints by employees that no cost data was available to ensure that contracts were priced appropriately.

66.     CMS's Office of the Inspector General ("OIG") has issued extensive guidance to providers on the issue of providing below-cost goods and no-cost services.  Under that guidance, services and items provided to referral sources below or at no cost are heavily scrutinized.  The OIG Supplemental Compliance Guidance for Hospitals, issued in January 2005, notes that hospitals should "scrutinize carefully any remuneration flowing to the hospital from the provider or supplier to ensure compliance with the anti-kickback statute."[34]  This Guidance specifically notes that remuneration includes "free or below-market items and services or the relief of a financial obligation" that the provider would otherwise incur.[35]  OIG further instructed hospitals

---

[34] 70 Fed. Reg. 4858, 4868 (Jan. 31, 2005).

[35] *Id.*

to analyze whether the financial relationship is at FMV and fulfills a "legitimate business purpose of the hospital (apart from obtaining referrals)."[36]

67.     OIG also addressed the provision of "free or below market goods or services to actual potential referral sources" in a 2014 bulletin, describing such arrangements as "suspect under the anti-kickback statute because of the implication that one purpose of the payment is to induce ... Federal health care program referrals."[37]  OIG went on to note that "[s]uch intent may be evidenced by the arrangement's characteristics, including its legal structure, it operational safeguards, and the actual conduct of the parties to the arrangement."

68.     A 2011 OIG Advisory Opinion echoes the concerns set forth in the Special Fraud Alert, noting that "OIG's position on the provision of free or below-market goods or services to actual or potential referral sources is longstanding and clear" and that such arrangements are "suspect and may violate the anti-kickback statute, depending on the circumstances."[38]  This Advisory Opinion references OIG's 2005 Supplemental Compliance Program Guidance for Hospitals, stating that arrangements under which hospitals provide physicians with items or services for free or less than fair market value, or that relieve physicians of financial obligations they would otherwise incur, "pose significant risk."[39]

69.     Likewise, OIG Advisory Opinion No. 11-07 considered a service provided free of charge by a drug manufacturer which reminded parents of the need to keep their child's

---

[36] *Id.* at 4866.

[37] Dep't of Health & Human Servs., Office of Inspector Gen.,  *Special Fraud Alert: Laboratory Payments to Referring Physicians* 2 (2014), *available at*  https://oig.hhs.gov/fraud/docs/ alertsandbulletins/2014/OIG_SFA_Laboratory_Payments_06252014.pdf.

[38] Dep't of Health & Human Servs., Office of Inspector Gen.,  *OIG Advisory Opinion No. 11-07* 7 (2011), *available at* https://oig.hhs.gov/fraud/docs/advisoryopinions/2011/AdvOpn11-07-2.pdf.

[39] *Id.*

pneumococcal vaccination current.[40]  OIG ultimately decided that the program did not pose a risk to the program because the arrangement was narrowly tailored, operated transparently, did not target any particular referral sources (*i.e.*, was made available to all health insurers and health care entities), and was unlikely to result in either overutilization or a decrease in patient freedom of choice.[41]  These safeguards are completely absent from Fresenius' acute care hospital contracts, where there is no transparency and particular referral sources have been specifically targeted for the provision of low cost services in order to obtain referrals.

**B.**      **Physician Remuneration Intended to Induce Referrals Violates the AKS**

70.      The AKS and its safe harbors make clear that agreements between physicians and providers like Fresenius that are not at FMV, or that do not reflect payment for services actually rendered and needed, violate the law.  To the extent that Fresenius pays physicians remuneration regardless of whether they actually provide the work called for by their medical director agreements, as described below, the AKS is violated.

71.      To determine whether a financial relationship is lawful, the Federal government will look beyond any written terms to determine whether one purpose of the agreement is to induce referrals.[42]  OIG has also made clear that relationships that are designed with the purpose of obtaining referrals violate the AKS regardless of whether the agreements are at FMV and are commercially reasonable.  In the 2005 *OIG Supplemental Compliance Program Guidance For Hospitals*, for example, OIG noted that "[p]arties to an arrangement cannot obtain safe harbor protection by entering into a sham contract that complies with the written agreement requirement

---

[40] *Id.* at 2-5.

[41] *Id.* at 6-9.

[42] *See, e.g.*, *United States v. Campbell*, No. 08-1951, 2011 WL 43013, at *7-*8 (D.N.J. January 4, 2011); *United States ex rel. Kaczmarczyk v. SCCI Hospital Ventures, Inc*., No H-99-1031, 2004 WL 7089810, at *5 (S.D. Tex. Mar. 11, 2004).

of a safe harbor and appears on paper to meet all of the other safe harbor requirements, but does not reflect the actual arrangement between the parties.  In other words, in assessing compliance with a safe harbor, the OIG examines not only whether the written contract satisfies all of the safe harbor requirements, but also whether the actual arrangement satisfies the requirements."[43] "Importantly, under the anti-kickback statute, neither a legitimate business purpose for the arrangement nor a fair market value payment will legitimize a payment if there is also an illegal purpose (*i.e.,* inducing Federal health care program business)."[44]

72.    OIG repeated this position in the 2014 Special Fraud Alert: "[t]he anti-kickback statute is implicated when a clinical laboratory pays a physician for services. Whether an actual violation of the statute occurs depends on the intent of the parties—the anti-kickback statute prohibits the knowing and willful payment of such amounts if even one purpose of the payment is to induce or reward referrals of Federal health care program business.  The probability that a payment is for an illegitimate purpose is increased, however, if a payment exceeds fair market value or if it is for a service for which the physician is paid by a third party, including Medicare."[45]

73.    OIG reviews several factors to determine if a remuneration relationship is unlawful: (1) whether the relationship is "[]likely to interfere with, or skew, clinical decision making," (2) whether the relationship is "[]likely to increase costs to Federal health care programs or beneficiaries through overutilization or inappropriate utilization," and (3) whether the relationship "rais[es] patient safety or quality of care concerns."[46]  All of these factors are present in the

---

[43] 70 Fed. Reg. at 4864 n.41.
[44] *Id*. at 4864.  This admonition is repeated in OIG's 2003 Compliance Program Guidance for Pharmaceutical Manufacturers.  68 Fed. Reg. 23731, 23734 (May 5, 2003).
[45] Dep't of Health & Human Servs., Office of Inspector Gen.,  *Special Fraud Alert: Laboratory Payments to Referring Physicians* 4 (2014), *available at* .
[46] 42 C.F.R. § 1003.110.

contracts identified in this First Amended Complaint.  Fresenius uses medical director agreements and corollary inducements to obtain referrals to its clinics from physicians without regard for whether treatment at a Fresenius clinic reflects superior patient care or provides a more convenient care options for the patient.

### C.  Lease Arrangements Intended to Induce Referrals Violate the AKS

74.    Under the space lease safe harbor,[47] payments for the use of office space do not constitute remuneration if certain conditions are met.[48]  The lease agreement must be in writing, signed by the parties, and specify the premises to be used.  The term of the lease must be for at least one year.  The rent charged must be set in advance and consistent with fair market value.  The rent charged cannot be determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties.  The agreement must be commercially reasonable even if no referrals were made between the lessee and the lessor.

75.    With respect to rentals and leases, fair market value means the value of rental property for general commercial purposes not taking into account its intended use.  In the case of a lease of space, this value may not be adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor when the lessor is a potential source of patient referrals to the lessee.

76.    Fresenius' lease agreements with physicians were not at FMV and were not commercially reasonable.  Fresenius often leases office space in buildings owned by physicians at above FMV.  These leases are frequently guaranteed for 15 years whether the Fresenius clinic continues in business, and provide for annual escalators of 1% to 10%—arrangements that are not commercially reasonable and provide far greater remuneration to the physicians than justified by

---

[47] *Id.* § 1001.952(b).
[48] *Id.* § 411.357(a).

economic conditions in the market.  Conversely, when Fresenius owns its buildings, it frequently leases office space to its medical directors at rates significantly below FMV—arrangements that are not commercially reasonable and not justified by economic conditions in the market.

**D.**     **JVAs Intended to Induce Referrals Violate the AKS**

77.     Beginning in 1992, OIG has repeatedly expressed concerns about JVAs between health care providers and referral sources.  Those concerns take a variety of forms, and many of OIG's concerns are implicated by Fresenius' JVAs with nephrologists.  For example, OIG has expressed concerns that the profit distributions to investors in JVAs who are also sources of referrals to the joint ventures ("JVs") may represent remuneration for those referrals, in violation of the AKS.[49]  OIG has also been concerned that JVs which include lengthy covenants not to compete may be designed to secure referrals.[50]

78.      HHS OIG has been especially concerned about the valuation of physicians' investment in JVAs using a formula based on the venture's revenue stream because that valuation may lead to a payment based on the value of referrals of Medicare and Medicaid patients that the investing physicians may make to the entity in the future.[51]

79.     As described in more detail below, Fresenius chooses JV partners based upon the extent to which those partners can refer patients, places overt pressure on physicians in JVs to maintain and increase those referrals, values JV investments based upon this referral stream, and uses JVAs and MDAs to secure and enforce far-reaching and long-lasting non-competes.

---

[49] Dep't of Health & Human Servs., Office of Inspector Gen.,  *OIG Advisory Opinion No. 97-5* 7 (1997), *available at* https://oig.hhs.gov/fraud/docs/advisoryopinions/1997/ao97_5.pdf.
[50] Letter from D. McCarty Thornton, OIG Associate Gen. Counsel, to T.J. Sullivan, IRS Office of Associate Chief Counsel (Dec. 22, 1992), *available at* https://oig.hhs.gov/fraud/docs/safeharborregulations/acquisition122292.htm.
[51] Dep't of Health & Human Servs., Office of Inspector Gen., *OIG Advisory Opinion No. 09-09* 7 n.5 (2009), *available at* https://oig.hhs.gov/fraud/docs/advisoryopinions/2009/AdvOpn09-09.pdf.

80.     Fresenius' JVAs do not meet even the most basic requirements of the AKS safe harbor for investment interests, because, *inter alia*, the JVs do not limit investment by referral sources to less than 40%.  In fact, many Fresenius JVAs permit physicians to own up to 49% of the JVA—and, in some cases, to even maintain majority interests—with terms on which the investments are offered to investors in positions to make referrals, and which are directly related to expected levels of referrals.[52]

## VII.   FRESENIUS' FRAUDULENT SCHEMES

### A.    Fresenius Provides Below-Cost and No-Cost Services to Hospitals to Secure Patient Referrals

81.     At all times material hereto, a significant part of Fresenius' efforts to grow referrals to its dialysis clinics came through referrals from its acute care contracts with hospitals. The contracts were designed to induce referrals by: (a) providing inpatient dialysis services to hospitals at below cost and/or at no cost; and (b) providing significant free services to hospitals.

82.     Fresenius also entered into improper medical directorships with nephrologists who were in a position to influence referrals of patients from hospitals to Fresenius' outpatient dialysis clinics, paying them well above FMV for their services.

#### 1.    Fresenius Enters into Unprofitable and Below-Cost Hospital Acute Dialysis Contracts in Order to Induce Patient Referrals

83.     Fresenius made the calculated business decision to offer dialysis services to hospitals well below cost, and to offer concomitant free services (including, but not limited to, free discharge planners) to hospitals in order to capture referrals of discharged patients to Fresenius dialysis clinics.

---

[52] *See* 42 C.F.R. § 1001.952(a)(2).

84.     Over the past two decades, the dialysis industry has become increasingly concentrated in the hands of two companies, as they each have acquired other dialysis chains over the past decade.   While in 2004 there were four major dialysis chains—DaVita, Gambro, Fresenius, and the Renal Care Group—by the end of 2005, ownership of free-standing dialysis clinics was concentrated in the hands of only two dominant companies, DaVita and Fresenius.  In 2005, DaVita purchased Gambro, acquiring an additional 1,200 clinics in North America.  In that same year, Fresenius acquired the Renal Care Group, adding a total of 425 clinics and 210 outpatient clinics to its rosters.  In 2012, Fresenius acquired Liberty Dialysis, adding another 260 clinics in North America. Opportunities for further acquisitions were limited because very few large dialysis providers remained.  Fresenius now has approximately 2,400 clinics in the United States, treating 190,000 patients, including more than 100,000 Medicare patients per year.

85.     Beginning in approximately 2007, Fresenius increasingly realized that the company's "organic growth" (*i.e.*, growth from adding new patients and not through acquisitions) was almost non-existent.  Fresenius decided that one of the keys to capturing new patients for its dialysis clinics was through its inpatient acute care relationships with hospitals.  To develop these relationships, FMCNA began to seek exclusive contracts to provide inpatient dialysis care in the hospital setting.

86.     Approximately fifty percent of all ESRD patients begin dialysis emergently, when they experience acute complications from kidney failure.  Fresenius knew that it could most effectively acquire new patients by ensuring they began dialysis treatment at its own facilities immediately after being discharged from the hospital.  Fresenius thus sought to establish a pipeline from inpatient dialysis (in the hospital setting) to outpatient dialysis at its own clinics.

87.     Because the dialysis industry is highly concentrated, Fresenius knew that it was directly competing with DaVita to obtain hospital contracts and to capture hospital referrals. Hospitals were aware of the competition between Fresenius and DaVita, and played the two companies against each other to secure the best financial deals for acute care contracts.  As a result, during discussions between Fresenius employees and hospital executives, there has been little, if any, discussion of the actual cost of acute treatment or fair market value.  Nor has there been any meaningful discussion of the quality of care.  Instead, what the hospital negotiators wanted was a "number," one that they could compare favorably or unfavorably to the other bidder, almost always Fresenius' main competitor, DaVita.

88.     Despite concerns with AKS compliance and that financial losses with inpatient contracts would detract from the overall performance of the area or region for which they were responsible, Fresenius mid-level managers (including Mr. Flanagan and his colleagues in the Western Division) were instructed by their superiors to obtain hospital contracts "at any cost" in order to secure the referrals of discharged patients.  Fresenius management, at the highest level, including the CEO and his direct reports, knew, and intended, that the company would remunerate hospitals in the form of below-cost services to induce these hospitals to refer patients to Fresenius clinics.

89.     Area and regional managers were expected to grow their outpatient base by at least 4% each year, and, in some cases, up to 13% a year.  Bonuses, which have exceeded $10,000, and performance evaluations for mid-level managers, were tied to growth of the number of patients and treatments at individual clinics, among other factors, as confirmed by Witness No. 1, an FMCNA Director of Business Development from October 2007 to May 2012 in the Midwest Region that included parts of Nebraska, Wyoming, Colorado, and Montana.  Indeed, regional and

area managers understood that, in the long run, it was better to capture a new patient, even if the company incurred a loss in an acute contract, for the long-term benefit of their regions and their own pocketbooks.

90.     Internal Fresenius documents—Excel spreadsheets entitled "Acute Programs w/Negative EBIT" and "Acute Txts & Program EBIT[53] vs. Budget"— show that Fresenius actually budgeted for losses in the acute programs at many of the larger hospitals.  Frequently, Fresenius' losses on these contracts exceeded even those originally budgeted.  For example, a spreadsheet entitled "Acute Programs w/Negative EBIT" shows that, of the eighteen hospitals listed (including hospitals in Arizona, California, Colorado, Hawaii, Kansas, Missouri, Oklahoma, Oregon, and Texas), all but four of the hospital acute contracts had been budgeted for losses:

| | | | YTD Acute EBIT | | |
| | | | Actual | Budget | Act vs. Budg. |
| Area | Facility # | Facility Name | Sep-10 | Sep-10 | Variance |
|---|---|---|---|---|---|
| San Antonio River City | 1243 | N.W. San Antonio | ($1,219,001) | $717,168.09 | ($1,936,169.09) |
| San Diego West | 1989 | SDDS Hospital | ($1,209,560.70) | ($1,533,146.80) | $323,586.10 |
| Rocky Mountain Acute Services | 4966 | Denver Acute | ($404,002.13) | ($175,572.77) | ($228,429.36) |
| Bay Area Acutes | 1810 | Bay Area Acutes | ($329,494.05) | ($192,911.41) | ($136,582.64) |
| Hawaii | 3302 | Honolulu Acutes | ($286,310.77) | ($538,813.73) | $252,502.96 |
| South Kansas | 4887 | Via Christi St Francis Acute | ($282,048.69) | ($235,844.13) | ($46,204.56) |
| Kansas City Metro | 4090 | Kansas City Acutes | ($244,656.67) | ($287,845.53) | $43,188.86 |
| Oklahoma Acute | 3974 | Oklahoma Acute Services | ($218,850.44) | $161,454.14 | ($380,304.58) |
| Haemo-Stat | 1904 | Haemo-Stat | ($203,926.80) | ($180,733.42) | ($23,193.38) |
| Tyler | 4792 | Tyler Etmc Acutes | ($176,585.31) | $14,491.64 | ($191,076.95) |
| West Houston | 1315 | Gulf Coast Mobile Unit | ($94,090.55) | $340,237.83 | ($434,328.38) |
| Inland Oc Apehresis | 6372 | Haemo-Stat South | ($92,807.48) | ($28,719.73) | ($64,087.75) |
| Northern Lights Alaska | 4891 | Juneau Acute | ($65,144.53) | $15,760.07 | ($80,904.60) |
| Nebraska Iowa | 4880 | North Platte Acute | ($53,559.19) | ($41,716.28) | ($11,842.91) |

[53] EBIT stands for "earnings before interest and taxes," a measure of net income calculated as revenue minus expenses (but excluding tax and interest).

| Arizona Acutes | 6318 | Phoenix Metro Acutes | ($49,116.42) | ($198,900.63) | $149,784.21 |
| Rural West | 6316 | Bullhead City Acutes | ($24,132.41) | $24,563.15 | ($48,695.56) |
| Rocky Mountain Acute Services | 3776 | Albuquerque Acute | ($19,029.02) | $503,408.46 | ($522,437.48) |
| Corpus Christi | 4964 | Corpus Christi Acute | ($9,258.87) | $185,107.04 | ($194,365.91) |

91.     By the date of this document, September 2010, Fresenius was losing money on its contracts with all of the hospitals listed above, many well in excess of their budgeted losses.  For example, the Fresenius San Antonio River City and San Diego West facilities each lost more than a million dollars per year.  Fresenius did nothing to alter its business practices or try to recoup these losses, many of which were substantial, illustrating that the losses were in fact kickbacks to induce referrals.

92.     The anticipated and realized losses reflected on these spreadsheets were approved in advance by Fresenius management as part of an annual budget cycle that began each year in June or July and concluded after the following January 1.  Regional managers proposed budgets to corporate headquarters that included planned losses from hospital contracts.  Those losses were approved by Fresenius management as part of the regions' budgets for the year.

93.     The spreadsheets referenced above, for instance, showing hospitals with negative EBIT, were prepared on a monthly basis by financial analysts at Fresenius' Waltham, Massachusetts headquarters.  The spreadsheets were reviewed and approved by mid-level and upper management, from regional managers to the business unit's vice president in the Waltham corporate headquarters.  While the spreadsheets referenced above are from the Western Business Unit, the decision to run hospital programs at a loss was driven by corporate management with similar budgeted losses for the acute contracts throughout the United States.

94.     These losses resulted from the fact that, in order to insure that it was in a position to secure referrals of patients who were discharged from hospitals and needed dialysis, FMCNA chose not to charge the hospitals for many of the costs it incurred in delivering inpatient services. For example, although Fresenius usually charged hospitals nursing fees at $40 per hour, in many regions, Fresenius incurred costs for nurses of up to $75 per hour.  Fresenius chose not to pass on these additional costs to the hospitals, resulting in a $30/hour loss.  Fresenius was frequently required to pay for additional nursing time while nurses were waiting for doctors' orders to begin treatments, costs that were also not charged to the hospital.  Fresenius also routinely waived ancillary fees, such as for tubing, dialysis equipment, treatment cancellation fees, removal of dialysis catheters, and other ancillary services. *See infra* ¶¶ 112-113.

95.     If Relator and other Fresenius employees tried to include fees for these ancillary services in their proposed hospital contracts, their proposals were vetoed by Fresenius' regional vice presidents ("RVPs"), who were responsible for approving the terms of hospital contracts. These RVPs had an incentive to accept a loss in a hospital contract that would result in more growth for individual clinics, ultimately bringing in much more revenue.  Eventually, Mr. Flanagan asked the RVPs simply to tell him what they were willing to charge the hospitals, which usually translated into the provision of services substantially below costs.  Mr. Flanagan would then negotiate those rates instead of following the prices set forth in the sample contract.

96.     When Mr. Flanagan discussed with management his concerns about pricing hospital contracts below cost, including with RVP Susan Raulie and President of the Western Business Unit Joe Prillmayer, he was told that entering into below-FMV contracts was Fresenius' standard business practice, with which Mr. Flanagan was instructed to comply.  RVP Raulie knew,

and intended, that the company would remunerate hospitals in the form of below-FMV services to induce these hospitals to refer patients to Fresenius clinics.

97.     At any given time, up to 65% of Fresenius' acute care contracts with hospitals in the Western Business Unit and throughout the country ran at a loss.  FMCNA was not concerned about these losses as long as the hospital acute care programs generated new patient referrals to its dialysis centers—indeed, the very point of these loss leaders was to secure referrals.  For example, Mr. Flanagan once discovered losses under a contract with Laredo Medical Center in Laredo, Texas, amounting to $295,975 above those budgeted.  The contract was set to renew in 2007 or 2008; during this period, Mr. Flanagan brought this discrepancy to the attention of RVP Raulie and told her that he would try to recoup the money from the hospital.  Ms. Raulie told Mr. Flanagan not to do so because that might be "bad for business"—meaning the hospital would retaliate against Fresenius by terminating its contract with Fresenius.  Instead, RVP Raulie informed Laredo Medical Center that, if it renewed the contract, FMCNA would waive the fees that were owed.

98.     Again in 2010, Mr. Flanagan attempted to address concerns about unprofitable acute contracts with his supervisor, President of the Western Business Unit, Joe Prillmayer, pointing out that because Fresenius was consistently losing money with acute care contracts, it appeared that Fresenius was buying referrals from hospitals.  Prillmayer told Mr. Flanagan to "back off" and that he should let Fresenius' Operations Department handle the issue.  Prillmayer knew, and intended, that the company would remunerate hospitals in the form of below-FMV services to induce these hospitals to refer patients to Fresenius clinics.

99.     Mr. Flanagan also relayed his concerns about the unprofitable acute contracts to Senior Vice President for Physician Strategies Brian Gauger, who responded that he did not want to hear any complaints about pricing of the acute care contracts.  Gauger knew, and intended, that

the company would remunerate hospitals in the form of below-FMV services to induce these hospitals to refer patients to Fresenius clinics.

100.    Despite Mr. Flanagan's having repeatedly raised these concerns within Fresenius about the profitability of acute contracts, there was no effort to rectify the problem because Fresenius management knew that hospitals would terminate their agreements and/or refer fewer patients to Fresenius if it priced the acute contracts at the actual cost of delivering services, let alone at a level sufficient for it to earn a profit.  FMCNA management knew these contracts served as a pipeline of referrals to its outpatient clinics from loyal hospital and physician partners. They viewed any efforts to increase the price at which these inpatient services were being offered (in order to reflect the true cost of providing those services) as interrupting the flow of new patients into Fresenius outpatient clinics from these hospitals, something Fresenius management was not willing to allow.

101.    Others had similar experiences as Mr. Flanagan. Witness No. 2, who was the Director of Business Development in Fresenius' Western Division from 2004 to 2010, confirmed what Relator had experienced.  In his job developing contracts with hospitals, Witness No. 2 witnessed Fresenius regularly bidding on hospital contracts at below FMV and below its costs of delivering dialysis services to the hospital.  In Fresenius' Dallas Region, for example, Fresenius' employees, following instructions from their supervisors, entered into acute care contracts with hospitals notwithstanding the fact that the price offered was below the actual cost of providing acute services.  In fact, Witness No. 2's supervisors within the Dallas Region instructed employees to win acute care contracts "at any price."  Fresenius treated these contracts as loss leaders, incentivizing hospitals to funnel referrals to its outpatient clinics.

102.     Witness No. 2 had personal experience with Fresenius' use of hospital acute care contracts for the purpose of feeding their outpatient clinics with patient referrals regardless of whether the hospital contract was profitable or ran at a loss.  He recalled that Fresenius never factored in the actual cost of providing acute services because the company used these contracts to generate patient referrals.  In his experience, hospitals were being incentivized through low-cost contracts to choose FMCNA to run these programs so that Fresenius could obtain the longer-term patient referrals for dialysis treatments at their outpatient clinics.

103.     Fresenius' negotiation strategy (*i.e.*, to secure hospital contracts even if the contracts would lose money) applied nationwide and was designed to secure referrals.  With regard to Fresenius' cost of providing services at hospitals, Witness No. 2 confirms that FMC "just didn't care" if it made a profit on those contracts, and did not even make the cost of providing these services—data that would have been necessary to negotiate a contract at FMV—readily available internally.   Jeffrey Hymes, Medical Director for the Fresenius hospital program, repeatedly requested information about the cost of these acute care contracts, sending emails to superiors, asking, for instance: "How do I price this contract based on costs if no cost information is available for the acute programs?"  Hymes never received an answer.

104.     Witness No. 2 personally conducted negotiations with Tenet and LTC Legacy, and was told by his superiors:  "let's get the contracts at any price."  In his experience, FMCNA entered into money-losing, below-cost contracts with at least 26 hospitals within Tenet Healthcare, a national health care management company with dozens of hospitals across the United States.

105.     Similar losses in the acute care contracting segment were reported by Witness No. 3, an RVP of Business Development for Fresenius Medical Care from August 2014 to November 2018 and as a Director of Market Development from April 2012 to July 2014 in the Capitol Lakes

Region Territory (which included Indiana, Kentucky, Maryland, Michigan, New York, Ohio, and Washington, DC).  In his role as a Director of Market Development, Witness No. 3 developed new business opportunities with health systems and hospitals.  In his experience, the acute care contracts regularly lost money "at an alarming level."

106.    The acute care losses were also experienced by Witness No. 4, an RVP for Fresenius in the northeast from April 2016 to May 2020 and an RVP for Michigan, Indiana and Ohio from July 2012 to June 2015.  As an RVP, Witness No. 4 oversaw the operational aspects of about forty Fresenius facilities across the New York metropolitan area, Newark, New Jersey, and Connecticut.  In his earlier role as an RVP in the Midwest Region, Witness No. 4 oversaw around thirty-five Fresenius clinics and negotiated JVAs with doctors.  As part of negotiating outpatient facility contracts and overseeing facility operations, he witnessed that, in order to get referrals, Fresenius lost money on acute inpatient contracts, especially with mid-sized hospitals that did not have their own dialysis nurses on site every day.

107.    Faced with the reality that it could no longer rely exclusively on growing its patient base by acquiring other dialysis chains, the pressure within Fresenius to secure and retain hospital acute contracts became especially intense in late 2009 to early 2010.  Donna McCarthy, Senior Vice President of Operations and President West Division, and other senior managers reminded the company's marketing directors that "if you lose a hospital, we lose referrals."  Marketing directors were instructed to concentrate their efforts on hospitals that performed significant numbers of dialysis treatments every year, such as those hospitals listed on an Excel spreadsheet entitled "West Top Hospitals By Volume 2009."

108.    Witness No. 5 confirmed that Fresenius focused on growing the business through acute care contracts with hospitals.  Witness No. 5 was a Director of Business Development for

the company from October 2007 to December 2013, where he was responsible for a territory that spanned several western states. Though in some situations a patient might go to a competitor's dialysis clinic, those situations were outliers. Witness No. 5 remembers that Fresenius' acute inpatient contracts served to "streamline" referrals to its outpatient clinics. Hospitals where Fresenius had an acute care contract reliably sent about 70% to 80% of the ERSD patients they discharged to Fresenius dialysis centers for outpatient treatment.

109. Losses in acute contracts were reported by Fresenius corporate headquarters on a monthly basis in an "Acute Profit and Loss Reports." These extremely detailed reports recorded the number of treatments anticipated on a monthly and YTD basis, compared with the numbers actually performed, the anticipated treatment costs, and the actual costs of treatment for inpatient dialysis. These reports were widely circulated throughout the company, including to top executives and to business development managers such as Relator, and are further evidence that Fresenius' top management was well aware of the extent to which hospital acute contracts for the provision of dialysis to inpatients were losing money and could identify cost overruns with precision, by hospital and by cost involved.

110. Not only were the acute contracts losing money, but Fresenius rarely (if ever) enforced the so-called standard "escalator" clause in section 6.01 of its Standard Acute Agreement, which called for annual fee increases of up to 4.0%. In 2009, Mr. Flanagan found that Fresenius had failed to enforce the escalator provisions in the contracts for numerous hospitals, including in contracts with Western Plains Medical Complex (Dodge City, Kansas), Mercy Medical Center (Des Moines, Iowa), Hays Medical Center (Hays, Kansas), Saint Lukes East Hospital (Lees Summit, Missouri), Great Plains Regional Medical Center (Elk City, Oklahoma), Galachia Heart Hospital (Wichita, Kansas), Kansas Heart Hospital (Wichita, Kansas), Kansas Medical Center

(Andover, Kansas), Wesley Medical Center (Wichita, Kansas), Select Specialty – Western Missouri (Kansas City, Missouri), St. Catherine Hospital (Garden City, Kansas), St Luke's Hospital of Kansas City (Kansas City, Missouri), Good Samaritan Hospital (Olathe, Kansas), Select Specialty Hospital (Kansas City, Missouri), and Wesley Rehab Hospital (Wichita, Kansas). Several of these hospitals had had no escalator increases since as early as 2002.

111.   Mr. Flanagan developed a plan to remedy this situation by notifying hospitals of contractual increases, a plan that was blocked by management, including his supervisor, Joe Prillmayer, who told him to "let it [the contractual increases] go." Fresenius showed no interest in stopping these significant losses because upper-level management believed that doing so would cause Fresenius to lose hospital contracts which were the key to obtaining referrals of new patients to Fresenius' outpatient clinics.

112.   Fresenius routinely waived these escalator provisions in contracts that called for cost increases upon renewal. Instead of enforcing the escalator provisions in existing contracts, FMCNA senior management made the calculated decision to use the escalator clauses as a bargaining chip in exchange for contract renewal because the company's main interest was generating patient referrals from the hospitals and revenue for its outpatient clinics, not making money from the hospital contracts themselves.

113.   A slide from an internal 2009 PowerPoint presentation given to the Southwest Group explains how Fresenius intended to use waiver of the fee increases to curry favor by telling hospitals which resisted the increase that Fresenius would waive application of the escalation provision "in recognition of their partnership with FMCNA" and that "we thank them for their business." In other words, Fresenius inserted the escalator provisions into its contracts, knowing

it would later waive these provisions to cement its relationship with hospitals from which it received substantial referrals of new patients:



114.    Witnesses from around the country have confirmed that the acute care contracts were not profitable for FMCNA.  Witness No. 7, a Fresenius Manager of Hospital and Patient Services from August 2016 to January 2019 in a territory that included Nevada and California, learned from several colleagues that Fresenius was losing money on its acute care contracts.

115.    Witness No. 7 said the hospital contracts were vital to Fresenius, whether or not the acute services were offered below Fresenius' actual costs.  "The hospitals gave us first priority to see [the] patient," he recalls.  A typical Fresenius contract would have the company servicing a 20-bed dialysis unit in a 500-bed hospital.  At the end of the day, the key thing for getting referrals for Medicare and Medicare-eligible patients was having the hospital contracts.  "Referrals came

in the pipeline from the contracts," he said.   Whoever had those hospital contracts had the opportunity to call in their preferred nephrologist.

116.   This experience is consistent with that of Witness No. 4.  In his role overseeing acute care contracts in the Northeast Region, Witness No. 4 recalled that a team headed by Director of Business Development Mike Christensen and Fresenius Senior VP Tom Wieder negotiated a lowball rate of $250 for inpatient dialysis treatments with HCA, knowing it was offered well below cost and would be a money loser, but with the hope that Fresenius could eventually secure a nationwide contract with HCA hospitals to perform inpatient dialysis treatments which would result insignificant numbers of referrals.   Asked why Fresenius had money-losing contracts, Witness No. 4 confirmed:  "The thought was, if we get the acute contract, it will equate to more patients in our facilities."

117.   Witness No. 8, a Director of Market Development for Fresenius Medical Care from February 2015 to February 2018 in the Western Region, was tasked with identifying potential acquisitions and developing new business relationships with nephrologists within the north Texas market.  He recalled that Fresenius would "lose in acute, but get all those referrals."  By providing in-hospital dialysis treatment at local hospitals, Fresenius ensured referrals would flow to its outpatient dialysis centers.

118.   This was the same experience of Witness No. 9, who worked as a Director of Operations at FMCNA from 2012 to January 2018.  In her role directing, administering, and controlling the daily operations of Fresenius' contracts with hospitals in two southern states, she negotiated twenty hospital contracts.  In her experience, such contracts guaranteed approximately seventy to eighty percent of outpatient referrals went to Fresenius clinics, but at a cost as "there was a lot of money going down the drain with those contracts."  For example, in her experience,

Fresenius' acute contracts in New York and Maryland regularly lost Fresenius $1.5 million annually; those in Kentucky regularly lost the company $600,000 annually.

119.     Nevertheless, Witness No. 9 confirmed that the contracts served their purpose: "The contracts channeled patients to the clinics."  As to why Fresenius pursued loss-making contracts, Witness No. 9  recalled:  "I don't think they looked at the profitability, to be honest with you. . . . [I]t was a relationship initiative— the idea was the nephrologist [in the hospital and under an MDA with Fresenius] would refer discharged patients to [Fresenius] clinics."  According to Witness No. 9, Fresenius determined the value of a hospital contract based upon the number of ESRD patients in a given market relative to the number of Fresenius dialysis clinics in that market, without regard to the profitability of the contract.  "I don't know if Fresenius did a feasibility for cost *per se*—it was more market analysis of the number of ESRD patients relative to clinics in the area."

120.     Fresenius management viewed its hospital contracts as key to ensuring a steady supply of patients to Fresenius dialysis clinics.  These managers expected that the acute contracts would contribute toward the overall target of four percent annual growth in dialysis treatments performed by Fresenius.

121.     A PowerPoint presentation from 2012 used to guide employees negotiating and implementing acute care contracts entitled "Manager of Business Development Roll-Out and Implementation Plan" similarly demonstrates how Fresenius provided below-cost and free services in order to generate referrals.  Fresenius' managers of business development ("MBDs") were to be responsible for "[c]oordinat[ing] the care of pre-ESRD patients at the practice and hospital to facilitate their seamless, expeditious transition into dialysis."  This presentation states that the MBDs should work to "Expand [the] Referral Relationship" with hospitals.  The presentation

cautions: "Do not leave [the sales call] without Customer knowing and understanding our immediate admission process."

122.    To determine whether it was worth pursuing an acute contract at that location, Fresenius instructed its MBDs during the first sales call to ask the hospital negotiators about the total number of anticipated referrals, using this script: "[I]n order to help me better understand how we may be able to better meet your needs, can you give me a feel for how many new patient discharges you typically handle in a month?"  This information was essential to Fresenius, as it helped the Company target hospitals that would have a significant referral "yield" to Fresenius' outpatient dialysis clinics.  If Fresenius' provision of acute services to the hospitals were unconnected to the inducement or rewarding of referrals, its employees would have no need to ask this question:



123.    This same presentation instructs MBDs to coordinate with hospitals where Fresenius offered acute services to "be alerted when a new patient has a new order for acute

dialysis (MBD to be available 24/7 to initiate discharge planning process)" and to coordinate with Fresenius-affiliated physicians at hospitals to "maximize referrals to FMC centers". Fresenius instructed its MBDs to enlist "affiliated" nephrologists (*i.e.*, those nephrologists with pre-existing relationships with Fresenius as medical directors, business management clients, or joint venture partners) who attended patients at hospitals or were medical directors at hospitals with which Fresenius had acute contracts to assist in funneling patients to Fresenius, asking them to participate in sales calls with hospital management: to "try to get them [the nephrologists] to co-own the discharge planning process versus a detached approach":



124.     The presentation goes on to state that Fresenius aimed to "[i]ncrease[] and streamline[] the admissions process into [Fresenius] facilities from referral hospitals and physician practices":

125.   The below-cost services constituted illegal remuneration to the hospitals in exchange for referrals.  Hospitals seeking to provide dialysis services in-house would incur costs much greater than the price at which Fresenius contracted to provide those services.  For example, in Maryland, a Medicare waiver state, the Health Services Cost Review Commission ("HSCRC") is charged with setting rates for hospitals based upon on actual costs or median costs of providing services as reported by hospitals across the state.  According to HSCRC data, the rate for renal dialysis services delivered in Maryland hospitals in FY 2009 ranged from approximately $550 to $1,000.

126.   The HSCRC rates reflect generally what it would cost mid-size community hospitals, such as those covered by Fresenius acute contracts, to provide dialysis services to inpatients.  On average, the rates set by Fresenius for its acute care contracts were commonly much lower: generally, less than 50% of the rates requested by these Maryland hospitals.  At the same time, Fresenius was charging NE Methodist Hospital, in Live Oak, Texas, $255 per treatment, less

than 50% of the lowest rate determined by the HSCRC and 25% of the highest rate, and was charging the Scripps Hospital $375 per treatment, a substantial reduction from the lowest rate approved by the HSCRC for a hospital in Maryland.

127.    Fresenius' below-cost acute dialysis services constitute illegal remuneration to hospitals, as those services relieved the hospitals of financial obligations they otherwise would have incurred in providing inpatient treatment to ESRD patients and were provided as an illegal inducement for referrals to its outpatient clinics, in violation of the AKS.  Any claims submitted for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this scheme are false claims within the meaning of the FCA.

### 2. Fresenius Provided Hospitals with Significant Free Services to Ensure a Steady Flow of Referrals

128.    In addition to below-cost acute dialysis services, Fresenius provided free discharge planning services, free in-service training to staff, free chronic kidney disease training to patients, and free Quality Assessment and Improvement Program ("QAI") data analysis.  These free services constitute remuneration, as they relieved the hospitals of financial obligations they would otherwise incur in training, discharge planning, in-service training, and data analysis.

#### a.   Bridge Program to Induce Referrals

129.    One of the key tools Fresenius developed to ensure a steady flow of patient referrals was its "Bridge Program."  A PowerPoint presentation entitled "Bridge Program May 3, 2010," drafted by Oliver Maier, Fresenius' then Head of Corporate Development and Strategies and Director of Investor Relations, made clear that the Bridge Program was developed to address competition from DaVita for patients who begin dialysis during a hospitalization: "DaVita, with their service, 'Pathways' is aggressively targeting newly diagnosed ESRD patients and attempting to redirect outpatient placement to their facilities, even in hospitals where Fresenius Medical Care

has relationships."  To counter DaVita, Fresenius developed the Bridge Program to serve as an "Inpatient Services Dialysis Discharge Brand" that would "maximize new patient acquisition and minimize out migration to competing facilities in the acute care setting":



130.     Maier's presentation explains that the "Solution" Fresenius came up with was a "Package" of free services including the Bridge Program, which would offer hospitals so that it could "[r]eclaim ownership of the inpatient market potential":



131.   A Fresenius internal document ratified by Fresenius management entitled "BRIDGE Dialysis Transition Program" describes "the services provided for identification and placement of patient in chronic dialysis facility" under the Bridge Program in terms of how they will facilitate referrals to Fresenius.  The program was ostensibly designed to "help hospitals save money by streamlining the process for patient discharge from the hospital and admission to a chronic facility for dialysis"—but Fresenius employed unlawful means to ensure as many of those patients were treated at its own outpatient facilities.   The document describes the process of discharging patients into a Fresenius outpatient clinic:

- Referring physician or hospital discharge planner "[i]dentifies patients needing chronic facility placement and notifies" Fresenius Placement Coordinator.

- Fresenius Placement Coordinator "[c]ontacts patient's MD to identify which [Fresenius] clinic the Physician prefers for this patient's chronic treatment."

- Fresenius Financial Coordinator "[v]erifies patient's insurance coverage for needed services and clears patient for placement.  Provides [Fresenius] Central Admissions Office with patient demographic and insurance information."

- Fresenius Placement Coordinator "[n]otifies TOPs [54] educator of new patient's clinic location and schedule."

- Fresenius Placement Coordinator "[g]ives patient information re: [Fresenius] Prescription Drug service."

---

[54] Fresenius' Treatment Options Program ("TOPS") is an educational service Fresenius provides free of charge to patients and their families. *See infra* ¶¶ 150-151.

- Fresenius Placement Coordinator "[f]ollow[s] up with patient one week after placement to verify satisfaction with placement and that patient has met with clinic manager, dietician, and social worker and has appointment for TOPS education."

132.    This document makes clear that the Bridge Program could "help hospitals save money by streamlining the process for patient discharge from the hospital and admission to a chronic facility for dialysis," but that it was truly designed to capture all of the hospital's referrals.

133.    By providing free discharge planning services to hospitals, Fresenius relieved hospitals of the burdens of discharge planning themselves, freeing up time and resources to be used elsewhere.  In exchange, Fresenius controlled the discharge process, funneling ESRD patients to its own outpatient clinics.

134.    Because hospitals are reimbursed by Medicare for inpatient hospitalizations based upon each patient's diagnosis-related group ("DRG") regardless of how long each patient is hospitalized, Fresenius' ability to accept discharged ESRD patients immediately into its outpatient clinics reduced the cost of care to the hospital by reducing the patient's Length of Stay ("LOS"). In its oral and written presentations to hospitals, Fresenius emphasized that its Bridge Program would benefit the hospitals' bottom line by reducing LOS for patients who needed to be dialyzed, insuring that they would receive top priority to be admitted to Fresenius outpatient clinics, which would enable the patients to begin dialysis immediately.  This process would allow the hospitals to discharge its ESRD patients earlier, resulting in significant cost savings to the hospital and significant profits for FMCNA.

135.    The Bridge Program also included the placement of a free Hospital Service Specialist ("HSS") or a Hospital and Patient Services Manager ("HPS") into a hospital, or, alternatively, making a Fresenius intake employee available to the hospital remotely, in order to

capture referrals.  These Fresenius employees were responsible for ensuring a smooth transition from inpatient treatment to outpatient treatment at a Fresenius clinic.  Hospitals were instructed to, and did, notify Fresenius of any anticipated discharge of an ESRD patient and upload the patient's file to the Fresenius patient intake system even before the patient had a chance to contact an outpatient clinic to obtain continued dialysis treatment.

136.    The free HSS or HPS discharge planning services in the Bridge Program became a key selling point in negotiations with hospitals.  A July 29, 2011 testimonial offered during a presentation to Kadlec Medical Center in Richland, Washington, with which Fresenius had an acute contract that was up for renewal, quotes a nurse employed by a hospital who noted that the Fresenius HSS Brooke Luppino had "take[n] over the dialysis discharge planning piece of my patients [sic] care."

137.    Moreover, in this 2010 presentation to Sutter Health, which operates 24 acute care hospitals and over 200 clinics in Northern California, Fresenius emphasized the Bridge Program as part of its "Portfolio" of "Value Added Services":



138.    The PowerPoint presentation further outlines the purported advantages of the services that the HSS would perform, including "discharge coordination" to the Fresenius dialysis clinic:



139.    Likewise, a 2014 presentation to Hoag Hospitals in Orange County, California, described among the "Key Value Added Services"—*i.e.*, free services—being provided was its "Hospital Services Specialist Program (BRIDGE)."  In explaining why Fresenius is uniquely qualified to offer acute care services, the slides note that Fresenius had 25 HSS programs at 71 hospitals in the Western Division.

140.    The discharge planning relationship was of key importance to Fresenius because about half of the company's patients came into Fresenius clinics via that route.  This was the experience of Witness No. 10, former Group Vice President of Operations for Fresenius Medical Care from 2014 to 2016, where he led a team of seven regional VPs across Minnesota, Wisconsin, Illinois, Michigan, Indiana, Ohio, Pennsylvania, New York, New Jersey, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, and Maine.  In his role as FMCNA VP of

Operations in the Northeast Region, he saw that it was standard practice for Fresenius to station personnel in hospitals to facilitate admissions from the hospitals to its outpatient dialysis units.

141.    Overtly, Fresenius taught its market development directors during compliance training sessions that all services included in the acute contracts with hospitals had to be provided at FMV and that providing free services in exchange for referrals was against company policy. Covertly, however, Fresenius regularly did just that, entering into below-FMV contracts which included free Bridge services in exchange for referrals.

142.    Fresenius acknowledged that all services provided under the Bridge Program must be provided at FMV to comply with the law.   For example, a February 7, 2011 Fresenius' "Inpatient Services Bridge Program Guidance Document" states that "[r]ates will be determined according to fair market value for the HSS services to be provided."   The Guidance Document spells out that the RVP was to prepare a fair market analysis "by calculating incremental cost of the expected HSS FTE (or FTE equivalent) assigned to that hospital's acute program divided by the number of (i) actual historical treatments or (ii) in the case of a new program or a program expected to have significant changes in the upcoming year, projected treatments.  Such incremental cost should then be added to the per-treatment cost for such acute program."

143.    In practice, however, the FMV analysis for these free discharge planning services was regularly ignored.  Instead, Fresenius management directed and ratified conduct that regularly ran afoul of this written guidance.  For instance, despite written instructions to the contrary, Mr. Flanagan was never required to obtain a FMV analysis for any hospital contract or for Bridge Program services during his tenure at Fresenius, and Fresenius never charged any of these hospitals for Bridge Program discharge planning services.  Rather, Fresenius provided these services, which

it valued in excess of $10,000 annually per hospital, free of charge in order to induce referrals to its own clinics.

144.   Not only did the free Bridge discharge planning service constitute illegal remuneration to hospitals, it interfered with medical decision-making and patient choice, causing patients to be directed not to the care that was most beneficial for their overall health and well-being, but which was instead most beneficial to Fresenius' bottom line, resulting in patients being discharged to Fresenius facilities without even consulting with them and asking where they preferred to receive outpatient treatment.

145.   For example, Witness No. 11, Dialysis and Admissions Coordinator at Balboa Nephrology Medical Group, Inc. in San Diego, California from March 2006 to November 2015, recounted that the Fresenius employee who handled discharges from Sharp Hospital (where Fresenius had an inpatient acute contract and where the Balboa nephrologist Dr. John Videen was medical director) "was just placing patients with whatever Fresenius clinic she could." She "would place the patients without even talking to them." Witness No. 11 recalled being troubled by the immediate and inevitable funneling of Balboa patients to Fresenius clinics. She recalled wondering about patients: "Did you have a choice? Did anybody talk to you?"

146.   This was the same experience of Witness No. 12, Regional Financial/Insurance Coordinator & Case Manager for Fresenius from May 2006 to December 2017, where she tracked some 1,000 dialysis patients in twelve Fresenius clinics across Ohio. Witness No. 12 recalls patients ended in outpatient Fresenius clinics through discharges from hospitals where it had acute care, onsite discharge planners referring patients. Their jobs were to get placements of as many patients into Fresenius facilities as possible. Although she voiced concerns about whether the

company's conduct was ethical, her colleagues and supervisors ignored her: "It would be, we'll just figure it out [later]. We just need cheeks in seats."

147.    Witness No. 13, a Manager of Business Development in Cleveland, Ohio from May 2012 to September 2014 and Director of Hospital and Patient Services from September 2014 to October 2019, where she served a region that encompassed eastern Ohio, central/northeast Indiana, and Michigan, reported that HSSs regularly worked to refer patients to Fresenius clinics. In Witness No. 13's role supervising staff in Ohio, Michigan, and Indiana, she saw that HSSs regularly discharged patients into outpatient Fresenius facilities.

148.    The same was true for Fresenius' HPS employees. Witness No. 14 worked as an HPS for the company from August 2014 to February 2016, where she was responsible for fostering relationships inside the hospital and with area nephrologists such as West Jefferson Medical Center LCMC Health in Marrero, Louisiana. In her experience, inpatients who were introduced to Fresenius' services in the acute care setting more often than not continued their dialysis at one of the company's dialysis centers. If the attending physician did not refer the patient somewhere, an HPS often worked to arrange the patient's discharge treatment location, usually into a Fresenius facility.

149.    Witness No. 15, who worked as an HPS from July 2014 to March 29, 2018, recalled that in mid-2014 Fresenius decided to begin focusing more on non-physician referrers, sending her and others to work with hospital social workers from inside hospitals. She remembers that upper-level Fresenius management created the HPS role to network with the hospital among case management and social work staff. She spent most of her time working with the social workers to "facilitate an ease of referrals into our centers." While she spoke with some doctors at the hospitals in her role as well, social workers were the main focus. "We were told that there needed to be

someone who works with social workers because they were decision makers to provide referrals to us over our competitors," Witness No. 15 said.

b. <u>Free TOPs Education Services to Induce Referrals</u>

150.    Fresenius also provided free "community education" via its Treatment Options Programs ("TOPs") to hospitals to enable ESRD patients to learn about renal replacement therapy options and programs.  According to an internal February 7, 2011 Guidance Document, "TOPs is a community educational service that FMCNA, at no charge, makes available to interested hospitals, physicians, and community organizations (to the extent FMCNA resources and availability permit).  TOPs will continue to be made available to interested hospitals whether  such hospital participates in the Bridge Program."

151.    TOPs became a key part of ensuring that patients were discharged into a Fresenius outpatient dialysis clinic.  The TOPs training was not entirely educational, but was part of promoting the Fresenius outpatient services.

c. <u>Other Free and Below-Cost Services Provided to Hospitals to Induce Referrals</u>

152.    Fresenius provided many other free services to hospitals in addition to the Bridge Program and TOPs, which it generally referred to in promotional literature as "value added services" or "services beyond the rate."

153.    Fresenius routinely provided free services to hospitals that went beyond what was required by the acute contract, including free nursing services, free in-service training, free transportation to and from the dialysis suite, and free patient education.

154.    The contract with Scripps Health, a large health care system with five hospitals in San Diego, California, is representative of Fresenius' corporate approach to negotiation with hospitals.  Fresenius' response to a request for proposal ("RFP") from Scripps to provide dialysis

services at its San Diego hospitals makes clear that Fresenius promised to deliver significant services to the hospital at no charge, leading to Fresenius' losing over $1.5 million on its contract with Scripps as of September 2010 alone.

155.    Fresenius' "NO CHARGE" services offered to Scripps included: hourly surcharge for treatments exceeding five hours, educational services, pre-ESRD options training, discharge services and transfer of care to in-center facility, and after-hours charges.  The document also includes a description of the discharge planning services Fresenius provided to Scripps under this acute care contract, for which there is no charge, as follows: "Fresenius in San Diego has a dedicated Admissions Office *to place new dialysis patients in a Fresenius facility*" (emphasis added).  Hospitals like Scripps Health were well aware that the Bridge Program was designed to funnel discharged patients into Fresenius outpatient clinics.  These hospitals were willing partners in Fresenius' scheme, as Fresenius provided the hospitals with valuable remuneration in below-cost and free services.

156.    Internal Fresenius documents show that the hospital and Fresenius agreed to the following procedure to facilitate referrals to Fresenius clinics: "1.  Scripps electronic system sends notice to Fresenius Medical Care [of an anticipated ESRD patient discharge] and gives 1 hour for acceptance.  2. Fresenius Medical Care accepts all referrals usually in under 1 hour.  3. Scripps Case Manager [a Fresenius employee] . . . leads the Bridge effort calls the physician and gives the referral to Fresenius Medical Care case manager."

157.    An Excel spreadsheet drafted by Fresenius management entitled "Pricing Model Sample" confirms that Fresenius' contract with Scripps was a loss leader designed to induce referrals to Fresenius clinics.  This document shows several of the usual prices Fresenius charges

for the services:  after-hours charges are listed at $80 per hour and educational services range from $50 to $250 per hour.  Fresenius provided these services to Scripps at no charge.

158.    Fresenius also provided Scripps with a free service that collects and analyzes outcomes data, referred to as the "Bridge QAI" (or "Quality Assessment and Improvement Program," a quality assessment program hospitals are required by CMS to provide), free in-service training, and free discharge planning services.  Fresenius touted these and other free or "value-added" services to Scripps and other hospitals as inducements to enter into acute contracts with Fresenius.

159.    Fresenius offered a similar suite of free and reduced-cost services to Oregon Health & Science University in a presentation dated March 14, 2009, including a dedicated Inpatient Program Manager five days per week, Acute Data Collection System (ADCS), and QAI outcomes data.

160.    Other "Comparison Analysis" materials drafted by Fresenius management for its market development personnel compared Fresenius' acute services to its competitors' services in discussions with hospitals.  For example, the Comparison Analysis prepared by the company for use in negotiations with HCA Gulf Coast Hospital Division (located in Houston and South Texas, including sixteen acute care and specialty hospitals, freestanding emergency rooms, and ambulatory surgery centers, as well as more than 16,000 employees), contains an extensive list of services that were to be provided by Fresenius to hospitals at no charge, including: peritoneal dialysis exchange fees (which, according to Fresenius, were charged at up to $250 per treatment by its competitors), monitoring fees (charged by competitors at $250 per day), and additional charges for treatments lasting longer than four hours (charged by competitors at $35 per hour),

among other items.  The Comparison Analysis explains that each of these services were provided at "[n]o additional cost to hospital."

161.    Fresenius' free or below-cost acute services (*e.g.*, TOPs in-service training, CKD training to patients, Bridge discharge planning services, and QAI data analysis) constitute illegal remuneration to hospitals as those services relieved the hospitals of financial obligations they otherwise would incur in treatment, training, discharge planning, and data analysis, and were provided in exchange for referrals.  Moreover, to the extent hospitals were able to bill Medicare for the provision of these services, they constituted direct financial inducements to the hospitals to enter into contracts with Fresenius and send patients to its outpatient clinics.

### 3.  Fresenius Tracked the Success of Its Inpatient Acute Contracts in Inducing Referrals to Its Outpatient Clinics

162.    FMCNA knew that the hospital contracts resulted in referrals, and tracked those referrals in several ways:

- First, as part of the Bridge Program, *see supra* ¶¶ 129-149, Fresenius personnel who were part of the hospital discharge process were required to fill out a "Comprehensive Transition Program Intake Checklist" which included information about the "Referral Source" including the referral date, source name/title, and the hospital from which the patient had been discharged.

- Second, Fresenius also maintained an Excel spreadsheet called "Discharge Tracking Reports," which tracked new patient starts by hospital.

- Finally, using "Practice Group Tracking Reports," Fresenius kept close track of referrals from physicians, including those generated by physicians who were medical directors, JV partners, or otherwise financially affiliated with Fresenius, such as through the practice management agreements described below, *see infra* ¶ 309.

163.    The information in these databases, which also included information about referrals generated by Fresenius' medical directors and JV partners, was reported to FMCNA headquarters. Mid-level management (regional, area, and district managers) kept close tabs on where new patient admissions originated through frequent calls with clinic managers.  Through these conversations, Fresenius management was well aware of which clinics were adding patients from hospital programs serviced by the company.

164.    Fresenius carefully tracked the below- or no-cost discharge planning services which were regularly provided to hospitals.  For example, an internal document entitled "CASE STUDY: SCRIPPS HOSPITAL SYSTEM – Bridge Program" provides "Metrics" for the success of the Bridge Program at Scripps, including an average of 16.33 referrals to a Fresenius dialysis clinic each month:

Metrics
The following data is collected monthly and shared with the Scripps Acute Dialysis Team:

| Case management/discharge planning activity | Past 6 months |
|---|---|
| Number of new dialysis patients referred per month | 16.33 |
| Discharge documentation completed | 96.3% |
| Initial response time < 1 hour | 96.3% |
| Dialysis schedule & clinic appointment documented | 99.0% |
| MD notified | 99.0% |
| Transportation scheduled & documented | 97.8% |
| Clinic choice offered & documented | 90.3% |
| Teaching packet reviewed & documented | 100.0% |

165.    Extrapolating from this data, Fresenius received some 192 referrals per year from Scripps Hospital as a result of the acute contract and the Bridge Program.  Consistent with Fresenius' internal data, which reflects that at most, 10-12% of patients in its outpatient clinics were commercially insured patients, eighty-eight to ninety percent of the treatments resulting from these Scripps referrals were paid for by Federal health care programs.  At an average of three treatments per week per patient, those 172 additional patients (whose treatments were paid for by

Federal health care programs) received some 26,832 treatments each year.  Because the average dialysis patient stays in treatment for at least five years, the total value of these additional referrals to Fresenius during a five-year period from this single hospital system exceeded an estimated $30 million.  Every claim for reimbursement associated with treating these patients that was submitted to Federal health care programs was tainted by kickbacks and constituted a false claim.

166.    Through the circumstances alleged above, including the provision of services at below cost and at no cost to hospitals in order to induce referrals to its outpatient clinics, Fresenius violated the AKS, which prohibits the payment of remuneration to secure referrals.  Through these practices, Fresenius essentially paid hospitals to secure referrals, in violation of the AKS.  Any claims submitted for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this scheme are false claims within the meaning of the FCA.

**B.      Fresenius' Improper Remuneration Relationships with Physicians Who Served as Medical Directors in Fresenius Outpatient Clinics**

167.    At all times material hereto, a significant number, if not the majority, of referrals to Fresenius clinics came through referrals from physicians with whom Fresenius had multiple remuneration relationships that were not at FMV or otherwise did not comply with regulatory safe harbors under the AKS, including medical director contracts to oversee individual Fresenius clinics.  Those relationships, and the payment of fees that exceeded FMV for which little or no work was expected or required, were designed to induce referrals to Fresenius clinics.

168.    A core part of Fresenius' acute care contracts involved a separate contract with a hospital nephrologist, whose job it was to funnel discharged ESRD patients to Fresenius clinics. These nephrologists were handsomely rewarded under medical director agreements ("MDAs") that far exceeded FMV for the services rendered.  Fresenius' HSS or HPS personnel worked with the hospital medical director to identify patients who needed ESRD treatment and to direct them

to Fresenius clinics.  Fresenius often had separate remuneration relationships with these medical directors, paying them at least in part to refer patients to Fresenius clinics.

169.    According to Witness No. 9, dialysis frequently begins when a patient "crashes and burns into the hospital," requiring emergent treatment for kidney failure in the hospital's emergency room ("ER") and/or intensive care unit ("ICU").  "[T]hat phone call from the ER drives the business for the nephrologist."   As such, the ER and ICU became "hunting grounds" for nephrologist medical directors who wanted to boost their referrals and their compensation from Fresenius.  These physicians would do rounds in the ER and ICU, even if they were not responsible for the care of any patients in those areas, attempting to identify patients with kidney failure who would require dialysis and direct their referral to Fresenius facilities.

### 1.    The Role of the Medical Director in Dialysis Clinics

170.    Medicare regulations require that each dialysis clinic have a medical director who assumes substantial oversight functions for the operation and safety of the clinic.  These oversight functions include responsibility for processes of care and outcomes, staff education, dialysis technology, water quality and reuse, and infection control.  The medical director is also responsible for developing and implementing the Quality Assessment and Performance Improvement ("QAPI") program related to patient care described in CMS's Conditions for Coverage ("CfC"), in conjunction with the facility's interdisciplinary care team.  The CfC regulations define standards that health care organizations must meet to participate in the Medicare and Medicaid programs. These regulations define regulatory policy for general provisions, patient safety, patient care, and clinic administration.

171.    In the realm of ESRD, the CfC extensively defines the medical director's roles and responsibilities, giving global responsibility to the medical director for the dialysis patient population safety, the facility staff safety and training, and clinical oversight for all patients in the

facility, including those attended by other nephrologists credentialed in the facility. Additionally, the medical director is expected to be knowledgeable about all the aspects of facility operation for which he/she is responsible, and should be prepared to demonstrate this knowledge if requested by state surveyors. Further, the medical director is accountable for the patient care processes and outcomes achieved by members of the medical staff of the facility, including all attending nephrologists who see patients in that clinic, and is responsible for facilitating the quality improvement of underperforming physicians.[55]

172.     With regard to time expectations for medical directors, the regulations state that the medical director should "devote sufficient time" to carry out her/his responsibilities and offers as a "guideline" that the job requires one quarter of a typical full-time equivalent ("FTE"), defined as a 40-hour work week. The language addressing time expectations from the CfC Interpretive Guidelines states: "The medical director should devote sufficient time to fulfilling these responsibilities. As a guideline, the financial cost report each facility must file annually with CMS considers the medical director position to reflect a 0.25 FTE."

173.     Medical directors should document their regular and active presence in the dialysis facility. According to the Medical Director Toolkit, developed by members of the Forum of ESRD Networks' Medical Advisory Council, medical directors of dialysis units "should be prepared to offer documentation of a regular and active presence in each unit, particularly including activities not directly related to the care of individual patients. State surveyors or ESRD Network personnel may well ask unit staff, not just the medical director herself, about the level of the involvement of the medical director in unit activities."[56]

---

[55] 42 C.F.R. § 494.150.
[56] *Id.* at 10.

174.    The CfC Interpretive Guidance states that non-compliance with the responsibilities of the medical director may result in "[s]ignificant deficient practices in patient care policy and procedure development or implementation in which a lack of involvement and oversight by the Medical Director was a contributing factor."[57]

### 2. Fresenius Selected Medical Directors for Its Outpatient Clinics Based Upon the Number of Expected and Historical Referrals

175.    Fresenius used the medical director position to recruit and reward physicians who were in a position to refer patients to its clinics and paid medical directors exorbitant amounts for the number of patients they had referred to those clinics.

176.    In recruiting medical directors for its outpatient clinics, Fresenius openly spoke of the fact that the nephrologists could earn significant monies for minimal effort.  When hiring medical directors for its clinics, Fresenius focused upon courting nephrologists in multi-physician private practices with high numbers of patients who potentially could be referred to Fresenius clinics.  Many such physician groups had multiple medical director appointments covering multiple Fresenius clinics.  Fresenius' pitch was simple:  You can earn a great deal of money—often much more than $100,000 annually—for little or no investment of time.  In exchange, all you have to do is refer your patients to our clinics.

177.    Fresenius has regularly engaged in improper remunerative relationships with physicians who serve as medical directors at Fresenius clinics, negotiating exorbitant compensation that is not based upon competition, professional qualifications, the size of the clinics or expected tasks at the clinics where they served as medical directors.  In fact, as explained in

---

[57] U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., *Interpretative Guideline Medical Director Reference Table* 16 (2014), *available at* https://cjasn.asnjournals.org/content/clinjasn/suppl/2014/10/02/CJN.04920514.DCSupplemental/CJN04920514SupplementaryData.pdf.

more detail below, compensation varies widely between the same medical directors, or different medical directors in the same geographical area, and at least one (if not the only) explanation for the differential in pay is the physicians' ability to generate referrals to Fresenius' outpatient clinics. *See infra* ¶¶ 199-204.

178.    Despite the fact that medical directors could ostensibly attend patients at any clinic—even those owned by Fresenius' competitors—provisions permitting a physician to treat patients at any clinic were substantially undermined by pressure exerted by Fresenius, insisting physicians steer patients only to Fresenius clinics where they had a financial interest, rather than to make decisions based upon what was best for the patient.

179.    The number of potential referrals was key to selecting medical directors for its outpatient dialysis clinics. Witness No. 16, a Vice President of the Western Business Unit from October 2007 to June 2011, where he was responsible for developing new dialysis centers by identifying and developing medical directorships with physicians, explained that "[t]here was a keen awareness of patient volumes." According to Witness No. 16, "Fresenius would look at a particular physician, the sheer number of chronic kidney patients and the potential referral component downstream" in determining whom to partner with using an MDA.

180.    In his role as RVP for Michigan, Indiana and Ohio overseeing around thirty-five Fresenius clinics between April 2016 and May 2020, Witness No. 4 saw how Fresenius structured its arrangements with doctors by hiring doctors from practice groups to serve as medical directors of its clinics. The arrangements were very lucrative for the doctors. "The younger nephrologists especially all understand that where they make money is through medical directorships," he said.

181.    According to Witness No. 4, many physician groups had multiple medical director appointments covering multiple Fresenius clinics. "If you could get a couple of medical

directorships, you'd be sitting pretty. A medical directorship is your ticket." Witness No. 4 recalled Fresenius pitching medical director positions to nephrologists as involving "minimal" time or "1 to 2% of your time" for "maximum compensation." Fresenius consistently emphasized the ability of a nephrologist to earn a considerable income for little or no investment of time.

182.   Witness No. 17, a Fresenius Director of Operations and RVP from June 2014-March 2019, had responsibility for fifty Fresenius dialysis centers in Michigan and central Illinois, and oversaw their finances, operations, and quality. Witness No. 17 recalled thinking that Fresenius' main customer appeared to be the nephrologist, not the patient. Consistent with other witnesses who remember that patient choice and care was sacrificed for the bottom line, Witness No. 17 said that all of these nephrologists "have a stake in the game. They're tied to Fresenius through the MDs [medical directorships]. It's not about where the patient wants to go, it's about where the MD has a stake."

183.   When seeking to hire nephrologists to become medical directors, Fresenius used software called Nephro-Logix to track "key performance indicators" for how many patients each nephrology group had in its pipeline, where those patients lived, what stage of kidney disease they had, their demographics, and their insurance status. Those Nephro-Logix inputs drove Fresenius' decision of where to set up a new dialysis clinic, and which nephrologist and/or practice group to hire as medical director.

184.   Witness No. 17 recalled that medical directors were compensated based on the number of patients a doctor had, and were adjusted upward as the number of patients in a given clinic grew over time. However, Fresenius was careful to avoid using such explicit language in their written agreements: "The MDA is always based off number of patients, but I'm sure it doesn't exactly say that, because that would be pay-to-play." Witness No. 17 used the term "pay-to-play"

to describe Fresenius' approach to nephrologists and medical directorships.  "Look, why do you even have an MD [medical director] agreement?  To get patients.  Fresenius could hire its own MD [medical director] and pay it $250K a year.  But why would Fresenius do that?  It wouldn't bring in patients.  It's pay-to-play."

185.   Fresenius' internal documents show just how important the physician referral pipeline was to Fresenius and how it strategically has used MDAs and other incentives to induce referrals from its loyal "partner" physicians.  In late 2012, Fresenius tasked each division with developing a strategic plan to increase organic growth.  The resulting Strategic Plan Review documents reveal significant detail about how Fresenius used MDAs to generate referrals.  Those Strategic Plans went directly to, and were reviewed and approved by, Ron Kuerbitz, the CEO of Fresenius in 2012, as well as other top management personnel.  Kuerbitz knew, and intended, that the company would remunerate nephrologists in the form of above-FMV medical directorships to induce these nephrologists to refer patients to Fresenius clinics.

186.   For example, the appendix to the November 28, 2012 "West Division Pacific Group – Northern California Region Strategic Plan Review" reveals how Fresenius used its relationships with physicians to generate referrals.  One slide notes that "Dr. Tay is MD [medical director] at Fremont and Ardenwood" and that he is "interested in JV [Joint Venture] de novo."  The Plan notes that "[i]f so, it would be good to split his current MDA's [medical director agreements]; renew for Fremont and new JV, and release Ardenwood for KP [Kaiser Permanente] MD."

187.   The author of this Plan, which was reviewed and approved by Fresenius upper management, also notes that "Dr. Smith has very few patients; jeopardizing the viability of the unit.  We would like to explore ways to reassign this unit to Fresno Nephrology with whom a JV agreement is imminent."  If the financial viability of a clinic were not dependent on a steady stream

of referrals from a medical director, and the compensation of each medical director actually based on FMV, the number of Dr. Smith's patients should not have mattered. Fresenius' concern regarding Dr. Smith and its desire to replace him with another group of Fresenius-affiliated physicians demonstrates that the company used medical director agreements and other financial incentives to induce or reward referrals.

188.    The discussion of doctors and their referrals in the Strategic Plan developed in the Western Division continues: "Dr. Tilles contract renewal is critical. Currently, he is only physician referring to San Jose and has majority of Los Gatos. He must be secured for at least one more year at San Jose and indefinitely in Los Gatos" (emphasis added). Again, it was "critical" to retain this doctor as a medical director (and to continue paying kickbacks) only to ensure continued referrals.

189.    The Plan also noted that some medical directors were not "productive"—*i.e.*, they were not fulfilling their end of the bargain to refer patients to Fresenius clinics—and that the company should consider shortening the length of MDAs to provide it with more leverage in negotiations: "consider shortening length of contracts (3 years max?) Drs. Paukert and Smith have 10-year contracts which are hampering our efforts to make their respective units productive." By shortening the length of these contracts, Fresenius could more effectively induce and reward the referral of patients to its facilities.

190.    The Strategic Plan also discusses the importance of Fresenius' acute contracts to the referral pipeline, and how acute contracts worked in tandem with MDAs: "Kaiser [Permanente] The importance of maintain[ing] and reversing the trend in this relationship cannot be overstated; reduced rate by $15-$20 will allow us to retain ALL current patients, make MDA's available whenever possible." In other words, Fresenius planned to reduce its rates substantially to provide inpatient acute care at Kaiser Permanente facilities, which would incentivize Kaiser to

continue referring patients to Fresenius' outpatient clinics.  Awarding MDAs to Kaiser physicians would provide further incentives to keep referrals flowing to Fresenius.

191.    To make sure it focused its sales efforts on the physician groups with the highest potential to refer patients to its dialysis clinics, Fresenius sales calls on practice groups were prioritized into three "Tiers"—Tier 1, Tier 2, and Tier 3—with Tier 1 practices having the highest priority because they had the highest potential to refer business to a Fresenius clinic, what it termed a "common goal" —*i.e.*, they will work "actively in establishing common goals":



192.    Fresenius also provided reports for business development employees to use in planning their sales calls with customers, which tracked the potential for success in inducing referrals from nephrologist practice groups.  For instance, a sample of a Q1 2012 tracking report information for the South Division for "Tier 1" high priority practice groups in Alabama, Mississippi, Florida, and Texas, shows each group's name, the number of practice locations, whether it was a JV, the number of patients treated by the practice, the Q1 2012 "organic growth" (*i.e.,* any growth in patients treated in its dialysis centers during a certain period in a given area

minus acquisitions), revenue per treatment, the group's priority status (in this case, all "High"), and a narrative comment about the group:

| Senior Director | Group | Group Tier | Locations | JV Units | Practice's Patients | Q1 '12 Facility Org Growth | Q1 '12 Facility Com Mix | Facility Q1 '12 Rev Per Txt | Facility Q1 '12 Com Rev Per Txt | Priority | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chad Heise | Nephrology Associates Pc  (Al-Birmingham) | Tier 1 | 16 | No | 990 | 5.7% | 12.5% | $381.44 | $1,463.48 | High | Large Practice Group & We Have Groups Data |
| Chad Heise | Nephrology Associates Of Mobile, P.C. | Tier 1 | 13 | No | 937 | 1.6% | 7.3% | $314.14 | $1,483.05 | High | Large Practice Group |
| Chad Heise | Central Nephrology Clinic | Tier 1 | 11 | No | 603 | 1.9% | 7.8% | $309.04 | $1,478.94 | High | Have Data |
| Chad Heise | Pensacola Nephrology, P.A. | Tier 1 | 7 | No | 438 | 6.1% | 5.5% | $255.60 | $627.81 | High | Large Practice Group & We Have Groups Data |
| Chad Heise | Pensacola Nephrology | Tier 1 | 3 | No | 219 | 12.4% | 7.8% | $314.84 | $1,065.21 | High | Good Growth & Home Penetration |
| Jacqueline Palesch | Renal Specialists Of Houston | Tier 1 | 20 | No | 1,094 | 8.1% | 12.0% | $306.67 | $824.39 | High | Large Practice Group & We Have Groups Data |
| Jacqueline Palesch | Southwest Nephrology Associates (TX) | Tier 1 | 6 | No | 586 | 5.9% | 9.9% | $299.35 | $889.10 | High | Large Practice Group & We Have Groups Data |
| Jacqueline Palesch | Austin Diagnostic Clinic | Tier 1 | 7 | No | 462 | 9.5% | 11.9% | $321.40 | $919.60 | High | Large Practice Group & We Have Groups Data |
| Jacqueline Palesch | Tyler Nephrology Associates, Pa | Tier 1 | 15 | Yes | 452 | -4.4% | 9.6% | $284.66 | $928.49 | High | Large Practice Group & We Have Groups Data |

193.    A sample of another Q1 2012 tracking report shows the same information for the West Division for Tier 1 practice groups in New Mexico, Arizona, Oregon, Washington, Hawaii, California, Texas, Kansas, Oklahoma, and Colorado:

| Senior Director | Group | Group Tier | Locations | JV Units | Practice's Patients | Q1 '12 Facility Org Growth | Q1 '12 Facility Commerci al Mix | Facility Q1 '12 Rev Per Txt | Facility Q1 '12 Com Rev Per Txt | Priority | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Doug Pressley | Renal Medicine Associates | Tier 1 | 10 | Yes | 844 | 2.3% | 11.3% | $535.35 | $2,873.37 | High | Large Practice Group with Joint Ventures and High Revenue |
| Doug Pressley | Desert Kidney Associates, Plc | Tier 1 | 16 | Yes | 703 | 5.7% | 7.6% | $302.10 | $1,061.99 | High | Large Practice Group, with Joint Ventures and We Have Groups Data |
| Doug Pressley | Northwest Renal Clinic | Tier 1 | 11 | Yes | 647 | -1.8% | 17.2% | $563.24 | $1,957.64 | High | Large Practice Group, with Joint Ventures and We Have Groups Data |
| Doug Pressley | Eugene Springfield Nephrology Associates | Tier 1 | 3 | No | 373 | 7.4% | 9.5% | $446.12 | $2,548.15 | High | Large Practice Group with High Revenue |
| Doug Pressley | ROCKWOOD CLINIC | Tier 1 | 13 | Yes | 296 | 4.9% | 11.9% | $498.01 | $2,393.99 | High | Large Practice Group with Joint Ventures and High Revenue |
| Doug Pressley | Olsten Division Of Nephrology | Tier 1 | 1 | Yes | 137 | 20.6% | 14.3% | $680.74 | $2,789.93 | High | Medium Practice Group with Joint Ventures and High Revenue |
| Mayya Yukilevich | Balboa Nephrology Medical Group | Tier 1 | 20 | Yes | 1,902 | 2.9% | 6.9% | $302.46 | $794.71 | High | Large Practice Group & We Have Groups Data |
| Mayya Yukilevich | Kantor Nephrology Consultants | Tier 1 | 11 | No | 726 | 3.3% | 22.4% | $342.59 | $697.88 | High | Large Practice Group & We Have Groups Data |
| Mayya Yukilevich | Vista Del Mar Medical Group | Tier 1 | 5 | No | 407 | -3.0% | 9.2% | $308.17 | $881.63 | High | Large Practice Group & We Have Groups Data |
| Mike Buck | Dallas Nephrology Associates | Tier 1 | 30 | No | 2,918 | 5.2% | 10.7% | $289.44 | $814.02 | High | Large Practice Group - work with after JV finalized |
| Mike Buck | Renal Associates, Pa (TX) | Tier 1 | 24 | No | 1,795 | -2.7% | 8.9% | $287.36 | $828.72 | High | Large Practice Group & We Have Groups Data |
| Mike Buck | Dialysis Associates (TX) | Tier 1 | 10 | No | 666 | 3.8% | 12.0% | $315.46 | $889.17 | High | Large Practice Group & We Have Groups Data |
| Mike Buck | Bay Area Kidney Disease Physicians | Tier 1 | 11 | No | 584 | -1.0% | 8.8% | $270.23 | $716.38 | High | Large Practice Group & We Have Groups Data |
| Mike Buck | Kansas Nephrology Physicians | Tier 1 | 17 | Yes | 339 | 4.4% | 11.7% | $319.90 | $1,225.23 | High | Large Practice Group & We Have Groups Data |
| Mike Buck | Kidney Specialists Central Ok | Tier 1 | 5 | Yes | 287 | -15.4% | 10.5% | $325.46 | $1,653.03 | High | Large Practice Group & We Have Groups Data |
| Mike Buck | South Plains Kidney Disease Associates | Tier 1 | 4 | No | 218 | -7.7% | 8.8% | $322.97 | $1,261.68 | High | Large Practice Group & We Have Groups Data |
| Doug Pressley | AKDHC | Tier 1 | 39 | Yes | 2,217 | 1.8% | 9.3% | $303.53 | $878.48 | Medium | Large Practice Group |

194.    Noteworthy in this list are two groups discussed herein with which Fresenius has had very significant relationships:  Balboa Nephrology Medical Group (with JVAs, and treating 1,902 patients), *see infra* ¶¶ 236-238, and Dallas Nephrology Associates (treating 2,918 patients), *see infra* ¶¶ 286-287.

195.    Internal Fresenius documents also show that MDAs were targeted for specific nephrologists based upon the number of patients they had referred to Fresenius clinics and not based upon patient care or medical necessity.  Fresenius used this data to reinforce the message that medical directors were expected to refer patients, and the pressure to do so was intense.

196.    The "Monthly Market Development Growth Metrics by Director" report tracks the trend of the referrals by the medical director and their practice groups to each Fresenius facility, including whether its medical directors and their practice groups referred patients to competitors—so-called "leakage."  *See supra* ¶¶ 217-221.  This enabled Fresenius to apply pressure on medical directors and their practice groups who sent patients to clinics owned by competitors, such as DaVita.  Fresenius bluntly told these physicians that Fresenius was paying them to be medical directors, and to make sure that in the future they sent patients exclusively to Fresenius clinics.

197.    Fresenius held monthly or quarterly meetings with physicians and physician groups that held MDAs and would display the number of patients referred to Fresenius clinics on a screen viewable by all attendees.  The purpose of these meetings was to use peer pressure to incentivize doctors to refer patients to Fresenius.  If a doctor was sending patients to clinics other than a Fresenius clinic, it would be clear to all of the participants.  Fresenius employees would then publicly chastise the doctor for costing Fresenius, and his or her practice, money.

### 3.  Fresenius Paid Medical Directors at Its Dialysis Facilities Well Above FMV to Reward Referrals

198.    Fresenius medical director contracts were very lucrative.  Fresenius medical directors received substantial compensation for their agreements to refer patients to its dialysis clinics, with the medical director for its Charlotte, North Carolina facility earning some $1.041 million in 2019 alone as reported by Fresenius itself, on the cost reports it submitted to CMS.  For example, medical directors at some 160 Fresenius clinics made over $300,000 during 2019.  The

following table lists the names and locations of these facilities, the medical director compensation at each facility ("FKC Comp."), the average medical director peer compensation at non-Fresenius clinics in the same city ("Avg. Comp."), and the ratio of compensation between Fresenius' medical directors and their peers ("Ratio")[58]:

| Name | City | State | FKC Comp. | Avg. Comp. | Ratio |
|---|---|---|---|---|---|
| FKC Charlotte NC | Charlotte | NC | $ 1,041,142 | $ 157,567 | 660.76% |
| FKC Indianapolis | Indianapolis | IN | $ 915,259 | $ 114,701 | 797.95% |
| FKC Gastonia/Lowell | Gastonia | NC | $ 872,446 | Unavailable | N/A |
| FKC Fayetteville | Fayetteville | NC | $ 753,115 | Unavailable | N/A |
| FKC Greensboro Kidney Ctr | Greensboro | NC | $ 721,508 | $ 53,584 | 1,346.50% |
| FKC Columbia Heights | Washington | DC | $ 718,405 | $ 179,768 | 399.63% |
| FKC Pitt County | Greenville | NC | $ 716,567 | Unavailable | N/A |
| FKC Brandywine Home Therapies | Newark | DE | $ 655,788 | $ 132,472 | 495.04% |
| FKC North Charlotte | Charlotte | NC | $ 608,206 | $ 157,567 | 386.00% |
| FKC Southern Indiana | Clarkesville | IN | $ 603,331 | Unavailable | N/A |
| FKC West Suburban | Oak Park | IL | $ 597,913 | $ 26,950 | 2,218.60% |
| FKC Circle City | Indianapolis | IN | $ 587,133 | $ 114,701 | 511.88% |
| FKC New Iberia | New Iberia | LA | $ 564,948 | $ 200,000 | 282.47% |
| FKC Midtown | Columbia | SC | $ 558,175 | $ 92,290 | 604.81% |
| FKC East Mobile | Mobile | AL | $ 542,260 | Unavailable | N/A |
| FKC Richmond | Richmond | IN | $ 540,157 | $ 79,001 | 683.73% |
| FKC Northwest Bexar County | San Antonio | TX | $ 536,547 | $ 139,174 | 385.52% |
| FKC Redbud | Lubbock | TX | $ 528,329 | $ 87,500 | 603.80% |
| FKC Northern Virginia | Alexandria | VA | $ 521,676 | $ 95,970 | 543.58% |
| FKC South Greensboro | Greensboro | NC | $ 519,425 | $ 53,584 | 969.37% |
| FKC Indianapolis East | Indianapolis | IN | $ 510,851 | $ 114,701 | 445.38% |
| FKC Raleigh | Raleigh | NC | $ 504,029 | $ 122,166 | 412.58% |
| FKC Wake | Raleigh | NC | $ 503,941 | $ 122,166 | 412.51% |
| FKC Southwest Houston | Houston | TX | $ 500,755 | $ 102,468 | 488.69% |
| FKC Pierremont | Shreveport | LA | $ 500,541 | $ 108,387 | 461.81% |
| FKC Central San Antonio | San Antonio | TX | $ 498,470 | $ 139,174 | 358.16% |
| FKC Beatties Ford | Charlotte | NC | $ 495,285 | $ 157,567 | 314.33% |
| FKC Indianapolis North | Indianapolis | IN | $ 491,978 | $ 114,701 | 428.92% |
| FKC Eagle Pass | Eagle Pass | TX | $ 487,305 | $ 172,000 | 283.32% |
| FKC Anchorage | Anchorage | AK | $ 480,788 | $ 175,000 | 274.74% |
| FKC West Lafayette | Lafayette | LA | $ 473,423 | $ 76,116 | 621.98% |
| FKC Columbia Home | Columbia | SC | $ 469,752 | $ 92,290 | 509.00% |
| FKC Pamlico | Washington | NC | $ 469,667 | Unavailable | N/A |

---

[58] In some instances, data for competitor compensation are unavailable.

| Name | City | State | FKC Comp. | Avg. Comp. | Ratio |
|---|---|---|---|---|---|
| FKC Los Paseos | San Juan | PR | $ 467,135 | Unavailable | N/A |
| FKC Irving | Irving | TX | $ 465,499 | $ 190,392 | 244.50% |
| FKC Kearny Mesa | San Diego | CA | $ 464,629 | $ 180,202 | 257.84% |
| FKC Kansas City | Kansas City | MO | $ 461,751 | $ 112,434 | 410.69% |
| FKC Southeast San Antonio | San Antonio | TX | $ 461,371 | $ 139,174 | 309.95% |
| FKC South Louisville | Louisville | KY | $ 459,816 | $ 121,739 | 377.71% |
| FKC Del Rio | Del Rio | TX | $ 458,499 | Unavailable | N/A |
| FKC Mission Hills | Mission Hills | CA | $ 456,037 | Unavailable | N/A |
| FKC Queens – Nyds | Jackson Hts | NY | $ 455,400 | Unavailable | N/A |
| FKC Hendricks County | Danville | IN | $ 454,365 | Unavailable | N/A |
| FKC Rosenberg | Rosenberg | TX | $ 450,172 | $ 100,000 | 450.17% |
| FKC Degraw Dialysis | Brooklyn | NY | $ 450,000 | $ 156,491 | 287.56% |
| FKC West Fayetteville | Fayetteville | NC | $ 445,310 | $ 84,048 | 529.83% |
| FKC Pioneer Valley | W. Springfield | MA | $ 443,903 | Unavailable | N/A |
| FKC Wilkes Barre | Wilkes Barre | PA | $ 440,599 | Unavailable | N/A |
| FKC ECU Dialysis | Greenville | NC | $ 437,969 | Unavailable | N/A |
| FKC North Houston | Houston | TX | $ 436,776 | $ 102,468 | 426.26% |
| FKC Suburban | Louisville | KY | $ 432,026 | $ 121,739 | 354.89% |
| FKC Southside | Chicago | IL | $ 430,161 | $ 93,993 | 457.65% |
| FKC Milford | Milford | DE | $ 428,861 | Unavailable | N/A |
| FKC McAllen | McAllen | TX | $ 427,565 | $ 133,608 | 320.01% |
| FKC Lumberton | Lumberton | NC | $ 427,326 | Unavailable | N/A |
| FKC Kokomo | Kokomo | IN | $ 420,814 | $ 30,000 | 1,402.71% |
| FKC Kinston | Kinston | NC | $ 420,487 | Unavailable | N/A |
| FKC South Ramsey Cross Cheek | Fayetteville | NC | $ 419,365 | $ 84,048 | 498.96% |
| FKC Floyd County | New Albany | IN | $ 419,119 | $ 48,495 | 864.25% |
| FKC Burlington Kidney Ctr | Burlington | NC | $ 417,501 | $ 71,808 | 581.41% |
| FKC West Charlotte | Charlotte | NC | $ 416,680 | $ 157,567 | 264.45% |
| FKC Pasadena | Houston | TX | $ 416,675 | $ 102,468 | 406.64% |
| FKC Craven County Dialysis Ctr | New Bern | NC | $ 407,080 | Unavailable | N/A |
| FKC Coastal Dialysis Ctr | Savannah | GA | $ 406,981 | $ 112,246 | 362.58% |
| FKC Berwyn | Berwyn | IL | $ 403,264 | Unavailable | N/A |
| FKC North Ramsey/Cape Fear | Fayetteville | NC | $ 401,578 | $ 84,048 | 477.80% |
| FKC Marietta | Marietta | GA | $ 399,634 | $ 75,000 | 532.85% |
| FKC Fairfax | Fairfax | VA | $ 396,480 | $ 120,815 | 328.17% |
| FKC Baytown | Baytown | TX | $ 396,121 | $ 116,500 | 340.02% |
| FKC East Springfield | Springfield | MA | $ 391,686 | $ 150,000 | 261.12% |
| FKC Albemarle | Albemarle | NC | $ 388,899 | Unavailable | N/A |
| FKC Matthews | Matthews | NC | $ 383,855 | Unavailable | N/A |
| FKC Nations Ford | Charlotte | NC | $ 382,606 | $ 157,567 | 242.82% |
| FKC Monroe | Monroe | NC | $ 379,309 | $ 241,224 | 157.24% |
| FKC Waco | Waco | TX | $ 379,167 | Unavailable | N/A |
| FKC East Charlotte | Charlotte | NC | $ 377,497 | $ 157,567 | 239.58% |

| Name | City | State | FKC Comp. | Avg. Comp. | Ratio |
|---|---|---|---|---|---|
| FKC East Greensboro | Greensboro | NC | $ 374,993 | $ 53,584 | 699.82% |
| FKC U. of Rochester – Clinton | Rochester | NY | $ 374,112 | $ 82,953 | 450.99% |
| FKC South Gastonia | Gastonia | NC | $ 373,149 | Unavailable | N/A |
| FKC Albany | Albany | NY | $ 369,088 | $ 130,000 | 283.91% |
| FKC Asheboro | Asheboro | NC | $ 367,736 | Unavailable | N/A |
| FKC Riverside Park | Wilmington | DE | $ 366,078 | $ 95,000 | 385.35% |
| FKC Dallas South | Dallas | TX | $ 364,422 | $ 89,909 | 405.32% |
| FKC Southwest Louisville | Louisville | KY | $ 364,117 | $ 121,739 | 299.10% |
| FKC Homestead Art Kidney Ctr | Homestead | FL | $ 362,291 | $ 85,151 | 425.47% |
| FKC Western Mass. Kidney Ctr | Springfield | MA | $ 362,206 | $ 150,000 | 234.80% |
| FKC Wichita Falls | Wichita Falls | TX | $ 361,122 | Unavailable | N/A |
| FKC Lincolnton | Lincolnton | NC | $ 360,825 | Unavailable | N/A |
| FKC NW Wisconsin Neenah | Neenah | WI | $ 360,572 | Unavailable | N/A |
| FKC NW Louisiana | Shreveport | LA | $ 359,837 | $ 108,387 | 331.99% |
| FKC SE New Mexico | Roswell | NM | $ 356,861 | Unavailable | N/A |
| FKC Collin County | Plano | TX | $ 353,714 | $ 106,714 | 331.46% |
| FKC Village II | Dallas | TX | $ 353,417 | $ 89,909 | 393.08% |
| FKC Roanoke Rapids | Roanoke Rapids | NC | $ 353,162 | Unavailable | N/A |
| FKC South Central Louisville | Louisville | KY | $ 352,198 | $ 121,739 | 289.31% |
| FKC Swiss Avenue | Dallas | TX | $ 351,808 | $ 89,909 | 391.29% |
| FKC East Louisville | Louisville | KY | $ 350,607 | $ 121,739 | 288.00% |
| FKC Village Oaks | Live Oak | TX | $ 347,654 | $ 166,475 | 208.83% |
| FKC Metro East Dial Ctr | Mesquite | TX | $ 346,089 | $ 141,894 | 243.91% |
| FKC North Buckner | Dallas | TX | $ 345,596 | $ 89,909 | 384.38% |
| FKC Bay Shore | Pasadena | TX | $ 345,273 | $ 83,333 | 414.33% |
| FKC New Bern | New Bern | NC | $ 345,176 | Unavailable | N/A |
| FKC Town Gate | Garland | TX | $ 344,790 | $ 108,500 | 317.78% |
| FKC Goodyear | Goodyear | AZ | $ 344,724 | $ 10,000 | 3,447.24% |
| FKC Little Rock | Little Rock | AR | $ 344,517 | $ 115,875 | 297.32% |
| FKC Rocky Mount | Rocky Mount | NC | $ 343,379 | $ 90,895 | 377.78% |
| FKC Baker | Baker | LA | $ 342,110 | Unavailable | N/A |
| FKC Bethlehem | Bethlehem | PA | $ 341,302 | $ 102,009 | 334.58% |
| FKC St. Clair Shores Dialysis | St. Clair Shores | MI | $ 339,794 | Unavailable | N/A |
| FKC Audubon | Louisville | KY | $ 339,463 | $ 121,739 | 278.84% |
| FKC Morehouse Parish | Bastrop | LA | $ 337,352 | Unavailable | N/A |
| FKC Parkview | Philadelphia | PA | $ 337,301 | $ 148,847 | 226.61% |
| FKC Christiana | Newark | DE | $ 336,339 | $ 132,472 | 253.89% |
| FKC Walnut Hill | Dallas | TX | $ 333,598 | $ 89,909 | 371.04% |
| FKC Opelika | Opelika | AL | $ 333,018 | $ 75,000 | 568.19% |
| FKC Kings Mountain | Kings Mountain | NC | $ 332,262 | $ 40,200 | 826.52% |
| FKC Bullhead City | Bullhead City | AZ | $ 331,264 | Unavailable | N/A |
| FKC Mount Airy | Philadelphia | PA | $ 330,760 | $ 148,847 | 222.21% |
| FKC Central Delaware | Dover | DE | $ 329,272 | $ 93,125 | 353.58% |

| Name | City | State | FKC Comp. | Avg. Comp. | Ratio |
|---|---|---|---|---|---|
| FKC Mobile | Mobile | AL | $ 328,661 | Unavailable | N/A |
| FKC Anderson | Anderson | SC | $ 327,720 | Unavailable | N/A |
| FKC Fort Belvoir | Alexandria | VA | $ 327,536 | $ 95,970 | 341.29% |
| FKC South Oak Cliff | Dallas | TX | $ 325,001 | $ 89,909 | 361.48% |
| FKC Midland | Midland | TX | $ 325,000 | $ 94,821 | 342.75% |
| FKC Southern Westchester | Yonkers | NY | $ 324,066 | $ 146,558 | 221.12% |
| FKC Westminster | Houston | TX | $ 323,468 | $ 102,468 | 315.68% |
| FKC Heart Of Ohio | Marion | OH | $ 323,278 | $ 99,162 | 326.01% |
| FKC Woodstock | Woodstock | GA | $ 323,114 | $ 84,997 | 380.15% |
| FKC Columbia | Columbia | TN | $ 321,823 | $ 90,321 | 356.31% |
| FKC Blue Island | Blue Island | IL | $ 321,232 | Unavailable | N/A |
| FKC Springfield Midwest | Springfield | MO | $ 320,141 | $ 159,358 | 301.01% |
| FKC Columbia | Columbia | SC | $ 319,467 | $ 92,290 | 346.16% |
| FKC Azalea City | Mobile | AL | $ 318,559 | Unavailable | N/A |
| FKC Northwest Philadelphia | Philadelphia | PA | $ 316,451 | $ 148,847 | 212.60% |
| FKC Jersey City | Jersey City | NJ | $ 316,061 | $ 126,270 | 250.31% |
| FKC Cutler Ridge | Cutler Bay | FL | $ 315,872 | $ 80,000 | 394.84% |
| FKC Northwest Kidney Ctr | Greensboro | NC | $ 315,175 | $ 53,584 | 588.19% |
| FKC North Albuquerque | Albuquerque | NM | $ 315,027 | $ 114,565 | 274.98% |
| FKC Southern Manhattan | New York | NY | $ 315,000 | $ 209,215 | 150.56% |
| FKC Trenton | Trenton | NJ | $ 314,822 | $ 155,478 | 202.49% |
| FKC Appleton | Appleton | WI | $ 314,541 | Unavailable | N/A |
| FKC North Roanoke | Roanoke | VA | $ 313,431 | $ 50,000 | 626.86% |
| FKC Memphis Downtown | Memphis | TN | $ 312,474 | $ 100,297 | 311.55% |
| FKC Independence | Independence | MO | $ 312,408 | $ 121,187 | 257.79% |
| FKC Whitehall | Whitehall | PA | $ 311,708 | $ 94,160 | 331.04% |
| FKC South Miami | Palmetto Bay | FL | $ 311,161 | $ 74,722 | 416.24% |
| FKC Elkton | Elkton | MD | $ 309,353 | Unavailable | N/A |
| FKC Camp Springs | Suitland | MD | $ 309,318 | Unavailable | N/A |
| FKC Irvington | Irvington | NJ | $ 308,994 | Unavailable | N/A |
| FKC South Cobb | Austell | GA | $ 308,983 | $ 115,827 | 266.76% |
| FKC Grand Prairie | Grand Prairie | TX | $ 308,411 | $ 97,000 | 317.95% |
| FKC Mancuso Lane | Baton Rouge | LA | $ 307,628 | $ 104,536 | 294.28% |
| FKC Elk Grove | Elk Grove Vill. | IL | $ 307,343 | Unavailable | N/A |
| FKC Neomedica South | Chicago | IL | $ 306,919 | $ 93,993 | 326.53% |
| FKC Vernon | Kinston | NC | $ 305,429 | Unavailable | N/A |
| FKC Dupont Circle | Washington | DC | $ 304,503 | $ 179,768 | 169.39% |
| FKC West Plano | Plano | TX | $ 303,917 | $ 106,714 | 284.80% |
| FKC Burke County | Morganton | NC | $ 303,903 | Unavailable | N/A |
| FKC Maryvale | Phoenix | AZ | $ 302,568 | $ 106,965 | 282.87% |
| FKC Redbird | Dallas | TX | $ 301,801 | $ 89,909 | 335.67% |
| FKC Southwest Greensboro | Jamestown | NC | $ 301,416 | Unavailable | N/A |
| FKC Central Fort Worth | Fort Worth | TX | $ 301,000 | $ 123,280 | 244.16% |

| Name | City | State | FKC Comp. | Avg. Comp. | Ratio |
|------|------|-------|-----------|------------|-------|
| FKC Pleasant Run | Desoto | TX | $    300,839 | $    180,742 | 166.45% |
| FKC Tupelo | Tupelo | MS | $    300,125 | Unavailable | N/A |
| FKC Desert Milagro | Odessa | TX | $    300,000 | $    111,718 | 268.53% |

199.    Even assuming that these medical directors actually worked the expected eight to ten hours a week as Fresenius falsely claims on the cost reports it submits to CMS, *see supra* ¶ 30, the average hourly rates for these top 160 Fresenius medical directors (which range from $600 per hour to over $2,000 per hour) are well in excess of average hourly medical director compensation at other, non-Fresenius facilities.

200.    By serving as a medical director for Fresenius, a nephrologist can easily substantially increase his or her annual salary for just a few hours of work per month.  The aforementioned MDA compensation rates do not replace a nephrologist's ordinary salary; they supplement it.  Indeed, it is crucial to Fresenius that these medical directors continue to participate in thriving individual practices; if they devoted all of their time to directing a Fresenius clinic, they would be unable to generate referrals and would therefore be useless to Fresenius.   Therefore, a Fresenius medical director can expect to earn, on average, roughly $300,000 annually *plus* lucrative medical director compensation from Fresenius.

201.    The medical director compensation paid by Fresenius has at all times material hereto been well above FMV.  For example, the Renal Associates Nephrology Practice Business Benchmarking Survey determined that the median nephrologist compensation was $282,280 in 2005.  A 2007 survey by the Medical Group Management Association ("MGMA") determined that the median compensation for nephrologists was $299,121; 2008 median compensation was $308,943.  A similar compensation survey by Medscape determined that median compensation for nephrologists in 2019 was $305,000.

202.    These surveys demonstrate that nephrologist compensation has not changed substantially in the years since 2005, and that nephrologists can expect to earn, on average, approximately $147 per hour in their practices—a stark contrast to the exorbitant hourly rates Fresenius pays many of its medical directors.

203.    In cities across the country, Fresenius not only pays its medical directors far more than the industry average, it pays its medical directors far more than DaVita, its chief competitor, pays its own medical directors.   The following table shows the average medical director compensation among Fresenius facilities ("FMCNA Comp."), the average medical director compensation among non-Fresenius facilities ("Avg. Comp."), a comparison of Fresenius' compensation to the average ("FMCNA v. Avg."), the average medical director compensation among DaVita facilities ("DaVita Comp."), and a comparison of Fresenius' compensation to DaVita's ("FMCNA v. DaVita"):

| City | FMCNA Comp. | Avg. Comp. | FMCNA v. Avg. | DaVita Comp. | FMCNA v. DaVita |
|------|------------|-----------|---------------|--------------|-----------------|
| Alexandria, VA | $ 424,606 | $ 95,970 | 442.44% | $ 102,405 | 414.63% |
| Baton Rouge, LA | $ 209,460 | $ 104,356 | 200.72% | $ 104,356 | 200.72% |
| Charlotte, NC | $ 363,255 | $ 157,567 | 230.54% | $ 174,014 | 208.75% |
| Dallas, TX | $ 261,066 | $ 89,909 | 290.37% | $ 108,279 | 241.10% |
| Indianapolis, IN | $ 321,426 | $ 114,701 | 280.23% | $ 116,142 | 276.75% |
| Kansas City, MO | $ 352,178 | $ 112,434 | 313.23% | $ 99,016 | 355.68% |
| Lafayette, LA | $ 303,927 | $ 76,116 | 399.29% | $ 103,029 | 294.99% |
| Little Rock, AR | $ 236,247 | $ 115,875 | 203.88% | $ 100,333 | 235.46% |
| Louisville, KY | $ 208,285 | $ 121,739 | 171.09% | $ 107,753 | 193.30% |
| Marietta, GA | $ 206,128 | $ 75,000 | 274.84% | $ 82,500 | 249.85% |
| Nashville, TN | $ 227,640 | $ 84,283 | 270.09% | $ 74,997 | 303.53% |
| Raleigh, NC | $ 316,123 | $ 122,166 | 258.77% | $ 122,166 | 258.77% |
| Rochester, NY | $ 186,604 | $ 82,953 | 224.95% | $ 82,953 | 224.95% |
| Savannah, GA | $ 295,280 | $ 112,246 | 263.07% | $ 109,295 | 270.17% |
| Shreveport, LA | $ 274,389 | $ 108,387 | 253.16% | $ 80,988 | 338.80% |
| Spokane, WA | $ 211,912 | $ 78,512 | 269.91% | $ 78,512 | 269.91% |

204.    These data demonstrate that Fresenius' compensation of its medical directors cannot be explained by competition or market forces.  The difference is also not explained by differing duties and responsibilities, because the duties of dialysis clinic medical directors are defined by uniform federal regulations.  Instead, at least one (if not the only) reason Fresenius pays its medical directors so far above FMV is in order to secure referrals.  At least in part because of receiving this above-FMV compensation from Fresenius, the medical directors for the foregoing facilities and in the foregoing cities have referred patients to Fresenius facilities, the majority of whose care was paid for by Federal health care programs.  Every claim submitted to these programs for reimbursement was tainted by kickbacks and thus constitutes a false claim under the FCA.

205.    These data are merely illustrative of Fresenius' longstanding efforts—over more than ten years—to bribe nephrologists to refer patients to Fresenius facilities.

### 4.   Fresenius Made No Effort to Report or Verify Hours Spent by Medical Directors

206.    Although Fresenius' cost reports submitted to CMS for individual clinics represent that all of its medical directors spend an average of 8 to 10 hours per week on their medical director duties, there is, in fact, no evidence that medical directors spend anywhere near that amount of time on their duties.  This is because Fresenius does not require, and the majority of medical directors do not maintain, adequate documentation that would show that they performed anything more than nominal services.

207.    Nor is there documentation to show that medical directors contracted by Fresenius were regularly and actively present in the dialysis facility as required by CMS regulations, *see supra* ¶ 32, making Fresenius' cost reports false and misleading.  At least one purpose of the exorbitant medical director salaries paid by Fresenius was to reward or induce physicians in exchange for a steady stream of patient referrals.

208.     In order to establish FMV for medical direction services, Fresenius must be able to accurately track the time spent on medical director duties.  However, at no time relevant hereto has Fresenius required its medical directors to account for time spent on their duties or prove attendance at meetings at outpatient or inpatient facilities in connection with their contracts. Instead, Fresenius only provided its medical directors with a quarterly "checklist" of duties they supposedly performed.

209.     In Relator's experience, Fresenius made few meaningful efforts to track what services medical directors actually performed.  Relator Flanagan recalls medical directors often spent almost no time at all in the dialysis clinic.  Some medical directors never showed up in the clinic, and were even absent during CMS and state licensing survey or audit inspections.  Their involvement often was limited to a perfunctory monthly review of documents that require a medical director's signature, requiring less than an hour of time per month.  Nonetheless, despite it being widely known at Fresenius that many medical directors performed little of their required services, the company never attempted to track the hours worked by these medical directors or account for whether they actually were providing the services required by their MDAs and the CMS CfC regulations.  *See infra* ¶¶ 170-174.

210.     One nephrologist, Dr. Charles K. Crumb, from Southwest Nephrology Associates, LLP in Houston, Texas, was the medical director for twenty-nine Fresenius hospital inpatient acute care contracts.[59]  Other than attending quarterly meetings with clinic staff, Dr. Crumb failed to

---

[59] Dr. Crumb was the Fresenius inpatient Medical Director for some 29 Houston area hospitals: Bellaire Medical Center, Twelve OAKS d/b/a Bayou City, Park Plaza Hospital, Cypress Fairbanks Hospital, Bayshore Medical Center, Clear Lake Regional Hospital, Kingwood Medical Center, West Houston Medical Center, West Houston Medical Center, IHS Hospital at Houston, Methodist Willowbrook Hospital, San Jacinto Methodist Hospital, Memorial Hermann Memorial City Hospital, Memorial Hermann Northwest Hospital, Memorial Hermann Southeast Hospital,

perform any of the other duties required by his MDA, including being present during surveys or audits of his dialysis facilities. Despite it being well known at Fresenius that he rarely, if ever, performed any actual services, neither Fresenius management nor any employee took action to ensure Dr. Crumb was performing the services promised under his MDAs. Indeed, there were no efforts by Fresenius to ensure it could account for Dr. Crumb's actual services performed or hours worked for some 1,897 hemodialysis patients receiving ESRD care at the acute care facilities where he held medical directorships.

211.    Witness No. 4, *see supra* ¶ 106, recalls many medical directors rarely, if ever, were even present at the Fresenius facilities to oversee patient care other than to sign paperwork. In his experience, medical directors frequently did not even attend monthly staff meetings at the clinics they supposedly direct, and their involvement often was limited to a token monthly review of documents that require a medical director's signature. This behavior was widespread at Fresenius. Instead of being hired for the patient care they were to oversee at Fresenius clinics, these physicians were chosen to become medical directors based upon their proven (or anticipated) ability to provide referrals of patients for treatment.

212.    Witness No. 18, who was Director of Hospital and Patient Services, Western Division, from May 2011 to May 2012, explained that being a medical director was typically a very cushy job. "I'll tell you, there are very little responsibilities. It's up to the [medical director] to decide how engaged he wants to be in the clinic. He's [only] asked for one or two operational

---

Memorial Hermann Katy Hospital, Memorial Hermann Southwest Hospital, Memorial Hermann The Woodlands, Memorial Southwest, Herman Medical Center, Northeast Medical Center, Polly Ryan Memorial Hospital, Select Specialty Hospital, The Specialty Hospital of Houston (Houston Campus), The Specialty Hospital of Houston (Clear Lake Campus), Spring Branch Medical Center, Vencor Hospital - Houston Northwest, Vencor Hospital - Bay Area, Triumph Healthcare, LLC (Baytown), and Triumph Healthcare, LLC (Sugarland).

meetings a month" with Fresenius. "Some [medical directors] are [actually] supervising, dealing with operations, inventory, equipment," but many other "will come in, see patients and go back, and attend monthly meetings and that's it.  It's very few hours."

213.    Witness No. 19, a Fresenius Vice President of Operations from June 2015 to February 2016, said the failure to oversee medical directors negatively affected Fresenius's quality of care.  "At the end of the day, the patients have paid the price.  At the end of the day, look at the quality of care.  Are the doctors rounding when they need to be rounding?  Are they filling out the records thoroughly?  It goes on and on."  She recalled how she and Arturo Villamil, the VP of Operations at Fresenius Medical Care, "got dragged in" to meet with representatives of one of health plan who "read us the Riot Act" over Fresenius physicians not "spending enough time with patients, and their medical protocols were not the most appropriate."  Witness No. 19 recalled that during this meeting "my throat turned dry and the gentleman sitting next to me [Arturo Villamil] turned red, because it was true . . . .  The reality is there's not a lot of control over this."

214.    Despite its public claims to the contrary, Fresenius' excessive medical director payments are not solely explained by competition, experience, or by the number of stations or patients at a clinic, but at least in part (if not entirely) by the total stream of referrals that come from the MDAs, as explained in more detail below.

### 5. Fresenius Carefully Tracked Referrals from Medical Directors to Make Sure They Were Not Referring Patients to Competitors

215.    Fresenius' clinic reports tracked physicians' referrals for each of its outpatient clinics, including tracking of "Facility Metrics" (including total patients treated, YTD treatments per day, and utilization), physicians with patients at the facility and at other Fresenius facilities, and a market share summary.  The report thus gave a real-time scorecard to measure the growth in physician referrals.

216.    For instance, an April 2013 report tracked referrals by, *inter alia*, medical director Dr. David Tay of Fremont Nephrology in Fremont, California, *see supra* ¶ 186, who was paid some $120,000 per year as medical director in 2012, and who had referred thirty-two patients to the Ardenwood facility as well as referring ninety-five patients total to Fresenius facilities:

| Physician that have Patients at this Facility | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **April** | | | | | |
| Fac MD | Physician Name | Practice Name | Status | FMS Aff. | **Physician Patients at Facility** | | | **Physician Patients at All FMS Facilities** | | | **Group Total Patients at All FMS Facilities** | | |
| | | | | | 2012 | 2013 | Var | 2012 | 2013 | Var | 2012 | 2013 | Var |
| | Neelam Bhalla | Vanderbilt University Medical Center | Active | U | 22 | 0 | -22 | 22 | 0 | -22 | 272 | 212 | -60 |
| | Lucia Yumena | Lucia Yumena MD | Active | U | 5 | 4 | -1 | 15 | 15 | 0 | 15 | 15 | 0 |
| | George Lai | Kaiser Permanente Hayward | Active | U | 1 | 0 | -1 | 1 | 0 | -1 | 65 | 38 | -27 |
| | Peter Lunny | Strong, Tay, Lunny | Active | U | 2 | 2 | 0 | 17 | 7 | -10 | 37 | 24 | -13 |
| X | David Tay | Fremont Nephrology | Active | X | 30 | 32 | 2 | 86 | 95 | 9 | 86 | 95 | 9 |
| | Mary Palathumpat | Kaiser Permanente Hayward | Active | U | 12 | 18 | 6 | 61 | 18 | -43 | 65 | 38 | -27 |
| | Sarasa Kimata | KAISER PERMANENTE MEDICAL GROUP IN | Active | U | 0 | 23 | 23 | 0 | 23 | 23 | 0 | 23 | 23 |
| | | | **Total** | | 72 | 79 | 7 | | | | | | |

217.    Fresenius tracked whether each medical director funneled all or nearly all of his or her patients to its clinics.  Fresenius' managers had a term for referrals to non-Fresenius clinics: "leakage."  So that it could track leakage, including whether physicians were referring patients to competitors, Fresenius also tracked whether its medical directors and their practice groups were making referrals to non-Fresenius facilities.  The following image shows the "leakage" report for Fresno Nephrology referrals (including by medical directors Steven Levy and Yangming Cao) to non-Fresenius facilities between June 2012 and March 2013, along with "comments" tracking the reasons for the non-Fresenius referral:

**Discharges**

**TRANSFERRED TO NON-BMA PERMANENTLY**

| Month-Yr | Physician Name | Discharged Comments |
|---|---|---|
| *Fresno Nephrology Medical Group, Inc.* | | |
| Jun-12 | Steven Levy | TRANSFERRED TO HOSPITAL BASED PROGRRAM MICHIGAN |
| Jun-12 | Steven Levy | |
| Jul-12 | Steven Levy | |
| Jul-12 | Steven Levy | TRANSFERRED TO CLINIC CLOSER TO HOME. |
| Aug-12 | Yanqming Cao | MOVED TO TEXAS |
| Aug-12 | Steven Levy | |
| Sep-12 | Steven Levy | LONG TERM TRANSIENT.  RETURNED HOME. |
| Sep-12 | Steven Levy | |
| Sep-12 | Steven Levy | TRANSFERRED TO DAVITA PALM BLUFFS TO BE CLOSER TO HER HOME. |
| Oct-12 | Harpreet Dhindsa | PATIENT FOUND FACILITY NEAR HOME. |
| Oct-12 | Steven Levy | TRANSFERRED TO CLINIC CLOSER TO HOME. |
| Oct-12 | Steven Levy | PATIENT FOUND FACILITY NEAR HER HOME. |
| Nov-12 | Hemant Dhingra | |
| Dec-12 | Steven Levy | TRANSFERRED TO NEW DAVITA CLINIC CLOSER TO PATIENTS HOME. |
| Dec-12 | Steven Levy | DISCHARGED TO DAVITA ASHTREE FOR INSURANCE NONPAYMENT |
| Jan-13 | Steven Su | TRANSFERRED TO NEW DAVITA CLINIC CLOSER TO HOME |
| Jan-13 | Sukbvit Atwal | TRANSFERRED TO SELMA DAVITA, CLOSER TO PATIENTS HOME. . |
| Jan-13 | Steven Levy | |
| Jan-13 | Yanqming Cao | PATIENT WENT TO NEW DAVITA CLOSER TO PATIENTS HOME. |
| Feb-13 | Steven Su | |
| Feb-13 | Steven Levy | WENT TO LIVE IN MEXICO. |

218.    If Fresenius' compensation of its medical directors were unrelated to the inducement or rewarding of referrals, the company would have no reason to track referrals to non-Fresenius clinics, let alone characterize such referrals as "leakage."  To the contrary, Fresenius' granular tracking of "leakage" demonstrates that the company based its compensation decisions at least partially (if not entirely) on the physicians' ability and willingness to refer patients to Fresenius clinics—and only to Fresenius clinics.

219.    There would be repercussions if a physician were referring patients to competitors. Witness No. 18 oversaw a team of twenty-three people in FMNCA's western division, which was responsible for overseeing the discharge of patients from hospitals to Fresenius dialysis clinics. He explained that the Fresenius clinic medical director, for his/her part, "had to make sure his [practice] group is putting patients in those [Fresenius] dialysis chairs, not [in] the competition's. No leakage."  On occasion, a doctor in a practice group wanted to send a patient to a competitor,

such as DaVita.  "Sometimes there's a need.  The doctor would say: 'We didn't have a chair available.  The patient was next to a DaVita.'"  At the instruction of his managers, Witness No. 18 would warn the doctor: "'We're paying you to be MD [medical director].  Make sure you put those patients in [Fresenius clinics].'"

220.    Fresenius placed considerable pressure on medical directors who failed to refer patients to a Fresenius clinic.  Witness No. 18 stated that, if a nephrologist Fresenius had hired to be the medical director of a Fresenius clinic was not referring all or nearly all of his or her patients to Fresenius clinics, Fresenius would hold a meeting, typically at the nephrologist group's offices, and sometimes at a restaurant.  "What they did was, the [doctors'] groups and Fresenius would have quarterly, sometimes monthly reviews where we would throw all the numbers [for patients referred to Fresenius clinics] on a screen."

221.    The purpose of these meetings was to use peer pressure and intimidation tactics to incentivize doctors if they were not "playing the game.  If they have leakage that's costing the group and Fresenius money, it's gonna be up there on a screen."  Witness No. 18 described "leakage" as patients referred to a Fresenius competitor, such as DaVita.  "Usually the low [referring] doctor is talked to by a senior colleague in the [doctors'] group.  Fresenius would go to the CEO of the group and say, ok, we're having a problem with this clinic, with this doctor—he's put two commercial patients at a DaVita clinic in the past month.  Why?  The Group CEO would talk to the doctor" about sending more patients to Fresenius clinics.

222.    Witness No. 4, *see supra* ¶ 105, recalls pressure on medical directors to refer patients was "systemic" during his time there.  For example, Fresenius threatened to fire Dr. Dan Legeault, a medical director in Grand Rapids, Michigan, who was not referring an adequate

number of patients to Fresenius clinics.  Legeault finally relented after Fresenius threatened to build a competing nephrology clinic across the street from his.

### 6. Fresenius Required Medical Directors to Sign Onerous Non-Compete Agreements That Locked Them and Their Practices into Long-Term Illegal Remunerative Arrangements

223.    Fresenius' standard MDA, which is signed by all physicians who agree to serve as medical directors (along with all "member" physicians in the medical directors' practice groups) for both outpatient dialysis clinics as well as inpatient dialysis programs, provides the following:

- For those facilities Fresenius was acquiring, the term of the Agreement is defined as "the closing date of the Company's acquisition of the Facilities" to which the Agreement applies, and that it "shall continue for ten (10) years thereafter unless sooner terminated as provided herein."  This establishes the "Commencement Date" of the MDA as the date the facilities are acquired, not the date that patient care actually begins.  Since the acquisition of the facilities may precede the CMS certification of the facilities to accept Medicare or Medicaid patients for treatment by many months, in many instances the medical director would be paid for services for many months before beginning to provide those services.

- For those facilities Fresenius built from scratch (*i.e.*, which were not acquired), the MDAs list the "Commencement Date" as the date it treats or trains the first patient "and shall continue for ten (10) years from the Commencement Date."   Frequently, however, these first-treated or trained patients would have been commercially insured patients because getting CMS certification for a clinic to treat Medicare and Medicaid patients is a slow process and could take over a year.  Since the treating or training of patients often precedes by many months the CMS certification of the facilities to accept Medicare or Medicaid

patients for treatment, in many instances the medical director is being paid for services related to only a few commercially insured patients.

- The MDAs all provide for substantial restrictive covenants (in section 6, so-called "Covenants Protecting Business Interests of Company"), including non-compete (section 6.1), non-solicitation (section 6.4) and non-disparagement provisions (section 6.8).  Having selected physicians as medical directors who could refer patients, Fresenius then took steps to lock the physicians into the deal and inserted these restrictive covenant provisions in the agreement that made it substantially more difficult for physician to leave the medical directorships, compete with Fresenius in any way, or enter into any transactions with Fresenius competitors.

- The restrictive covenants apply not only to the physicians who act as medical directors for Fresenius, denominated "Consultants" under the Agreement, but to any "Member Physician," which is defined as "each nephrologist who as of the date of this Agreement or any time during the Restricted Period is employed by or affiliated with Consultant anywhere in the Restricted Territory" or any nephrologist who "provides services on behalf of the Consultant anywhere within the Restricted Territory."  The "Restricted Territory" ranges from a 20- to 50-mile radius of the facility and the "Restricted Period" runs from the date of the commencement of the Agreement to one to three years after the Agreement terminates, a period of eleven to thirteen years.

- With regard to the non-compete provisions, any "Member Physician" is restricted, during the "Restricted Period" and in the "Restricted Territory" from "engaging as a principal, agent, independent contractor, consultant, manager, partner, joint venturer, proprietor, landlord, shareholder, director, officer of employee of" or from "participating in the

ownership, management, medical directorship, operation or control of or and a consultant or advisor to, or [from] holding any direct or indirect ownership or other interest in; or rendering services other than as a treating physician to" any "operation, person, firm, entity or enterprise other than with Company or any of its Affiliates that engages or proposes to engage in" the provision of outpatient or inpatient dialysis treatments.  This effectively precludes any medical director and those in the practice group from engaging in any remunerative relationship with another dialysis company, such as DaVita, that may tie the physicians to a relationship with a competitor.  As a result of these contractual restrictions, Fresenius effectively established its medical directorships as the exclusive option for each physician to refer patients.

224.    The key was to lock the physicians into MDAs with onerous non-compete provisions.  Witness No. 19, *see supra* ¶ 213, explained that not only were doctors who served as medical directors at Fresenius clinics "way overpaid" and required to send their private practice patients to a Fresenius clinic—"that was expected.  That's the whole reason for the agreements"—but that the non-compete clauses made certain these doctors would continue to send patients to Fresenius.

225.    Fresenius' contracts with doctors were designed to ensure that their patients showed up for thrice-weekly dialysis treatment over many years at nearby Fresenius clinics.  "The way you get the funnel is by tying the doctors to these onerous agreements they can't get out of."  One tie consisted of non-compete agreements, in which doctors pledged not to work with competitors to Fresenius within a certain distance.  In 2015, one physician in Puerto Rico, for example, "signed a non-compete that had a radius that went into the ocean."  The radius was around 20 miles.

226.     Witness No. 18, *see supra* ¶ 212, recalled the medical director contracts included non-compete agreements that doctors sometimes chafed over, especially if they thought they could get more money from a competitor.  For example, he recalled a nephrologist in Brownsville, Texas, Dr. Subramanian Anandasivam, who had 400 private-practice patients and was also medical director for Fresenius Kidney Care North Brownsville, which paid him $273,710 per year.  Dr. Anandasivam was unhappy with his MDA, including the non-compete provision that prevented him from working for a competitor, but Fresenius would not allow him to end the contract.

227.     Witness No. 18 stated that Anandasivam "hated his MDA.  He was locked in big time."  To protest, the doctor began refusing to sign patient records.  Witness No. 18 was sent in around 7:00 p.m. one evening to talk to the doctor to turn things around.  "He was one of two nephrologists in the city, so we couldn't fire him."  The doctor "yelled and screamed at me for two hours, then he finally gave up and said: 'You want to go to dinner?' So we went to the best steakhouse in Brownsville."  Fresenius paid the cost of the meal.  About a year later, Fresenius rewarded Dr. Anandasivam by making him the medical director at a new Brownsville dialysis facility, FKC South Price, which by 2019 paid him another $256,803 a year.

228.     Not only were they locked into non-compete provisions requiring they refer patients to Fresenius facilities, physicians who wanted out of the non-compete provisions were forced to negotiate onerous buyouts, requiring them to pay Fresenius for the right to be released from the non-compete.  For example, Dr. Denise Hart from San Antonio, Texas had a medical directorship with Fresenius that required she pay a "reasonable price" or "buyout" to obtain a release from the non-compete provision, essentially forcing her to buy back her ability to refer patients to a non-Fresenius facility.  Fresenius thus used its enforcement rights under the non-compete term, along

with onerous buyout provisions, as a barrier to physicians referring patients to its competitors or establishing their own competing dialysis centers.

229.    The physicians who had entered into MDAs referred patients to Fresenius facilities based at least in part on remuneration from Fresenius, and these facilities submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients. All such claims, which were tainted by kickbacks, were false.

### C.    Fresenius Used MDAs to Induce Referrals from Medical Directors and Their Practice Groups Around the United States

#### 1.   MDAs Used to Induce Referrals in California

230.    Fresenius' internal documents show how important the physician referral pipeline was to Fresenius and how it strategically used medical director agreements and other incentives to induce referrals from its "loyal" physicians.  Fresenius knew exactly whether medical directors and their practice groups were referring patients to its outpatient facilities.  Referrals both by group and physician are tracked in a monthly report entitled Monthly Market Development Growth Metrics by Director.  For example, the following screenshot shows the referral trends for Fresno Nephrology Medical Group, Inc. in Fresno, California, for March 2009 through August 2012, showing the referrals by the entire physician group, including FMC Fresno North medical director Dr. Yanming Cao (43 referrals as of August 2012) and FMC Fresno medical director Dr. Steven Levy (126 referrals as of August 2012):

| Physician Name | Status | 2009-03 | 2009-06 | 2009-09 | 2009-12 | 2010-03 | 2010-06 | 2010-09 | 2010-12 | 2011-03 | 2011-06 | 2011-09 | 2011-12 | 2012-03 | 2012-06 | 2012-09 | Current Month 2011-09 | 2012-09 | '11/'12 Growth |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fresno Nephrology Medical Group, Inc.** | | | | | | | | | | | | | | | | | | | |
| Anuradha Suri | Active | 19 | 21 | 18 | 16 | 18 | 19 | 16 | 17 | 17 | 17 | 15 | 15 | 14 | 15 | 18 | 17 | 15 | 17 | 13.3% |
| Gregory Martinez | Active | | | | | | | | | | | | | 3 | 5 | 8 | | 8 | |
| Harpreet Dhindsa | Active | 22 | 20 | 21 | 17 | 20 | 24 | 28 | 27 | 26 | 28 | 24 | 23 | 21 | 20 | 20 | 19 | 24 | 19 | -20.8% |
| Hemant Dhingra | Active | 9 | 10 | 11 | 11 | 14 | 14 | 14 | 12 | 11 | 12 | 12 | 13 | 13 | 16 | 15 | 17 | 12 | 17 | 41.7% |
| Joseph Duflot | Active | 36 | 32 | 29 | 30 | 32 | 29 | 30 | 29 | 30 | 31 | 31 | 31 | 28 | 30 | 27 | 28 | 31 | 28 | -9.7% |
| Mandeep Singh | Inactive | | | | | 2 | 2 | 5 | 2 | 2 | 2 | 1 | 1 | | | | | 1 | | |
| Mei-Tsuey Hwang | Active | 3 | 4 | 4 | 4 | 8 | 8 | 8 | 10 | 11 | 11 | 13 | 14 | 12 | 13 | 12 | 13 | 13 | 13 | 0.0% |
| Steven Levy | Active | 76 | 85 | 80 | 83 | 88 | 88 | 85 | 88 | 96 | 100 | 105 | 103 | 109 | 116 | 121 | 126 | 105 | 126 | 20.0% |
| Steven Su | Active | 25 | 22 | 19 | 22 | 20 | 22 | 22 | 20 | 20 | 18 | 21 | 23 | 22 | 25 | 23 | 24 | 21 | 24 | 14.3% |
| Sukhvit Atwal | Active | | | | 1 | 3 | 2 | 11 | 14 | 13 | 13 | 12 | 11 | 14 | 13 | 16 | | 13 | 16 | 23.1% |
| Yangming Cao | Active | 29 | 28 | 27 | 30 | 30 | 30 | 33 | 37 | 39 | 43 | 44 | 40 | 39 | 41 | 44 | 43 | 44 | 43 | -2.3% |
| Sub Group Total | | 219 | 222 | 209 | 213 | 233 | 239 | 243 | 253 | 266 | 275 | 279 | 275 | 269 | 293 | 298 | 311 | 279 | 311 | 11.5% |
| Group Total | | 219 | 222 | 209 | 213 | 233 | 239 | 243 | 253 | 266 | 275 | 279 | 275 | 269 | 293 | 298 | 311 | 279 | 311 | 11.5% |

231.   Fresenius carefully monitored whether it was getting referrals from its medical directors.  The same Monthly Market Development Growth Metrics by Director report tracks the trend of the referrals by the medical director's practice group to each Fresenius facility.  The statistics for Fresno Nephrology Medical Group, Inc. ("MD Group Pts at Fac"), show growth for FKC Fresno North (36%) and FMC Fresno (4.8%), "Total YTD Org[anic] Txts [Treatments]" trends for 2012 (total organic growth = 11.7%), and the EBIT profitability of the group's referrals (total EBIT $736,731):

**FMS Facility Information**

Fresno Nephrology Medical Group, Inc.

| FMS# | Facility Name | Region | MD Last Name | IC Patients 2012 | 2011 | Growth | Home Patients 2012 | 2011 | Growth | MD Group Pts at Fac 2012 | 2011 | Growth | Total YTD Org Txts 2012 | 2011 | Growth | Utilization Stations | 6 Shifts | YTD EBIT 2012 | 2011 | Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fully Owned** | | | | | | | | | | | | | | | | | | | | |
| **Fresno Nephrology Medical Group, Inc.** | | | | | | | | | | | | | | | | | | | | |
| 6119 | FRESNO NORTH | NORTHERN CALIFORNIA REGION | Cao | 112 | 78 | 43.6% | 5 | 5 | 0.0% | 108 | 79 | 36.7% | 9,861 | 6,941 | 42.1% | 0 | | 587,277 | 292,494 | 294,783 |
| 1359 | FRESNO | NORTHERN CALIFORNIA REGION | Levy | 148 | 126 | 17.5% | 31 | 43 | -27.9% | 174 | 166 | 4.8% | 16,063 | 16,269 | -1.3% | 17 | 145.1% | 813,283 | 371,335 | 441,949 |
| TOTAL OF Fresno Nephrology Medical Group, Inc. | | | | 260 | 204 | 27.5% | 36 | 48 | -25.0% | 282 | 245 | 15.1% | 25,924 | 23,210 | 11.7% | 17 | 254.9% | 1,400,560 | 663,829 | 736,731 |
| Total Fully Owned | | | | 260 | 204 | 27.5% | 36 | 48 | -25.0% | 282 | 245 | 15.1% | 25,924 | 23,210 | 11.7% | 17 | 254.9% | 1,400,560 | 663,829 | 736,731 |
| TOTAL Fresno Nephrology Medical Group, Inc. | | | | 260 | 204 | 27.5% | 36 | 48 | -25.0% | 282 | 245 | 15.1% | 25,924 | 23,210 | 11.7% | 17 | 254.9% | 1,400,560 | 663,829 | 736,731 |

a.   Diablo Nephrology

232.   Diablo Nephrology Medical Group, a nephrology practice comprising approximately eighteen physicians, located in Contra Costa County, California, has had numerous

financial relationships with Fresenius that are not at FMV or commercially reasonable, including its physicians serving as medical directors at Fresenius' West Antioch Dialysis Unit and Diablo Dialysis Access Center, at Fresenius' San Miguel Dialysis Unit, at Fresenius' Walnut Creek 1 Dialysis Unit at Fresenius' East Antioch Unit, and as Chief of Nephrology at John Muir Hospital, (where Fresenius has had an acute contract which included the provision of a Fresenius-provided HSS to help funnel referrals from John Muir to the Fresenius dialysis units listed in this paragraph).

233.   In addition to medical director agreements, Diablo Nephrology has JVAs with Fresenius in dialysis units and dialysis access centers.  In return for these lucrative remuneration relationships, Diablo Nephrology referred patients to Fresenius clinics, much of whose treatment was paid for by Federal health care programs.  As of August 31, 2012, for example, Diablo Nephrology had 585 patients in dialysis at various Fresenius facilities (including home dialysis patients), out of which only 6.9% were commercial pay patients.  The Diablo patients accounted for a total of 104,731 treatments, over 95,000 of which were billed to Federal payers at an average rate of approximately $230 per treatment, or more than $21,000,000 in Medicare reimbursement per year to Fresenius.  Every claim for reimbursement for the treatment of these patients constitutes a false claim.  Diablo Nephrology contributed $4,395,000 to Fresenius' EBIT in 2012.  Every claim for reimbursement Fresenius submitted to Federal health care programs associated with the treatment of these patients was tainted by kickbacks and therefore false within the meaning of the FCA.

234.   As part of tracking the profitability of the Diablo practice, Fresenius carefully monitored the number of referrals coming from its Diablo medical directors and practice group. The statistics for 2011-2012 at each of the Fresenius facilities (the "MD Group Pts at Fac") where

a Diablo nephrologist was medical director, show a total of 480 dialysis patients, or 3.7% "Organic

Growth" over 2011:

**FMS Facility Information**

DIABLO NEPHROLOGY MEDICAL GROUP

| FMS# Facility Name | Region | MD Last Name | IC Patients August 2012 | 2011 | Growth | Home Patients August 2012 | 2011 | Growth | MD Group Pts at Fac August 2012 | 2011 | Growth | Total YTD Org Txts August 2012 | 2011 | Growth | Utilization August Stations | 6 Shifts | YTD EBIT August 2012 | 2011 | Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fully Owned | | | | | | | | | | | | | | | | | | | |
| Diablo Nephrology Medical Group | | | | | | | | | | | | | | | | | | | |
| 1810  BAY AREA ACUTES | NORTHERN CALIFORNIA REGION | Dinnmonlo | 0 | 0 | | 0 | 0 | | | | | 10,479 | 10,544 | -0.6% | 0 | | -1,283,521 | -1,350,345 | 66,824 |
| TOTAL of Diablo Nephrology Medical Group | | | 0 | 0 | | 0 | 0 | | | | | 10,479 | 10,544 | -0.6% | 0 | | -1,283,521 | -1,350,345 | 66,824 |
| Total Fully Owned | | | 0 | 0 | | 0 | 0 | | | | | 10,479 | 10,544 | -0.6% | 0 | | -1,283,521 | -1,350,345 | 66,824 |
| Joint Venture | | | | | | | | | | | | | | | | | | | |
| Diablo Nephrology Medical Group | | | | | | | | | | | | | | | | | | | |
| 6796  EAST ANTIOCH | NORTHERN CALIFORNIA REGION | Wrone | 39 | 2 | 1850.0% | 0 | 0 | | 30 | 2 | 1400.0% | 2,515 | 83 | 2930.1% | 0 | | -530,056 | -482,472 | -47,584 |
| 6787  BRENTWOOD PARK - JV | NORTHERN CALIFORNIA REGION | Chin | 109 | 129 | -15.5% | 0 | 0 | | 65 | 81 | -19.8% | 11,336 | 13,071 | -13.3% | 15 | 121.1% | 924,971 | 1,116,404 | -191,433 |
| 6786  ANTIOCH - JV | NORTHERN CALIFORNIA REGION | Dinnmonlo | 86 | 100 | -14.0% | 0 | 0 | | 86 | 83 | 3.6% | 10,252 | 10,507 | -2.4% | 12 | 119.4% | 796,592 | 655,876 | 140,716 |
| 6785  PITTSBURG - JV | NORTHERN CALIFORNIA REGION | Shey | 77 | 79 | -2.5% | 0 | 0 | | 67 | 70 | -4.3% | 7,734 | 7,985 | -3.1% | 12 | 106.9% | 240,192 | 158,076 | 82,116 |
| 6784  WALNUT CREEK - JV | NORTHERN CALIFORNIA REGION | Cunn | 85 | 89 | -4.5% | 34 | 34 | 0.0% | 121 | 113 | 7.1% | 11,611 | 11,720 | -0.9% | 17 | 83.3% | 836,122 | 807,617 | 28,506 |
| 6783  CONCORD - JV | NORTHERN CALIFORNIA REGION | Davies | 155 | 158 | -1.9% | 0 | 0 | | 111 | 114 | -2.6% | 15,624 | 15,878 | -1.6% | 18 | 143.5% | 1,458,102 | 1,273,598 | 184,504 |
| TOTAL of Diablo Nephrology Medical Group | | | 551 | 557 | -1.1% | 34 | 34 | 0.0% | 480 | 463 | 3.7% | 59,072 | 59,245 | -0.3% | 74 | 124.1% | 3,725,923 | 3,529,098 | 196,824 |
| Total Joint Venture | | | 551 | 557 | -1.1% | 34 | 34 | 0.0% | 480 | 463 | 3.7% | 59,072 | 59,245 | -0.3% | 74 | 124.1% | 3,725,923 | 3,529,098 | 196,824 |
| TOTAL DIABLO NEPHROLOGY MEDICAL GROUP | | | 551 | 557 | -1.1% | 34 | 34 | 0.0% | 480 | 463 | 3.7% | 69,551 | 69,789 | -0.3% | 74 | 124.1% | 2,442,402 | 2,178,753 | 263,648 |

235.    So that it could track leakage, *see supra* ¶¶ 217-221, including whether they were

referring patients to competitors, Fresenius also tracked whether Diablo medical directors and their

practice groups were making referrals to non-Fresenius facilities, as demonstrated in a report

covering June 2012 through April 2013:

**Discharges**

**TRANSFERRED TO NON-BMA PERMANENTLY**

| Month-Yr | Physician Name | Discharged Comments |
|---|---|---|
| *Diablo Nephrology Medical Group* | | |
| May-12 | Leena Ray | RELOCATED TO A NEW HOME. |
| Jun-12 | Jason Shey | PT. TRANSFERRED TO RAI PIEDMONT UNIT. |
| Jul-12 | Robert Davies | TRANSFERED BACK TO AUBURN CHRONIC UNIT |
| Jul-12 | Robert Davies | PT. TRANSFERED IN DAVITA RICHMOND. |
| Sep-12 | Leena Ray | PATIENT MOVED TO SAN FRANCISCO AND WAS PLACED AT RAI OCEAN AVE |
| Sep-12 | Jason Shey | TRANSFERRED TO DAVITA BENICIA, UNIT CLOSER TO HOME. |
| Sep-12 | Robert Davies | PATIENT TRANSFERRED TO DAVITA SAN PABLO BECAUSE UNIT IS CLOSER TO PATIENT'S HOME |
| Oct-12 | Jason Shey | PATIENT DECIDED TO TRANSFER TO DAVITA ANTIOCH |
| Jan-13 | Jason Shey | PT. TRANSFERRED TO DAVITA, SAN PABLO. |
| Feb-13 | Rohit Sharma | PATIENT MOVED TO LAS VEGAS, NV. |
| Mar-13 | Rohit Sharma | TRANSIENT PATIENT, WENT BACK TO HOME UNIT. |
| Apr-13 | Rohit Sharma | PATIENT DECIDED TO TRANSFER TO DAVITA LAS VEGAS. |

b. Balboa Nephrology Medical Group

236.   Fresenius had a variety of lucrative financial relationships with Balboa Nephrology Medical Group ("Balboa") in Southern California, which were in violation of the AKS because they were not at FMV or commercially reasonable and otherwise did not comport with a statutory or regulatory safe harbor.   Balboa Nephrology was listed as a "Tier I" priority practice for Fresenius in the 2012 Strategic Plans described above, with over 50 nephrologists serving hundreds of patients.

237.   Balboa has, at a minimum, the following relationships with Fresenius: multiple MDAs at clinics that are located in office buildings owned by Balboa, including but not limited to 340 4th Avenue, Chula Vista, CA and 3300 Vista Way, Oceanside, CA; at least six JVAs that include dialysis clinics and home dialysis training centers as well as vascular access clinics, including but not limited to Fresenius Medical Care Balboa V, LLC, BioMedical Applications of California, Fresenius Medical Care Balboa II, Fresenius Medical Care Balboa, Fresenius Medical Care East Lakes LLC and Fresenius Medical Care Northcoast; a joint research center; and joint investment in Interwell Health, a "population treatment management company focused on supporting the renal patient population across the full continuum of care."

238.   As of 2013, Balboa physicians had referred 2,175 patients for dialysis at Fresenius facilities, an increase of 274 dialysis patients over the previous year.   Fresenius' internal tracking documents show that Balboa's commercial mix was 10.5%, which means that over 1,900 of the patients that Balboa referred to Fresenius clinics were beneficiaries of Federal health benefit programs such as Medicare and Medicaid, whose care was paid for by these programs.   Every claim for reimbursement for the treatment of these patients constitutes a false claim.

c.  South Bay Nephrology

239.    Fresenius' relationship with South Bay Nephrology, a small single physician nephrology practice located in San Jose and Los Gatos, California, illustrates how it developed key physicians in specific markets.

240.    According to internal documents, Dr. Steven Tilles and his practice, South Bay Nephrology, in 2012 referred sixty patients to two Fresenius clinics, BMA San Jose (20 patients) and BMA Los Gatos (40 patients)—where he was medical director—for a YTD EBIT of $387,211:

| FMS Facility Information | | | | IC Patients August | | | Home Patients August | | | MD Group Pts at Fac August | | | Total YTD Org Txts August | | | Utilization August | | YTD EBIT | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| South Bay Nephrology | | MD Last | | | | | | | | | | | | | | | | | | |
| FMS# Facility Name | Region | Name | | 2012 | 2011 | Growth | 2012 | 2011 | Growth | 2012 | 2011 | Growth | 2012 | 2011 | Growth | Stations 6 Shifts | | 2012 | 2011 | Var |
| Fully Owned | | | | | | | | | | | | | | | | | | | | |
| South Bay Nephrology | | | | | | | | | | | | | | | | | | | | |
| 5330  SAN JOSE | NORTHERN CALIFORNIA REGION | Tilles | | 22 | 19 | 15.8% | 0 | 0 | | 20 | 14 | 42.9% | 1,947 | 1,919 | 1.5% | 0 | | -347,500 | -169,300 | -178,199 |
| 1172  LOS GATOS | NORTHERN CALIFORNIA REGION | Tilles | | 82 | 81 | 1.2% | 0 | 0 | | 40 | 37 | 8.1% | 8,076 | 8,109 | -0.4% | 10 | 136.7% | 734,711 | 709,566 | 25,145 |
| TOTAL OF South Bay Owned | | | | 104 | 100 | 4.0% | 0 | 0 | | 60 | 51 | 17.6% | 10,023 | 10,028 | 0.0% | 10 | 173.3% | 387,211 | 540,266 | -153,055 |
| Total Fully Owned | | | | 104 | 100 | 4.0% | 0 | 0 | | 60 | 51 | 17.6% | 10,023 | 10,028 | 0.0% | 10 | 173.3% | 387,211 | 540,266 | -153,055 |
| TOTAL South Bay Nephrology | | | | 104 | 100 | 4.0% | 0 | 0 | | 60 | 51 | 17.6% | 10,023 | 10,028 | 0.0% | 10 | 173.3% | 387,211 | 540,266 | -153,055 |

In 2012, Dr. Tilles was paid $50,000 for his BMS San Jose medical directorship and $128,240 for his BMA Los Gatos medical directorship.  Fresenius paid these amounts at least in part to induce or reward referrals.

241.    So that it could track leakage and whether Dr. Tilles was referring patients to competitors, Fresenius also tracked whether he was referring patients to non-Fresenius facilities, as demonstrated in a report covering June 2012 through March 2013:

| South Bay Nephrology | | |
|---|---|---|
| Jun-12 | Steven Tilles | BACK TO HOME CLINIC |
| Jun-12 | Steven Tilles | DISCHARGED OFFICIALLY |
| Aug-12 | Steven Tilles | SATELLITE CUPERTINO |
| Oct-12 | Steven Tilles | MOVED TO OREGON. |
| Nov-12 | Steven Tilles | MOVED IN W/DAUGHTER OUT OF TOWN. |
| Mar-13 | Steven Tilles | |
| Mar-13 | Steven Tilles | |

## 2.  MDAs Used to Induce Referrals in Illinois

242.    The pay for many Illinois Fresenius medical directors is far above the average nephrology hourly rate as determined by the nationwide surveys discussed above, *see supra* ¶¶ 199-204, as well as salaries paid by any of its competitors in the same market, and are not solely explained by competition or by the number of stations or patients, but by the total anticipated stream of referrals that come from the MDAs.  Of the twenty-six Illinois medical directors with salaries in 2019 over $200,000, all but one were FMCNA medical directors:

| Facility | City | State | Med. Dir. Comp. |
|---|---|---|---|
| FKC West Suburban | Oak Park | IL | $ 597,913 |
| FKC Southside Dialysis | Chicago | IL | $ 430,161 |
| FKC Berwyn | Berwyn | IL | $ 403,264 |
| FKC Blue Island | Blue Island | IL | $ 321,232 |
| FKC Elk Grove | Elk Grove Village | IL | $ 307,343 |
| FKC Neomedica South | Chicago | IL | $ 306,919 |
| FKC Bolingbrook Dialysis | Bolingbrook | IL | $ 293,156 |
| FKC North Avenue | Melrose Park | IL | $ 290,580 |
| FKC Dupage West | West Chicago | IL | $ 290,346 |
| FKC Humboldt Park | Chicago | IL | $ 280,442 |
| FKC Greenwood Avenue | Chicago | IL | $ 279,439 |
| FKC Oak Park | Oak Park | IL | $ 270,608 |
| FKC Neomedica North Kilpatrick | Chicago | IL | $ 259,182 |
| FKC East Peoria | East Peoria | IL | $ 247,152 |
| FKC Neomedic South Holland | South Holland | IL | $ 233,260 |
| FKC Neomedica Gurnee | Gurnee | IL | $ 223,586 |
| FKC Niles | Niles | IL | $ 218,379 |
| FKC Evergreen Park | Evergreen Park | IL | $ 217,576 |
| FKC Willowbrook | Willowbrook | IL | $ 216,622 |
| FKC Jackson Park | Chicago | IL | $ 216,039 |
| FKC Neomedica Bridgeport | Chicago | IL | $ 214,721 |
| FKC Crestwood | Crestwood | IL | $ 213,657 |
| FKC Westchester | Westchester | IL | $ 210,310 |
| FKC Peoria North | Peoria | IL | $ 206,146 |
| FKC Neomedica Rolling Meadows | Rolling Meadows | IL | $ 202,299 |

243.     These data are merely illustrative of Fresenius' longstanding efforts—over more than ten years—to bribe nephrologists to refer patients to Fresenius facilities.  At all times relevant to this First Amended Complaint, including, but not limited to, 2014 to 2018, Fresenius paid the medical directors at these facilities above-FMV compensation at least in part (if not entirely) to induce those medical directors to refer patients to Fresenius' clinics.

244.     These figures reveal that Fresenius pays its medical directors far above the average nephrologist's hourly rate and far above FMV.  Again, even assuming that Fresenius medical directors actually devoted 500 hours annually to their medical director duties (an assumption that is contrary to the evidence), the lowest paid medical director in this chart was earning $405 dollars per hour and the top-paid medical director was earning $1,196 per hour, a factor of 300% to 1,000% above average nephrology pay.  In reality, these nephrologists were not expected to, and did not, devote nearly 500 hours of work per year to their medical director duties, resulting in even more egregiously high salaries and demonstrating even more clearly that at least one purpose of their exorbitant compensation constituted a bribe to induce referrals.

245.     In exchange for the substantial bribes they were paid, medical directors could be relied on as a steady source of referrals to Fresenius clinics.  This was particularly true for Nephrology Associates of Northern Illinois and Indiana, LTD ("NANI"), headquartered at 120 W. 22nd Street, Oak Brook, Illinois 60523.  NANI is the largest nephrology practice in the United States with over 120 kidney specialists in three states.

246.     Of the top Fresenius medical director salaries paid in Illinois, the NANI medical directors are among the highest.  The salaries for these NANI medical directors (including $597,913 being paid to Dr. Arthur Morris, President of NANI and medical director for FKC West Suburban Dialysis Clinic) were illegal remuneration to secure referrals, and violated the AKS.

The seventeen highest-paid NANI medical directors all earned over $200,000 for hourly rates of $421/hour to $1,196/hour, generously assuming 500 hours of work per year:

| Facility | City | State | Med. Dir. Comp. | Medical Director |
|---|---|---|---|---|
| FKC West Suburban | Oak Park | IL | $ 597,913 | Arthur Morris, MD |
| FKC Southside Dialysis | Chicago | IL | $ 430,161 | Guatam Bhanushali, MD |
| FKC Berwyn | Berwyn | IL | $ 403,264 | Matthew Anderson, MD |
| FKC Blue Island | Blue Island | IL | $ 321,232 | Salvatore Ventura, MD |
| FKC Elk Grove | Elk Grove Village | IL | $ 307,343 | Lisa Pillsbury, MD |
| FKC Bolingbrook Dialysis | Bolingbrook | IL | $ 293,156 | Huma Rohail, MD |
| FKC Dupage West | West Chicago | IL | $ 290,346 | Gregory Kozeny, MD |
| FKC Greenwood Avenue | Chicago | IL | $ 279,439 | Malathia Shah, MD |
| FKC Oak Park | Oak Park | IL | $ 270,608 | Paul Balter, MD |
| FKC Neomedica N. Kilpatrick | Chicago | IL | $ 259,182 | Madhav Rao, MD |
| FKC East Peoria | East Peoria | IL | $ 247,152 | David Rosborough, MD |
| FKC Neomedica Gurnee | Gurnee | IL | $ 223,586 | Rakhi Khanna, MD |
| FKC Niles | Niles | IL | $ 218,379 | Harold Bregman, MD |
| FKC Evergreen Park | Evergreen Park | IL | $ 217,576 | Paul Crawford, MD |
| FKC Willowbrook | Willowbrook | IL | $ 216,622 | May Chow, MD |
| FKC Jackson Park | Chicago | IL | $ 216,039 | Wadah Atassi, MD |
| FKC Westchester | Westchester | IL | $ 210,310 | Leonard Potempa, MD |

247.    Fresenius' annual revenue in 2018 from Medicare was over $50 million for the seventeen facilities where NANI medical directors (or their affiliated nephrologists) referred many of the 1,623 Medicare patients.  The following table shows Fresenius' annual Medicare revenue from 2014 to 2018 at its dialysis clinics where NANI nephrologists served as medical directors:

| Facility | Medicare Revenue | | | | |
| | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| FKC West Suburban | $5,743,633 | $5,316,919 | $4,560,137 | $5,072,820 | $5,552,289 |
| FKC Southside Dialysis | $3,672,273 | $3,884,964 | $3,785,762 | $4,147,957 | $4,322,452 |
| FKC Berwyn | $3,550,203 | $3,676,763 | $3,001,315 | $2,971,154 | $3,810,916 |
| FKC Blue Island | $2,748,842 | $2,613,899 | $2,438,447 | $3,018,361 | $3,349,536 |
| FKC Elk Grove | $4,075,307 | $3,901,624 | $4,203,602 | N/A | $3,975,694 |
| FKC Bolingbrook Dialysis | $3,131,751 | $2,875,307 | $2,914,199 | $3,256,569 | $3,674,011 |
| FKC Dupage West | $2,076,193 | $2,232,356 | $2,016,743 | N/A | $1,853,491 |
| FKC Greenwood Avenue | $2,476,657 | $2,366,386 | $1,816,598 | $2,593,050 | $3,009,823 |
| FKC Oak Park | $1,760,548 | $1,585,591 | $1,404,327 | N/A | $1,317,247 |
| FKC Neomedica N. Kilpatrick | $3,036,754 | $2,904,445 | $2,852,103 | N/A | $2,751,213 |
| FKC East Peoria | $3,630,207 | $4,563,120 | $3,664,698 | N/A | $3,148,236 |

| | | | | | |
|---|---|---|---|---|---|
| FKC Neomedica Gurnee | $2,646,456 | $2,013,326 | $1,645,625 | $1,242,244 | $1,732,777 |
| FKC Niles | $3,057,432 | N/A | $3,087,496 | N/A | $3,452,780 |
| FKC Evergreen Park | 2,632,915 | N/A | $1,819,661 | $2,880,219 | $4,879,159 |
| FKC Willowbrook | $2,126,235 | $2,877,618 | $2,054,713 | $2,238,257 | $2,585,640 |
| FKC Jackson Park | N/A | $2,013,200 | $2,148,595 | N/A | $3,349,536 |
| FKC Westchester | $2,272,256 | $1,965,465 | $2,078,908 | $2,072,950 | $2,570,205 |

248.    Fresenius' revenue from Medicaid has been substantial for each of the seventeen facilities where NANI medical directors referred many of the Medicaid patients being treated. Under the FMAP match, the Federal government paid approximately 51% of the cost of treatment for these Illinois Medicaid patients.  The following table shows Fresenius' revenue from Medicaid at each of these facilities for 2014 to 2018 where NANI nephrologists served as medical directors:

| Facility | Medicaid Revenue | | | | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| FKC West Suburban | $89,015 | $100,836 | $72,686 | $134,208 | $908,538 |
| FKC Southside Dialysis | $247,359 | $85,641 | $74,618 | $175,501 | $716,436 |
| FKC Berwyn | $276,224 | $347,096 | $100,744 | $113,690 | $575,854 |
| FKC Blue Island | $64,650 | $48,261 | $25,834 | $35,604 | $255,932 |
| FKC Elk Grove | $56,702 | $5,319 | $73,247 | N/A | $98,910 |
| FKC Bolingbrook Dialysis | $108,330 | $104,497 | $88,038 | $70,104 | $105,076 |
| FKC Dupage West | $86,913 | $134,605 | $184,746 | N/A | $132,627 |
| FKC Greenwood Avenue | $77,184 | $57,006 | $51,363 | $166,502 | $545,937 |
| FKC Oak Park | $17,188 | $11,912 | $27,001 | N/A | $233,066 |
| FKC Neomedica N. Kilpatrick | $194,479 | $179,587 | $187,672 | N/A | $444,394 |
| FKC East Peoria | $91,643 | $163,640 | $80,057 | N/A | $50,472 |
| FKC Neomedica Gurnee | $34,853 | $45,604 | $21,879 | $74,316 | $175,561 |
| FKC Niles | $127,822 | $84,192 | $120,397 | N/A | $386,749 |
| FKC Evergreen Park | $27,604 | N/A | $11,854 | $18,336 | $668,673 |
| FKC Willowbrook | $23,292 | $48,297 | $48,680 | $51,192 | $68,572 |
| FKC Jackson Park | $74,404 | $112,115 | $99,354 | N/A | $255,932 |
| FKC Westchester | $13,322 | $64,675 | $16,142 | $26,142 | $126,750 |

249.    All of the Medicare and Medicaid claims submitted to these Federal health plans were tainted by the kickbacks Fresenius paid to NANI, which were illegal remuneration to secure referrals, and violated the AKS.  As such, they constituted false claims under the FCA.

250.    The reciprocal relationship between NANI and Fresenius has required that, as part of Illinois Certificate of Need ("CON") filings, NANI medical directors provided so-called "Physician Referral Letters," explaining how many ESRD patients NANI has referred to date and would refer to Fresenius facilities in the future.  For example, in a CON proceeding by Fresenius to establish its new Fresenius Medical Care Zion facility in Zion, Illinois, its medical director, Dr. Omaima Degani, a nephrologist in practice with NANI, disclosed to the Illinois Health Facilities & Services Review Board ("IHFSRB") that NANI had referred 165 patients to nearby Fresenius clinics in 2012, 190 patients in 2013, 182 patients in 2014, and 190 patients in 2015.  According to Illinois state ESRD data, 54.2% of the patients referred for treatment at the Zion facility were Medicare beneficiaries and 1.4% were Medicaid beneficiaries.  Degani's "Physician Referral Letter" states that, if the new facility were approved, she would refer 69 patients in the future, a commitment which Fresenius relied upon to justify the need for another dialysis facility.

251.    In another Illinois CON proceeding in 2018 by Fresenius for expanding its Elgin, Illinois clinic, its medical director, Raju Ray, a nephrologist in practice with NANI, disclosed in a Physician Referral Letter to the IHFSRB dated January 11, 2018 that he and his partners had referred 118 new patients for hemodialysis in the past year to the Elgin Fresenius facility, and expected to refer another 33 patients in the next 12 to 18 months, a commitment Fresenius used to justify its request to expand its dialysis center by 5 stations.[60]  According to Illinois state ESRD data, 52.5% of the patients referred for treatment at the Elgin facility were Medicare beneficiaries and .6% were Medicaid beneficiaries.  The Elgin facility had become a JV with Dr. Ray and NANI in 2012.

---

[60] Ill. Health Facilities & Servs. Rev. Bd., *Fresenius Medical Care Elgin Certificate of Need, No. 18-004* at 44, 70-71 (Jan. 18, 2018),  *available at* https://www2.illinois.gov/sites/hfsrb/Projects/ProjectDocuments/2018/18-004/2018-01-18%2018-004%20application.pdf.

252.    Likewise, in a 2020 Illinois CON proceeding by Fresenius to expand its Galesburg, Illinois dialysis clinic, its Medical Director Parthasarathy Srinivasan, a nephrologist in practice with NANI, disclosed in a Physician Referral Letter to the IHFSRB that he and his NANI partner had referred thirty-two new patients for hemodialysis services at the Galesburg Fresenius clinic in the previous twelve months and that the practice anticipated it would refer seventy-two patients for dialysis to Fresenius clinics in the next two years, a commitment which Fresenius relied upon to justify the need for another dialysis facility.  According to Illinois state ESRD data, 60.8% of the patients referred for treatment at the Elgin facility were Medicare beneficiaries and .5% were Medicaid beneficiaries.

253.    This support from NANI physicians in Fresenius CON filings (wherein they declared they would agree to refer patients, many of whom were Medicare or Medicaid beneficiaries, to a Fresenius dialysis facility before those patients are even eligible for dialysis) shows how Fresenius' medical director agreements and the resulting referrals were bribes used to override Federal health care program beneficiary choice.

254.    Fresenius not only asked NANI to do its bidding in support of CON filings to open or expand its dialysis clinics, but it has also asked NANI nephrologists to file oppositions with the IHFSRB to block competitor DaVita's CON requests for expansion into Illinois.  For example, on September 5, 2017, NANI nephrologist Anis Rauf from Hinsdale, Illinois wrote a letter in a successful opposition to a competing DaVita CON[61] for a proposed facility at DuPage, Illinois, arguing the requested facility (along with four other requested DaVita facilities which NANI had

---

[61] Ill. Health Facilities & Servs. Rev. Bd., *Geneva Crossing Dialysis Certificate of Need, No.* 17-013 at 30 (2017), *available at* https://www2.illinois.gov/sites/hfsrb/Projects/ProjectDocuments/2017/17-013/17.%2017-013%20Geneva%20Crossing%20Dialysis-Supplemental.pdf.

also opposed) would "flood the market," something that would undercut Fresenius market share and largesse to NANI.  The Rauf letter is identical to a letter by (and appears to have been written by) Lori Wright, Fresenius Senior CON Specialist, opposing the same project. [62]

255.    Fresenius has thus used NANI's support not only to expand its Illinois business, but also to block competition, demonstrating that the symbiotic relationship between the two entities has been based at least in part on remuneration to secure a steady flow of referrals.

### 3.  MDAs Used to Induce Referrals in Indiana

256.    Fresenius' medical directors salaries in Indiana are far above the average nephrology hourly rate as determined by the nationwide surveys discussed above, *see supra* ¶¶ 199-204, far above the salaries paid by any of its competitors in the same market, and are not solely explained by competition or by the number of stations or patients, but at least in part (if not entirely) by the total anticipated stream of referrals that come from the MDAs.  The thirteen highest-paid medical directors in Indiana in 2019 all worked at Fresenius facilities:

| Facility | City | State | Med. Dir. Comp. |
|---|---|---|---|
| FKC Indianapolis | Indianapolis | IN | $   915,259 |
| FKC Southern Indiana | Clarksville | IN | $   603,331 |
| FKC Circle City | Indianapolis | IN | $   587,133 |
| FKC Richmond | Richmond | IN | $   540,157 |
| FKC Indianapolis East | Indianapolis | IN | $   510,851 |
| FKC Indianapolis North | Indianapolis | IN | $   491,978 |
| FKC Hendricks County | Danville | IN | $   454,365 |
| FKC Kokomo | Kokomo | IN | $   420,814 |
| FKC Floyd County | New Albany | IN | $   419,119 |
| FKC Morgan County | New Albany | IN | $   272,502 |
| FKC Indianapolis Shadeland Station | Indianapolis | IN | $   270,897 |
| FKC Gary | Gary | IN | $   264,616 |
| FKC Noblesville | Noblesville | IN | $   234,924 |

---

[62] *See* Letter from Fauzia Javaid to Courtney R. Avery (Oct. 25, 2017) (attaching letters drafted by Lori Wright and Anis Rauf), *available at* https://www2.illinois.gov/sites/hfsrb/Projects/ ProjectDocuments/2017/17-038/2017-10-25%2017-038%20Opposition%20Letter.pdf.

257.     Assuming 500 hours worked per year—a level far above that which these medical directors actually worked—these salaries correspond to a range of $470 to $1,831 per hour, far above the average nephrologist salary of $147 per hour.  These inflated salaries are not solely explained by competition in the relevant market or by the number of stations or patients, but at least in part by the total anticipated stream of referrals that come from the MDA.  The medical directors at all of these facilities referred patients to Fresenius facilities based at least in part on their compensation from Fresenius.  Fresenius then submitted claims to Federal health care programs associated with these patients' treatment.  All such claims were tainted by kickbacks and were false within the meaning of the FCA.

258.     Occasional disputes between Fresenius and its medical directors reveal that the real intent behind the MDAs has been to induce an illegal referrals in exchange for the payment of kickbacks.  One such recent dispute arose between Fresenius and Internal Medicine Nephrologists ("IMN"), a nephrology practice in Terre Haute, Indiana, operated by Drs. Manish Gera and Raj Jeevan.  Fresenius entered the Terre Haute market as a dialysis provider in 2006 and initially engaged IMN to serve as medical director of two local facilities (Terre Haute and Wabash) for $190,000 per year.

259.     The operative version of the IMN MDAs, amended in 2016, provided for an initial twelve-year term—through July 31, 2018—renewing automatically for additional two-year terms unless one of the parties provided written notice at least 90 days before the end of the then-current term.

260.     The MDAs between IMN and Fresenius included the standard non-compete language, requiring IMN and its "Member Physician[s]" agree not to work for a competitor in the "Restricted Territory."  *See supra* ¶ 223.

261.     By October 2017, the MDA arrangement between IMN and Fresenius had grown, with IMN serving as medical director of six Fresenius facilities in the Terre Haute area.  The Third Amended MDA stated that IMN would receive $136,971 for the Terre Haute North facility MDA, $121,949 for the Wabash Valley MDA, and $35,120 for the IMN medical directorship for acute care services rendered at the only two Terre Haute Hospitals, Union Hospital and Terre Haute Regional Hospital.

262.     As of October 2016, in exchange for the substantial monies it had received, during the prior 12 months, IMN had referred 32 patients for dialysis to Fresenius Terre Haute North and 50 patients to Fresenius Terre Haute South.

263.     The agreements had been very lucrative for IMN.  Between 2011 and 2018, Fresenius paid IMN a total of $3,450,633 for its medical director services at the Fresenius Terre Haute facilities (Terre Haute South, Terre Haute North, Wabash Valley Home Therapies, Terre Haute #5474, and Vigo County).  Since Fresenius did not require IMN medical directors to report or track the time they spent on their duties, there is no way for Fresenius to demonstrate how much time IMN physicians actually spent on their duties, and whether the hourly rate for its medical directorships was at FMV.  IMN's medical director compensation is wildly above FMV.  Using the average nephrologist compensation of $147 an hour, *see supra* ¶ 202, IMN physicians would have had to devote an impossible 23,000 hours annually to medical director duties to justify payments of this magnitude.

264.     In 2016, Fresenius' competitor DaVita approached IMN about serving as medical director for its proposed Paris, Illinois facility, which was beyond the Fresenius MDAs' twenty-five-mile restricted area.  Fresenius responded by instead enlisting IMN to convince Paris Community Hospital to open a dialysis facility with Fresenius as operator, which would directly

compete with DaVita's proposed Paris, Illinois facility.  In return for IMN's assistance in obtaining approval for the Paris CON, Fresenius, through RVP Michael Graves, promised that IMN would serve as medical director of Fresenius' proposed Paris facility.

265.    On October 7, 2016, Fresenius submitted an application for a CON to the Illinois Health Facilities and Services Review Board for the proposed Paris facility, identifying one of IMN's member physicians, Dr. Gera, as the medical director at the proposed new facility.  In exchange for the promised Paris medical directorship, IMN gathered clinical data and provided Fresenius with a Physician Referral Letter dated September 29, 2016, prepared by Dr. Gera, committing to the referral of 30 patients to the Paris facility in the first two years of operation and to the transfer of an additional 20 patients would transfer from the Fresenius Terre Haute facilities to the Paris facility.[63]

266.    Until October 2017, when DaVita entered the market, Fresenius had been the only dialysis provider in the Terre Haute area.  After DaVita's entry into the market, some of IMN's nephrology patients chose to receive dialysis treatments at DaVita facilities instead of Fresenius facilities.  As a result this "leakage" in IMN referrals to DaVita, the relationship between IMN and Fresenius came unraveled, with DaVita competing for Terre Haute dialysis patients, and exposing that IMN medical directorships in Terre Haute had in fact always about payments for patient referrals.

267.    Illustrating that there would be consequences should IMN medical directors refer patients to non-Fresenius facilities, in a letter dated May 1, 2018, Fresenius RVP Graves provided notice of Fresenius' "intent not to renew" the MDAs for four Terre Haute facilities, effectively

---

[63] Fresenius Med. Care Holdings, Inc., *Certificate of Need Application, Fresenius Kidney Care Paris Community* 68-69 (Oct. 7, 2016), *available at* https://www2.illinois.gov/sites/hfsrb/Projects/ProjectDocuments/2016/16-042/2016-10-07%2016-042%20APPLICATION.pdf.

terminating IMN's MDAs as of July 31, 2018. Graves and other Fresenius employees told IMN that the MDAs had been terminated because IMN would not automatically refer its patients to Fresenius clinics (interfering with its patients' choice of competing facilities) and because IMN had developed "too close" of a "relationship" with DaVita.

268.    On July 31, 2018, in a meeting between IMN's member physicians and Fresenius' VP Graves, Fresenius informed IMN that it would not be renewing the MDAs for the terminated facilities and would not engage IMN as medical director of its new Paris facility. Afterward, Fresenius sent a letter to patients at FKC Terre Haute South—which was not among the terminated facilities—announcing that the FKC Terre Haute North had a new medical director.

269.    Fresenius thereafter engaged an Indianapolis-based nephrology practice group to serve as interim medical director at the Terre Haute terminated facilities, and Fresenius began to solicit IMN's nephrology patients away from IMN to the new medical director.

### 4.  MDAs Used to Induce Referrals in North Carolina

270.    North Carolina has been a particularly profitable market for Fresenius medical directors, who are paid salaries that are far higher than almost anywhere else in the country, far higher than the average nephrology hourly rate as determined by the nationwide surveys discussed above, *see supra* ¶¶ 199-204, and far higher than the salaries paid by any of its competitors in the same market. These excessive payments are not solely explained by competition or by the number of stations or patients, but at least in part (if not entirely) by the total anticipated stream of referrals that come from the MDAs. Of the fifty North Carolina medical directors in 2019 making over $250,000, forty-seven were FMCNA medical directors:

| Name | City | State | Med. Dir. Comp. |
|------|------|-------|-----------------|
| FKC Charlotte NC | Charlotte | NC | $   1,041,142 |
| FKC Gastonia/Lowell | Gastonia | NC | $      872,446 |
| FKC Fayetteville | Fayetteville | NC | $      753,115 |
| FKC Greensboro Kidney Center | Greensboro | NC | $      721,508 |

| Name | City | State | Med. Dir. Comp. |
|---|---|---|---|
| FKC Pitt County | Greenville | NC | $ 716,567 |
| FKC North Charlotte | Charlotte | NC | $ 608,206 |
| FKC South Greensboro Kidney Ctr | Greensboro | NC | $ 519,425 |
| FKC Raleigh | Raleigh | NC | $ 504,029 |
| FKC Wake | Raleigh | NC | $ 503,941 |
| FKC Beatties Ford | Charlotte | NC | $ 495,285 |
| FKC Pamlico | Washington | NC | $ 469,667 |
| FKC West Fayetteville | Fayetteville | NC | $ 445,310 |
| FKC ECU Dialysis | Greenville | NC | $ 437,969 |
| FKC Lumberton | Lumberton | NC | $ 427,326 |
| FKC Kinston | Kinston | NC | $ 420,487 |
| FKC South Ramsey  Cross Creek | Fayetteville | NC | $ 419,365 |
| FKC Burlington Kidney Center | Burlington | NC | $ 417,501 |
| FKC West Charlotte | Charlotte | NC | $ 416,680 |
| FKC Craven County Dialysis Ctr | New Bern | NC | $ 407,080 |
| FKC North Ramsey/Cape Fear | Fayetteville | NC | $ 401,578 |
| FKC Albemarle | Albemarle | NC | $ 388,899 |
| FKC Matthews NC | Matthews | NC | $ 383,855 |
| FKC Nations Ford | Charlotte | NC | $ 382,606 |
| FKC Monroe | Monroe | NC | $ 379,309 |
| FKC East Charlotte | Charlotte | NC | $ 377,497 |
| FKC East Greensboro | Greensboro | NC | $ 374,993 |
| FKC South Gaston NC | Gastonia | NC | $ 373,149 |
| FKC Asheboro Kidney Center | Asheboro | NC | $ 367,736 |
| FKC Lincolnton | Lincolnton | NC | $ 360,825 |
| FKC Roanoke Rapids | Roanoke | NC | $ 353,162 |
| FKC New Bern | New Bern | NC | $ 345,176 |
| FKC Rocky Mount | Rocky Mount | NC | $ 343,379 |
| FKC Kings Mountain | Kings | NC | $ 332,262 |
| FKC NW Kidney Center | Greensboro | NC | $ 315,175 |
| FKC Vernon | Kinston | NC | $ 305,429 |
| FKC Burke County | Morganton | NC | $ 303,903 |
| FKC Southwest Greensboro | Jamestown | NC | $ 301,416 |
| FKC New Hope | Raleigh | NC | $ 297,784 |
| FKC Hickory | Hickory | NC | $ 292,302 |
| FKC Belmont | Belmont | NC | $ 284,968 |
| FKC Southwest Charlotte | Charlotte | NC | $ 283,448 |
| FKC Clinton | Clinton | NC | $ 280,382 |
| FKC Dunn | Dunn | NC | $ 280,252 |
| FKC East Rocky Mount | Rocky Mount | NC | $ 276,345 |
| FKC Fuquay-Varina | Fuquay-Varina | NC | $ 274,876 |
| FKC Zebulon | Zebulon | NC | $ 267,455 |
| FKC South Rocky Mount | Rocky Mount | NC | $ 260,907 |

271.     These data are merely illustrative of Fresenius' longstanding efforts—over more

than ten years—to bribe nephrologists to refer patients to Fresenius facilities.  At all times relevant

to this Complaint, including, but not limited to, 2014 to 2019, Fresenius paid the medical directors at these facilities above-FMV compensation at least in part to induce those medical directors to refer patients to Fresenius clinics.

272.    Fresenius' revenue from Medicaid has been substantial for each of the facilities where these medical directors referred many of the Medicaid patients being treated.  Under the FMAP match, the Federal government paid approximately 67% of the cost of treatment for these North Carolina Medicaid patients.  The following table shows Fresenius' revenue from Medicaid at several [64] of the facilities for 2014 to 2019 where it paid above-FMV compensation to nephrologists to serve as medical directors:

| Facility | Medicaid Spending | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 |
| FKC Albemarle | $98,385 | $110,954 | $103,431 | $110,117 | $121,547 | $95,687 |
| FKC Belmont | -- | -- | $76,888 | $28,442 | $65,511 | $22,116 |
| FKC Charlotte | -- | -- | $310,218 | $471,076 | $497,392 | $438,131 |
| FKC Craven County | -- | $174,651 | $141,381 | $164,431 | $252,590 | $201,953 |
| FKC E. Greensboro | -- | $384,776 | $358,691 | $353,762 | $317,629 | $186,866 |
| FKC ECU Dialysis | -- | $490,949 | $585,270 | $418,177 | $502,457 | $586,633 |
| FKC Gastonia/Lowell | -- | -- | $187,343 | $334,127 | $379,609 | $320,217 |
| FKC Matthews | $21,248 | $28,806 | $11,998 | $101,288 | $43,317 | -- |
| FKC New Hope | -- | $412,942 | $312,648 | $205,473 | $297,856 | $170,611 |
| FKC Pamlico | -- | -- | $186,895 | $181,414 | $154,506 | $166,235 |
| FKC Raleigh | $391,674 | -- | -- | -- | -- | -- |
| FKC South Gaston | $150,871 | $188,430 | $117,039 | $113,750 | $150,5890 | $114,861 |
| FKC Vernon | $123,941 | $113,495 | $141,806 | $108,410 | $165,679 | $111,131 |
| FKC W. Fayetteville | -- | -- | $225,031 | $224,415 | $282,865 | $248,382 |

273.    These payments corresponded to the following numbers of patients ("Pts") and treatments ("Txts"):

---

[64] Data for several years and several facilities are unavailable, as indicated in the table.

| | Medicaid Treatments | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 |
| Facility | Pts/Txts | Pts/Txts | Pts/Txts | Pts/Txts | Pts/Txts | Pts/Txts |
| FKC Albemarle | 48/4,745 | 51/4,570 | 49/5,201 | 39/5,325 | 48/12,084 | 36/10,019 |
| FKC Belmont | -- | -- | 27/2,581 | 19/2,443 | 18/5,071 | 16/3,920 |
| FKC Charlotte | -- | -- | 113/15,139 | 91/16,159 | 94/24,386 | 90/21,602 |
| FKC Craven County | -- | 42/5,539 | 56/4,802 | 48/6,425 | 59/12,415 | 53/10,347 |
| FKC E. Greensboro | -- | 73/8,493 | 75/8,076 | 59/9,279 | 62/13,350 | 50/11,191 |
| FKC ECU Dialysis | -- | 129/19,930 | 142/21,676 | 105/20,574 | 114/34,557 | 120/32,238 |
| FKC Gastonia/Lowell | -- | -- | 85/9,744 | 72/13,662 | 74/16,690 | 63/14,400 |
| FKC Matthews | 20/1,575 | 17/1,990 | 19/1,820 | 17/3,195 | 14/3,866 | -- |
| FKC New Hope | -- | 74/8,116 | 76/7,623 | 53/7,241 | 59/13,943 | 58/6,250 |
| FKC Pamlico | -- | -- | 85/11,122 | 62/11,577 | 54/15,279 | 61/15,992 |
| FKC Raleigh | 129/15,783 | -- | -- | -- | -- | -- |
| FKC South Gaston | 58/5,435 | 57/6,188 | 43/5,351 | 37/5,724 | 40/9,783 | 35/8,951 |
| FKC Vernon | 46/5,492 | 45/5,992 | 48/6,602 | 41/7,684 | 48/13,704 | 42/10,473 |
| FKC W. Fayetteville | -- | -- | 79/6,840 | 52/6,795 | 65/10,858 | 59/10,355 |

274.    Fresenius submitted each of the foregoing hundreds of thousands of claims for reimbursement to Medicaid on approximately 45,756 occasions (3,813 patients x 12 submissions annually).  When Fresenius submitted each claim, it impliedly certified that the corresponding treatments complied with the AKS.  However, all of these treatments were tainted by kickbacks in the form of above-FMV medical director compensation, at least one purpose of which was to induce referrals to Fresenius clinics.  Accordingly, each of these claims was false within the meaning of the FCA.

275.    The Fresenius medical directorships have been lucrative for Charlotte nephrologists, in particular.  Dr. George Hart, President of Metrolina Nephrology Associates, 2711 Randolph Road, Charlotte, North Carolina, earned an eyepopping $1,041,142 in 2019 for his medical directorship at the FKC facility in Charlotte, the second-highest for any medical directorship in the United States.  This salary could not plausibly reflect FMV; given average nephrologist hourly rates, Dr. Hart would have had to devote close to 7,000 hours annually to his medical director duties, or an unattainable 133 hours per week.

276.    Metrolina had a number of other lucrative medical directorships in the Charlotte area.  In 2019, the salaries for other Metrolina medical directors in Charlotte were: FKC Charlotte North ($608,206), FKC Beatties Ford ($495,285), FKC West Charlotte ($416,680), FKC Nations Ford ($382,606), and FKC East Charlotte ($377,497).

277.    These Metrolina salaries are all far higher than what was being paid to medical directors by competitors in the Charlotte market.  Indeed, the average salary of $395,580 for the ten Charlotte Fresenius dialysis clinics is 278% higher than the average salary of $141,810 for the ten medical directors in Charlotte who worked at its competitors' dialysis clinics.

278.    In exchange for the substantial bribes they were paid, North Carolina medical directors could be relied on as a steady source of referrals to Fresenius.  This was particularly true for Eastern Nephrology Associates ("ENA"), with which Fresenius has had a long relationship through multiple MDAs and JVAs.  ENA is headquartered at 511 Paladin Drive, Greenville, North Carolina.

279.    Under its MDA for the Fresenius Pitt County, Greenville, North Carolina dialysis facility, located at 510 Paladin Drive, right across the street from the ENA headquarters, it is paid $716,567 per year for its medical directorship services.

280.    In addition to outpatient dialysis services provided at its clinics, Fresenius also offers home dialysis services throughout the United States.  Just as its medical director scheme used MDAs to induce referrals to its outpatient clinics, Fresenius has used similar JVAs to induce referrals for home dialysis training and support services.

281.    Beginning in 2017, Fresenius has submitted four CON applications through a JVA between its subsidiary Bio-Medical Applications of North Carolina Inc. ("BMA") and ENA, to develop four home dialysis training facilities in eastern North Carolina.  The proposed facilities

would provide home peritoneal dialysis training and support services.  As part of the agreement, ENA agreed to provide medical directorship services for each facility.  The home dialysis training and support facilities are viewed as "outreach" facilities, and would enable Fresenius and ENA to establish a foothold should they ever wish to establish outpatient facilities in these markets.

282.    In Exhibit H to each of the Fresenius CON applications, the ENA physicians affirmatively state they "will refer patients" to each of the home dialysis facilities, commitments which Fresenius relied upon to justify the need for adding each of the facilities.  Thus, the ENA nephrologists certified they would be referring patients for home dialysis to the same clinics in which the physicians have an ownership interest and where they provide medical directorship services.

283.    All four home dialysis training facilities were approved by the North Carolina's Division of Health Service Regulation's Healthcare Planning and Certificate of Need Section.

284.    This support from ENA physicians in Fresenius' North Carolina CON filings, wherein they declared they would agree to refer patients to Fresenius home dialysis facilities in which those physicians were joint venture partners before those patients were even eligible for dialysis, shows how Fresenius' JVA agreements and accompanying MDAs for the resulting referrals were bribes used to override patient choice.  These physicians referred patients to Fresenius facilities based at least in part (if not entirely) on remuneration from Fresenius, and these facilities submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients.  All such claims, which were tainted by kickbacks, were false.

**5.  MDAs Used to Induce Referrals in Texas**

285.    Numerous Texas Fresenius medical directors are paid salaries that are far higher than any of its competitors' salaries in the same market, and are not solely explained by competition or by the number of stations or patients, but at least in part (if not entirely) by the total

anticipated stream of referrals that come from the MDAs.  Of the thirty-six Texas dialysis center medical directors who were paid over $300,000 in 2019, thirty-four were under medical directorships with Fresenius:

| Facility | City | State | Med. Dir. Comp. |
|---|---|---|---|
| FKC Northwest Bexar County | San Antonio | TX | $ 536,547 |
| FKC Redbud | Lubbock | TX | $ 528,329 |
| FKC Southwest Houston | Houston | TX | $ 500,755 |
| FKC Central San Antonio | San Antonio | TX | $ 498,470 |
| FKC Eagle Pass | Eagle Pass | TX | $ 487,305 |
| FKC Irving Dallas Dialysis | Irving | TX | $ 465,499 |
| FKC Southeast San Antonio | San Antonio | TX | $ 461,371 |
| FKC Del Rio | Del Rio | TX | $ 458,499 |
| FKC Rosenberg | Rosenberg | TX | $ 450,172 |
| FKC North Houston | Houston | TX | $ 436,776 |
| FKC Mcallen | Mcallen | TX | $ 427,565 |
| FKC Pasadena | Houston | TX | $ 416,675 |
| FKC Baytown | Baytown | TX | $ 396,121 |
| FKC Waco | Waco | TX | $ 379,167 |
| FKC Dallas South | Dallas | TX | $ 364,422 |
| FKC Wichita Falls | Wichita | TX | $ 361,122 |
| FKC Collin County | Plano | TX | $ 353,714 |
| FKC Village II | Dallas | TX | $ 353,417 |
| FKC Swiss Avenue | Dallas | TX | $ 351,808 |
| FKC Village Oaks | Live Oak | TX | $ 347,654 |
| FKC Metro East Dial Ctr | Mesquite | TX | $ 346,089 |
| FKC North Buckner | Dallas | TX | $ 345,596 |
| FKC Bay Shore | Pasadena | TX | $ 345,273 |
| FKC Town Gate | Garland | TX | $ 344,790 |
| FKC Walnut Hill Dialysis Ctr | Dallas | TX | $ 333,598 |
| FKC South Oak Cliff | Dallas | TX | $ 325,001 |
| FKC Midland | Midland | TX | $ 325,000 |
| FKC Westminster | Houston | TX | $ 323,468 |
| FKC Grand Prairie Tx | Grand | TX | $ 308,411 |
| FKC West Plano | Plano | TX | $ 303,917 |
| FKC Redbird | Dallas | TX | $ 301,801 |
| FKC Central Ft. Worth | Fort Worth | TX | $ 301,000 |
| FKC Pleasant Run | Desoto | TX | $ 300,839 |
| FKC Desert Milagro | Odessa | TX | $ 300,000 |

286.    In exchange for the substantial bribes they were paid, Texas medical directors could be relied on as a steady source of referrals to Fresenius.  The medical directors at all of these

facilities referred patients to Fresenius facilities based at least in part on their compensation from Fresenius. Fresenius then submitted claims to Federal health care programs associated with these patients' treatment. All such claims were tainted by kickbacks and were false within the meaning of the FCA.

287. This was particularly true for one of Fresenius' largest customers, Dallas Nephrology Associates ("DNA"), with which Fresenius has had a long and entangled relationship. DNA has more than 90 kidney specialists at more than 25 locations in the Dallas-Fort Worth Metroplex, and thus has the ability to direct substantial numbers of patients to Fresenius outpatient dialysis clinics. Witness No. 2, (*see supra* ¶ 101), recalled that DNA, one of the largest nephrology practices in the United States, staffed medical directorships both for hospitals under contract with Fresenius and also surrounding Fresenius outpatient clinics, supplying medical directors at more than 65 Fresenius dialysis clinics in the Dallas-Fort Worth area.

288. Witness No. 18, *see supra* ¶ 212, recalls that Fresenius paid nephrologist groups throughout Texas "a ridiculous amount of money" for their individual doctors to serve as medical directors of Fresenius clinics. Witness No. 18 remembers, in particular, an arrangement with San Antonio Kidney Disease Center Physicians Group ("SAKDC") in San Antonio, where Fresenius has thirty-two dialysis clinics, many through its JVAs. SAKDC was paid some $5 million a year for its doctors to work as medical directors at Fresenius' thirty-six clinics in the San Antonio region, in exchange for those physicians' referring patients to Fresenius clinics.

289. Fresenius' generosity with payments to medical directors—which the company viewed as essential to secure the physicians' loyalty in referring patients to its facilities—resulted in its often paying the physicians for months, and sometimes years, before a clinic would even be fully operational. Medical directors can be paid at their full contract rate for up to two years before

Medicare certifies a clinic (and Medicare patients may be admitted), during which time the medical director may only be supervising the care of a small number of commercially-insured patients.

290.    For example, at the direction of Fresenius management, Witness No. 20, Fresenius' Vice President for Physician Strategies, recalls aggressively courting Dr. Richard Morgan, a nephrologist in Bryan, Texas, at the direction of Fresenius management.  To secure Dr. Morgan's commitment to serve as medical director and refer his patients to Fresenius facilities, Fresenius paid Dr. Morgan $95,000 per year for two years before the clinic had actually become fully operational.  Fresenius entered into similar agreements throughout the country.

291.    As noted above, Fresenius' standard MDA states that the term of the agreement commences upon the acquisition date of the facilities, not on the date treatment commences at these facilities.  *See supra* ¶ 223.  Fresenius was thus able to disguise outright bribes as medical director fees—even though there was little (or no) work for the medical directors to do.

### 6.  MDAs Used to Induce Referrals in Washington State

292.    Numerous Washington Fresenius medical directors are paid salaries that are far higher than any of its competitors' salaries in the same market, and are not solely explained by competition or by the number of stations or patients, but at least in part (if not entirely) by the total anticipated stream of referrals that come from the MDAs.  Of the twenty-two highest-compensated Washington dialysis center medical directors in 2019, fourteen were under medical directorships with Fresenius.  The following table lists these facilities, Fresenius' compensation for each medical director (FMCNA Comp.), DaVita's average medical director compensation in the same city ("DaVita Comp."),[65] and the ratio of Fresenius' medical director compensation to that of DaVita ("Ratio"):

---

[65] Data for certain cities are unavailable.

| Facility | City | State | FMCNA Comp. | DaVita Comp. | Ratio |
|---|---|---|---|---|---|
| FKC Spokane | Spokane | WA | $ 242,969 | $ 78,512 | 309.47% |
| FKC Moses Lake | Moses Lake | WA | $ 204,310 | N/A | N/A |
| FKC Fort | Vancouver | WA | $ 202,954 | $ 126,505 | 160.43% |
| FKC Northpoint | Spokane | WA | $ 180,855 | $ 78,512 | 230.35% |
| FKC Mt. Rainier | Tacoma | WA | $ 172,424 | $ 80,000 | 215.53% |
| FKC North Pines | Spokane Valley | WA | $ 133,712 | N/A | N/A |
| FKC Salmon | Vancouver | WA | $ 131,869 | $ 126,505 | 104.24% |
| FKC Lacey | Olympia | WA | $ 127,826 | $ 75,000 | 170.43% |
| FKC Clark | Battle Ground | WA | $ 122,425 | $ 85,000 | 144.03% |
| FKC Skagit | Mount Vernon | WA | $ 113,468 | N/A | N/A |
| FKC Grays | Aberdeen | WA | $ 112,914 | N/A | N/A |
| FKC Columbia | Kennewick | WA | $ 112,296 | $ 50,000 | 224.59% |

293.    The medical directors at all of these Fresenius facilities referred patients to Fresenius facilities based at least in part on their compensation from Fresenius. Fresenius then submitted claims to Federal health care programs associated with these patients' treatment. All such claims were tainted by kickbacks and were false within the meaning of the FCA.

294.    Even Fresenius' unsuccessful attempts to install loyal medical directors demonstrates its intent to use medical director compensation to bribe nephrologists to refer patients to its clinics. In one example involving the Fresenius Fisher's Landing clinic in Clark County, Washington, Fresenius proposed in its CON submission that its medical director be Mandeep Sahani, MD, a nephrologist with Desert Kidney Associates ("DKA") in Mesa, Arizona, a suburb of Phoenix, Arizona. In its submission, Fresenius claimed that "the physician named in the Medical Director Agreement has committed to being present in the state of Washington for the required Medical Director duties," even though he lived far away from the proposed clinic and would not take up residence in Washington.[66]

---

[66] Wash. Dep't of Health, *Certificate of Need Application, FKC Fisher's Landing* 31 (Aug. 16, 2019), *available at* https://www.doh.wa.gov/Portals/1/Documents/2300/2019/Eval18-48A.pdf?ver=2019-08-22-171334-650.

295.    This dubious arrangement demonstrates that Fresenius' MDAs plainly were intended to induce or reward referrals, and not to compensate medical directors at FMV.  Section 4.3.2 of the MDA states the medical director must "be available during all hours of operation of the Dialysis Operations for visits to and consultation regarding the Dialysis Operations and be on-call and working such additional time at or away from the Dialysis Operations as necessary to fulfill Medical Director's responsibilities under this Agreement, it being understood that a Medical Director needs to be available by phone and in person, as needed, at all times."[67]  Because he is based (and lives) in Mesa, Arizona, Dr. Sahani clearly would not be "available during all hours of operation … for visits to" the facility and "available … in person … at all times" as the MDA contemplates, given the 1,500-mile distance and concomitant travel time involved.

296.    DaVita raised these reasonable questions in its opposition to Fresenius' CON.  In its response, Fresenius explained that, if Dr. Sahani were not available to fulfill his duties, other local physicians would be available.[68]  This response raises an additional question: Why was Dr. Sahani chosen as medical director instead of the qualified nephrologists Fresenius admits are available in Kent County, Washington?  The Washington Department of Health was skeptical, noting:  "FMC's lack of response on this topic is cause for concern.  It is unclear why FMC would not provide a description of how this non-traditional medical director arrangement would ensure health and safety to the dialysis patient."[69]  Indeed, in fashioning its medical director agreements, Fresenius has not been concerned with patient health and safety at all; it has focused only on enriching itself.

---

[67] *Id.*
[68] *Id.* at 35.
[69] *Id.* at 37.

297.     Fresenius' real reason for offering Dr. Sahani the medical directorship was simple. Dr. Sahani's medical group, DKA, had been "locked out" of the market for Fresenius medical directorships in Arizona by a larger group, Arizona Kidney Disease and Hypertension Centers ("AKDHC"), through a combination of non-compete agreements and rights of first refusal ("ROFRs") granted to AKDHC by Fresenius for any new Arizona Fresenius centers proposed. However, Fresenius still wanted to lock in Dr. Sahani and his colleagues to refer patients to Fresenius facilities.  Fresenius thus attempted to build a relationship with Dr. Sahani and his Arizona nephrology group by providing an out-of-state medical directorship option in Washington state that circumvented these legal strictures.  Although the Washington Department of Health denied Fresenius' request for a CON on this occasion, the saga demonstrates Fresenius' ruthless approach to driving patient growth by paying doctors to refer patients to its facilities.

298.     Other Fresenius' CON applications in Washington from 2018 to present further show how Fresenius used its MDAs and multiple lucrative contracts with the same physicians or physician groups to capture illegal referrals for existing and new facilities and to leverage the accompanying non-compete provisions with the largest number of providers possible.

299.     For example, Fresenius entered into an MDA with Rockwood Clinics, the largest outpatient diagnostic and treatment center in the Spokane region, covering four clinics, a home dialysis clinic, and seven inpatient facilities.  For its medical directorship services, Rockwood Clinics was paid a total of $510,000 annually.  This agreement is not commercially reasonable, as Fresenius has no explanation for why it needs to engage the services of multiple physicians for clinics within a relatively small geographic area, where one medical director could provide all services required, and the company could benefit from economies of scale.  Instead, Fresenius made these payments to induce these physicians to refer patients to Fresenius clinics.  These

physicians referred patients to Fresenius facilities based at least in part (if not entirely) on remuneration from Fresenius, and these facilities submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients.  All such claims, which were tainted by kickbacks, were false.

300.    This was true throughout Washington state.  Fresenius' CON applications filed in Washington show that Fresenius paid widely divergent amounts for medical directors who work at similarly sized clinics, serving comparable numbers of patient, and providing comparable numbers of treatments.

301.    Dr. Maria Rojas of Confluence Health was paid approximately $61,000 in 2016 to supervise the Fresenius Omak Dialysis Center in Omak, Washington, a clinic serving 56 patients and delivering 9,536 treatments annually.  By contrast, Dr. Saeed Arif was paid $106,318 in 2016 to supervise the Fresenius Columbia Basin Clinic located in Kennewick, Washington that treated 69 patients.  Dr. Arif thus received seventy-four percent more in compensation than Dr. Rojas for the treatment of twenty-three percent more patients—a difference attributable at least in part (if not entirely) to Fresenius' acknowledgement that Dr. Arif is more valuable as a source of referrals to its own clinics.

302.    This contrast between the compensation provided for Dr. Rojas and Dr. Arif is not an isolated instance.  Fresenius' CON applications elsewhere in Washington show other significant differences in how physicians overseeing similar sized clinics are compensated, showing further discrepancies in pay which cannot be solely explained by physician qualifications, competition or workload.

303.    For example, in 2019, Fresenius paid RVS LLC $32,401 to administer the FKC Shelton Dialysis Center, treating 36 patients and delivering 4,320 treatments annually.  In 2019,

Fresenius paid Rockwood Clinics $66,865, nearly double that paid to RVS LL, to administer the FMC Leah Layne Dialysis Clinic in Othello, Washington, with 32 patients, delivering 4,642 treatments.

304.    These unexplained differences appear even in the same facility over a period of time.  For instance, Fresenius entered into a contract with the Franciscan Medical Group ("FMG") to provide medical direction at Fresenius' Mount Rainier Washington dialysis clinic, a 22-station facility in Tacoma, Washington.  In 2016, FMG was paid $182,000 to provide medical direction at the Mount Rainier clinic, where 112 patients received 10,669 treatments per year.  After the proposed relocation of the 22-station facility to a new building, Fresenius provided FMG with a $20,686 increase in salary (to $202,686) in 2021 and another $13,339 increase (to $216,025) in 2023 without any corresponding increase in patients or treatments.  Fresenius' generosity with the FMG Mount Rainier facility cannot be solely explained by physician qualifications, competition, or workload.  Instead, Fresenius made these payments at least in part (if not entirely) to induce or reward these physicians to refer patients to Fresenius clinics.  These physicians referred patients to Fresenius facilities at least in part (if not entirely) on remuneration from Fresenius, and these facilities submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients.  All such claims, which were tainted by kickbacks, were false.

305.    The amounts paid to physicians such as Dr. Arif and FMG are most notably out of line with FMV when compared to MDAs Fresenius entered into with other physicians and to the amount paid by competitors.  For example, in proposing a new 16-station facility in Yakima, Washington, Fresenius' 2020 CON application stated it would pay medical director fees of $60,000 to Renasolve, Inc., at a facility it predicted would serve 56 patients receiving 7,528 treatments by 2022.  By comparison, FMG would earn four times that amount in medical director

compensation to supervise the care of only twice as many patients providing only fifty percent more treatments.

306.    Likewise, Fresenius pays its Washington medical directors significantly more than does its chief competitor, DaVita.  For example, in applications to expand or build new facilities in Washington during the same time period, DaVita disclosed MDA payments of $50,000 for an 8-station Zillah facility serving 48 patients and delivering 6,352 treatments and $85,000 for an 8-station facility in Mt. Adams delivering 15,953 treatments per year.  By comparison, Fresenius' medical director compensation for Dr. Arif ($106,318 to supervise the treatment of 69 patients) dwarfs that of its chief competitor, DaVita, demonstrating that its MDAs are priced well above FMV.

307.    Despite Fresenius' public disclaimers, Fresenius' excessive medical director payments are not solely explained by competition or by the number of stations or patients, but at least in part (if not entirely) by the total anticipated stream of referrals that come from the MDAs.

### D.    Free or Below-Cost Practice Management Services to Induce Referrals

308.    Among the free (or below-) cost services offered to nephrologists to secure referrals has been its practice management services, including specialty advice and technology solutions. Fresenius touts this as "helping [nephrologists] manage and grow your practice so that you can focus on your patients."[70]  The true aim has been to show physicians how they could become more profitable, and in turn to help those physicians make Fresenius more profitable.

309.    Fresenius has partnered with physician practices under free practice management agreements as part of getting key information to establish the value of the potential volume of referrals, what it termed the "practice footprint."  MBDs were instructed to, and did, use

---

[70] Fresenius Med. Care, *Fresenius Physician Solutions*, https://fmcna.com/physician-solutions/practice-management/fresenius-physician-solutions/ (last accessed Jan. 30, 2021).

PowerPoint presentations in their meetings with physician practices around the nation to discuss identifying the number of ESRD patients, new practice patients, late stage practice patients, and "areas for growth and business opportunities," including "new office locations, new dialysis centers, and vascular access [centers]."

310.   MBDs were directed to, and did, tell practice groups that the goal was to establish a "Common Vision" for "Practice growth and success" and "alignment" between Fresenius and physician practices to "Facilitate development, validation and implementation of a strategic plan":



311.   Fresenius' core practice management message throughout the United States focused on just how profitable the stream of referrals could be for physician practices, and how early referrals to ESRD treatment would also benefit Fresenius's bottom line.  Practices were told that, while only 16% of a given practice's patients are ESRD patients (as opposed to merely having chronic kidney disease), about 62% of their practice revenue typically comes from those patients.

312.   Fresenius MBDs showed physicians models demonstrating just how profitable it would be if they were "Working Upstream to Deliver a Healthier Patient to Dialysis"—a code phrase for starting dialysis earlier to earn both the practices and Fresenius more money. Slides

showed models illustrating that increased referrals to Fresenius clinics of as little as 2% resulted in increased practice revenue of $80,000 per year and that an increase in referrals of 3% per year would increase practice revenue some $120,000:



313.  The key to evaluating the value referral stream was for Fresenius to obtain access to the physicians' practice patient data.  To do that, Fresenius explained it needed an understanding of the "practice footprint," requesting the practice provide three to five years of detailed data "for all transactions at all locations where the practice performs services/procedures (dialysis locations, doctor's offices, hospitals, vascular access centers, etc."  The data Fresenius sought from physicians to calculate the number of referrals it might expect included the following elements:

**Practice Data Elements**                                    Fresenius Medical Care

- Transaction ID
- Patient Unique Identifier
- Patient DOB
- Patient Sex
- Patient Home Zip Code
- Patient Date of Death
- Physician Number
- Physician Last Name
- Physician First Name
- Location ID
- Location Name
- Location Address
- Location City
- Location State
- Location Zip Code

- Date of Service
- CPT (Medicare Procedure Code)
- CPT Description
- Charge Quantity
- Charge Amount
- ICD9 Diagnosis Code 1
- ICD9 Diagnosis Code 2
- ICD9 Diagnosis Code 3
- ICD9 Diagnosis Code 4
- Patient Primary Insurance ID
- Patient Primary Insurance Name
- Referring Physician Number
- Referring Physician Last Name
- Referring Physician First Name

Need at least 3 years but would prefer 5 years of billing data for all transactions at all locations where the practice performs services/procedures (dialysis locations, doctor's offices, hospitals, vascular access centers, etc…

*Working Upstream With our Practices to Deliver a Healthier Patient to Dialysis*  59

314.    Fresenius used this data to identify physicians and practice groups to target for its unlawful MDAs and JVAs; the greater the anticipated number of referrals, the higher the priority to bribe the providers to send those patients to Fresenius facilities.

315.    After Fresenius had persuaded physicians to agree to ensure a referral stream of patients to Fresenius clinics (what Witness No. 18, *see supra* ¶¶ 220-221, called "playing the game"), the parties would enter into a Confidentiality Agreement and Business Associate Agreement.  Under these agreements, Fresenius offered its physician partners significant free services, including business development and management services from a Fresenius Practice MBD, a dedicated Chronic Kidney Disease educator, financial coordination for the practice's patients entering dialysis, de novo development (the development of new Fresenius clinics that will be geographically compatible with the physicians' practices, where these physicians can easily serve as medical directors, adding to the physician's income), inpatient services (including the Bridge Program, *see supra* ¶¶ 129-149), vascular access center development (which added

significantly to a physician's income), and electronic health record ("EHR") decision support tools, as explained in the following PowerPoint slide:



316.   Another service FMNCA provided to physicians as part of its practice management services was a recruiting service called NephrologyMatch.com (also called "Nephrology Connect"), an online recruiting platform that was offered free of charge to its partner physicians with the understanding that new nephrologists recruited through the platform would affiliate with Fresenius by becoming medical directors and continue to funnel patients to Fresenius clinics.

317.   NephrologyMatch.com was part of the company's physician recruitment efforts headed by Michelle Cowens, Vice President of Physician Placement Services, which handled the recruitment of nephrologists to join doctors in private practice.   The free service recruited nephrology fellows or practicing physicians who were looking to make a change, and try to recruit them to its openings—*i.e.*, medical director positions at Fresenius clinics, at medical groups that were JV partners, or at practices that Fresenius itself owned and managed.

318.    Cowen and her team often acted as a placement service for under-served markets. Fresenius aimed its recruiting efforts at newly-minted nephrologists, annually recruiting thirty to forty nephrologists from over 150 nephrology programs throughout the country.  The job postings listed on NephrologyMatch.com commonly tout opportunities to participate in JVs, medical directorships, and real estate investment.

319.    Fresenius views the free NephrologyMatch.com recruitment of new physicians to its partner practices as a key to growing its business and is aimed at generating more patient referrals.  For instance, in a 2013 PowerPoint presentation by Physician Placement Services entitled "NephrologyMatch.com," it states that Fresenius' "future growth is directly dependent on our ability to recruit more than our fair share of new nephrologists and to drive growth through adding physicians to our loyal partners."  Fresenius' "loyal partners" who would use its free recruitment services are those physicians who have partnered with Fresenius through medical directorships or other arrangements that insure that the physician will refer patients to Fresenius and not to its competitors.

320.    Through the valuable free practice management services provided to physicians they would otherwise have to pay themselves, Fresenius violated the AKS, which prohibits the payment of remuneration to secure referrals.  All claims Fresenius submitted for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this practice management scheme are false claims within the meaning of the FCA.

E.    **Favorable Leases with Medical Directors to Induce Referrals**

321.    Above-FMV leases and extended guaranteed lease agreement payments provide further incentives for physicians to refer patients to Fresenius clinics.  Fresenius often leases office space in buildings owned by physicians at above FMV.  These leases are frequently guaranteed for 15 years whether  the Fresenius clinic continues in business, and provide for annual escalators

of 1% to 10%—arrangements that are not commercially reasonable and provide far greater remuneration to the physicians than justified by economic conditions in the market.

322.   Conversely, when Fresenius owns its buildings, it also frequently leases office space to its medical directors at rates significantly below FMV—arrangements that are not commercially reasonable and not justified by economic conditions in the market.

323.   In the experience of Witness No. 17, *see supra* ¶ 182, Fresenius rented property to and from doctors on terms that were favorable to the doctors.  "Fresenius has a whole business development department that does that."  For example, Fresenius often formed a JVA with a nephrologist group to put a Fresenius clinic in the group's medical building.  The group owned the building.  As part of the deal, Witness No. 17 explained that Fresenius would pay an above-market rate to the group for leasing space in the group's building for the clinic.  "It was always favorable to the physician."  For physicians who wanted "extra space" in a freestanding Fresenius clinic, the company would lease them the extra space—"a suite next door"—at a lower rate.  "Fresenius would of course lease the space to the physician on favorable terms."

324.   Witness No. 4, *see supra* ¶ 106, recalled that Fresenius regularly paid above-market rates to doctors to lease their office space for clinics.  He recalled an agreement in Grand Rapids, Michigan, a city where medical offices typically leased for $14 to $16 per square foot in 2013, where Fresenius paid the doctors $23 per square foot—a 64% increase over market rates.  Witness No. 4 "never saw where the physician was the landlord and we [Fresenius] were paying bottom dollars."

325.   Witness No. 4 also explained that Fresenius not only leased space from doctors at above-market rates, but in other instances, it leased back to the doctors space inside its existing clinics at below-market rates.  Under such arrangements, a typical lease for 9,000 square feet of

finished, medical-grade office space gave doctors the right to use the space every Monday, Wednesday and Friday from 1:00 pm to 4:00 pm.

326. These lease-back arrangements could be very lucrative for physicians. Witness No. 4 (*see supra* ¶ 106) recalled negotiating—at the instruction of Fresenius management—a JVA with doctors in Kalamazoo, Michigan, in which the doctors decided that they wanted to buy their medical offices, build a clinic for Fresenius, then lease it to Fresenius for around fifteen years under a triple net lease agreement (in which the tenant, not the landlord, pays for the property's taxes, insurance, and maintenance). While the Kalamazoo doctors were minority shareholders in the property, with a 49% stake, they were functionally the landlords. After building the clinic and locking Fresenius into the triple net lease, thus inflating the value of the property, the doctors then "flipped" the building, selling it at a substantial profit. Witness No. 4 recalled that the sale "didn't bother" Fresenius because the company could still count on the physicians to refer patients to its clinics.

327. Witness No. 21, an RVP of Operations for the Los Angeles and Las Vegas markets from 2016 to 2017, where she was responsible for managing the day-to-day operations for ninety Fresenius freestanding dialysis clinics, said it was commonly known that, as part of its financial arrangements with doctors' groups, Fresenius paid above-market rates for doctors' buildings or space in those buildings. Paying doctors above-market rates to lease or buy office space benefitted Fresenius by currying financial favor with doctors who were tasked with referring patients to Fresenius clinics," Witness No. 20 said.

328. Witness No. 19, *see supra* ¶ 213, explained that, in Puerto Rico, doctors simply leased their office buildings to Fresenius, allowing the company to set up outpatient dialysis clinics on site. "A number of the clinics are in buildings owned by doctors who also have medical

directorships."  Significantly, Fresenius paid handsomely to lease that space.  Witness No. 19 "always questioned these FMV assessments, where there isn't a lot of sophistication" on the part of Puerto Rican doctors regarding negotiations.  She saw some leases that paid doctors over $30 per square foot, where, in her experience, "it should have been $15 or $16."  An even more egregious example was a 2015 lease in which Fresenius paid $40 per square foot, well above FMV, for medical-grade office space "on the south side of the island."  The facility was closed after being trashed by Hurricane Maria in 2017.

329.    Witness No. 14 also cited lease provisions that were designed to increase Fresenius' payments to the doctors.  Such "escalators" ranged from 1% to 10% annually.  "[Fresenius] tried to couch it [in the agreements] as annual increases for a CPI [consumer price index] thing."  In reality, these provisions served as convenient methods for Fresenius to reward continuing referrals of patients to its facilities.

330.    Fresenius increases its control over physicians by tying "the lease ... to the medical directorship; they would stagger the end date of the MDA and the end date of the lease—that way I have you tied."  The end date of the lease typically came one year after the end date of the MDA. By staggering these end dates, Fresenius ensured that it constantly maintained leverage over its physician partners—with the carrot of bribes and the stick of non-compete provisions— encouraging them to continue referring patients to Fresenius clinics and renew their agreements, perpetuating the cycle.

331.    Through the actions alleged above, including the payment of above-FMV rents and provision of below-FMV leases to physicians in order to induce and secure referrals, Fresenius violated the AKS.  Through these practices, Fresenius essentially paid physicians for referrals, payments that violate the AKS.  All claims submitted for services Fresenius rendered to the patients

who were referred to Fresenius clinics through the operation of this scheme are false claims within the meaning of the FCA.  Fresenius has failed to comply with the requirements of the personal services safe harbor, by *inter alia*, failing to pay FMV, by failing to specify the terms of price for the periodic services, and failing to supervise medical directors adequately to insure that work paid for is actually performed.

### F.      Fresenius Entered into JVAs with Referral Sources in Order to Further Induce Referrals

332.    Starting in approximately 2007 through the present, Fresenius illegally expanded its access to referrals by entering into JVAs with nephrologists or other physicians who were in a position to become a primary referral source for dialysis patients to its clinics.

333.    JVs allow the participating partners to share in the management, profits, and losses of an outpatient dialysis facility.  Fresenius' strategy has focused on acquiring a controlling ownership interest in dialysis centers owned by one or more physicians or physician practice groups with an existing base of dialysis patients, leading to the creation of a JV controlled by Fresenius as majority owner with the physicians or physician practice groups retaining a minority interest.

334.    Fresenius paid these physicians or practice groups inflated amounts for controlling interests, ensuring the continued referral of patients to the Fresenius-controlled JV.  Fresenius carried out this kickback scheme through a web of agreements between the entities that included non-compete provisions designed to lock in Fresenius' receipt of patient referrals.

335.    The JVAs typically involved the construction of a new clinic—a "de novo" clinic in Fresenius parlance—or the relocation and expansion of an existing clinic.  Fresenius: (1) selected physicians as JV partners at least in part (if not entirely) on their ability and commitment to refer patients; (2) enforced the physicians' obligation to refer to the JV by a variety of methods;

(3) sold shares at below FMV to physicians in a position to refer in order to induce referrals; and (4) routinely permitted referral sources to own more than 40%, and at times, more than 50% of the JV investment, despite restrictions on the percentage of ownership imposed by the regulatory safe harbors.

336.    OIG has promulgated an "investment" safe harbor to protect investment interests that would otherwise be prohibited by the AKS.  In order to gain protection under this safe harbor, an investment arrangement must meet a number of criteria, including:

- "No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to . . . the entity."[71]

- "The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity."[72]

-  "No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12-month period may come from referrals or business otherwise generated from investors."[73]

---

[71] 42 C.F.R. § 1001.952(a)(2)(i).
[72] *Id.* § 1001.952(a)(2)(iii).
[73] *Id.* § 1001.952(a)(2)(vi).

- "The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operation service rendered) of that investor."[74]

Fresenius' joint venture arrangements with physicians do not satisfy any of these criteria and do not fall within this safe harbor.

### 1. Fresenius Intentionally Chose Joint Venture Partners Based Upon Their Ability to Make Referrals to Fresenius Dialysis Clinics

321.   Fresenius began offering JVs to physicians in or about 2007.  Fresenius did not offer JV partnerships to physicians to raise capital or to gain management expertise.  In fact, during most of the time period at issue, Fresenius made clear to regulators that it had substantial cash reserves of capital to invest.  For instance, in one 2011 application to the Illinois Health Facilities & Services Review Board, Fresenius noted that its "healthy financial position and abundant liquidity indicate that we have the ability to support the development of additional dialysis expected financial obligations and does not require any additional funds to meet expected project costs." This language, or substantially similar language, appears in almost all Fresenius applications to construct or enlarge dialysis facilities and makes clear that Fresenius did not engage in JVAs out of a need to raise capital.

337.   Nor did Fresenius need to enter into joint ventures to gain management expertise from its investors.  In fact, in nearly all cases, Fresenius controlled management of the joint venture operations, including assessing physicians a management fee for each dialysis patient in situations where physicians were majority owners.

338.   This fact is substantiated by Witness No. 16, Vice President of Business Development for the Western Region from 2007 to 2011, who was responsible for developing new

---

[74] *Id.* § 1001.952(a)(2)(viii).

dialysis centers by identifying and developing JVs with physicians, securing deals to provide acute services in hospitals, and acquiring and developing new dialysis centers. Witness No. 21 recalled that Fresenius began to seek out and negotiate JVs with doctors and hospitals. "Fresenius was late to the party in leveraging JVs in the nephrology space. All the other [dialysis] providers had been using them for years."

339.   According to Witness No. 16, the process involved "negotiating a premium" with nephrologists in private practice and with some hospitals, entities who were in a position to make referrals to the dialysis clinic. Witness No. 16 frequently worked directly with Fresenius' then-Co-Chief Executive Officers Rice Powell and Mats Wahlstrom on these agreements.

340.   Occasionally, dialysis centers were a three-legged JV between Fresenius, a hospital, and a nephrologists' practice group. The physicians and/or the hospital owned a significant minority share in the center, often up to 49% of the joint venture, and occasionally (for example, in deals with Dallas Nephrology Associates) up to 50%, although Fresenius usually retained ultimate control by insuring it had a majority share or preserved its management autonomy.

341.   Witness No. 16 explained that the deals were structured to entail "a referral stream of patients." In JVs, "the physician has a cadence they use to refer to their own entity. If a patient was being seen by a nephrologist in his office, the discussion takes place, where is the patient going to dialyze in an outpatient setting. I'm sure the physician [in a JVA] is not going to refer to another [non-Fresenius] dialysis place."

342.   Analysis of the potential JV profitability was done by a team in Fresenius' head office in Waltham, Massachusetts. "The analysts did all the modeling" for anticipated patient referrals, according to Witness No. 16. Joe Ruma, then Vice President of Acquisitions, later Senior

Vice President of Business Development, oversaw the Waltham analysts. All contracts were approved by Bill Valle, then Senior Vice President of U.S. Vascular & Joint Ventures and now Chief Executive Officer ("CEO"), and Brian Gaugin, Senior Vice President of Physician Strategies & Market Development.

343.   Witness No. 4, *see supra* ¶ 106, had a similar recollection. He explained that, through a JVA with Fresenius, a doctors' group can earn several million dollars a quarter. "Obviously, the upside for the doctors was ownership." The physicians and Fresenius would have a separate operating agreement where the doctors would get "a percentage of revenue off the contract, depending on the EBIT" of the clinic. Under a typical operating agreement, Fresenius would pay high-performing doctors—those that referred a substantial number of patients to the Fresenius clinic—10 to 12% of a clinic's topline revenue. It paid low-performing doctors—*i.e.*, physicians who referred a smaller number of patients to the Fresenius clinic—up to 6% of topline revenue. For JVAs where Fresenius was a minority shareholder, Fresenius also paid doctors a flat rate "management fee" of $25 per dialysis treatment.

344.   Fresenius' practice of offering JV opportunities to physicians only if they had referred substantial numbers of patients to Fresenius centers in the past, or were in a position to do so in the future, was corroborated by Witness No. 22, Director of Market Development for Fresenius from 2016 to July 2020. Witness No. 22 partnered with each RVP of Operations to define business plans and goals to grow the territory. Witness No. 22 stated that Fresenius leveraged data maintained by nephrology practices to show nephrologists what they could do to grow their practices and make them more lucrative, and to show how both Fresenius and physicians could benefit from increased referrals of ESRD patients. The Fresenius directors of market development were tasked with getting doctors to grow their businesses. Witness No. 22 said he

put together PowerPoint presentations to show doctors where their revenue was low and told them about opportunities like JVs and medical directorships.

345.     Witness No. 18, who was responsible for establishing new clinics and JVs with nephrologists in the San Antonio area, *see supra* ¶ 212, described the process by which FMCNA functionally "purchased" dialysis patient revenue streams from nephrologists in private practice by entering into JVAs.  JV contracts also always included a medical directorship contract with the investing physicians' group, making the investment even more lucrative and attractive.  Witness No. 18 said Fresenius paid a valuation company from San Francisco, Bay Valuation Advisors, around $30,000 to establish the value of a patient revenue stream that a group of nephrologists would bring to a JV.

346.     JV partners who failed to refer a sufficient number of patients faced considerable pressure, similar to the pressure described above that was applied to medical directors.  *See supra* ¶¶ 196-197.  According to Witness No. 21, *see  supra* ¶ 327, the doctors had a "stake in the financials—the nephrologists."  In her job managing monthly profit and loss ("P&L") reports for JVs, she saw that doctors who did not refer a given patient to a Fresenius clinic—perhaps because the patient lived closer to a DaVita clinic—were castigated by Fresenius' operations directors. "They'd say, 'you own part of the business—why aren't you referring to us?'"

347.     Witness No. 23, Corporate Vice President, Physician Services and Innovation, North America, from July 2012 to February 2017, had a similar experience.  In her role overseeing Fresenius' management of physician services at doctors' groups with which it had JVAs, she recalled that there is a level of network adherence by JV physicians to ensure profitability. "Network adherence," she explained, means that "you [the doctor] have to refer within a certain network [of dialysis clinics]."  The term "network adherence" was inserted into JVAs and other

contracts with doctors and doctors' groups to ensure physicians were referring a sufficient number of patients to Fresenius facilities.

348.    Fresenius did not in any way attempt to comply with the AKS investment safe harbor requirement that "[t]he terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to … the entity must not be related to the previous or expected volume of referrals."  In Fresenius' joint ventures, the investment interests were offered only to investors who could, and promised to, make substantial referrals of patients to the resulting dialysis clinic built or acquired by the joint venture, or to other Fresenius facilities.

349.    Fresenius also did not attempt to fulfill the AKS investment safe harbor requirement that "no more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to ... the entity."  In multiple instances, Fresenius has allowed physicians to own more than 40% of the investment interests, and sometimes even a majority share of the joint venture.  At least thirty Fresenius JVs exceed the forty percent threshold. The following table shows the names of these JVs, their date of creation, their total offering amount ("Total Cap"), the minimum investment accepted from any non-Fresenius investor ("Non-FMCNA Cap"), and the nephrologist ownership percentage of each JV ("% Non-FMCNA"):

| Name of JV | Date Created | Total Cap | Non-FMCNA Cap | % Non-FMCNA |
|---|---|---|---|---|
| FMC SW Jackson Home, LLC | 2/2/2012 | $412,652.00 | $231,385 | 56.072671% |
| FMC Reedley Home, LLC | 4/1/2020 | $1,268,428 | $621,530 | 49.000022% |
| FMC Surrats, LLC | 12/23/2013 | $3,262,350 | $1,598,552 | 49.000015% |
| FMC Tenafly, LLC | 5/27/2020 | $4,111,413 | $2,014,593 | 49.000015% |
| FMC Vineland, LLC | 11/1/2016 | $3,061,224 | $1,500,000 | 49.000008% |
| FMC Balboa II, LLC | 10/3/2013 | $9,721,630 | $4,763,599 | 49.000003% |
| FMC South Lewisville, LLC | 11/9/2020 | $2,008,755 | $984,290 | 49.000002% |
| FMC New Vista, LLC | 6/30/2015 | $3,708,355 | $1,817,094 | 49.000001% |
| FMC Balboa V, LLC | 2/25/2020 | $6,072,604 | $2,975,576 | 49.000001% |
| FMC NKDHC, LLC | 5/31/2013 | $3,877,551 | $1,900,000 | 49.000000% |

| FMC Cedar Hill, LLC | 11/7/2018 | $928,000 | $454,720 | 49.000000% |
|---|---|---|---|---|
| FMC Lubbock, LLC | 7/15/2014 | $4,060,349 | $1,989,571 | 49.000000% |
| FMC Loveland, LLC | 6/5/2013 | $2,770,694 | $1,357,640 | 48.999998% |
| FMC Mount Prospect, LLC | 11/6/2018 | $3,373,380 | $1,652,956 | 48.999994% |
| FMC East Ft. Lauderdale, LLC | 3/23/2018 | $2,462,627 | $1,206,687 | 48.999991% |
| FMC Truman, LLC | 12/10/2020 | $2,825,368 | $1,384,430 | 48.999989% |
| FMC Secaucus, LLC | 10/29/2018 | $3,662,205 | $1,794,480 | 48.999988% |
| FMC Griffith, LLC | 3/23/2016 | $1,165,080 | $570,889 | 48.999983% |
| FMC Anaheim, LLC | 5/30/2014 | $564,135 | $276,426 | 48.999973% |
| FMC Summit, LLC | 3/23/2016 | $989,615 | $484,911 | 48.999965% |
| FMC Sandhill, LLC | 12/12/2016 | $477,166 | $233,811 | 48.999929% |
| FMC Goose Creek Home Dialysis, LLC | 6/26/2014 | $84,629 | $ 41,468 | 48.999752% |
| FMC Reedley, LLC | 5/21/2014 | $491,529 | $240,680 | 48.965575% |
| FMC Enid, LLC | 2/28/2012 | $2,378,149 | $1,164,293 | 48.957950% |
| FMC Belleville, LLC | 7/20/2017 | $152,915 | $73,399 | 47.999869% |
| FMC OKCD, LLC | 11/3/2010 | $30,214,672 | $14,285,275 | 47.279266% |
| FMC VRO, LLC | 10/9/2012 | $368,932 | $147,573 | 40.000054% |
| FMC NAK Campbellsville, LLC | 7/1/2011 | $1,105,577 | $442,231 | 40.000018% |
| FMC NAK Scott County, LLC | 7/1/2011 | $1,167,277 | $466,911 | 40.000017% |
| FMC Zion, LLC | 8/28/2017 | $2,592,077 | $1,036,831 | 40.000008% |

350.   Not only did Fresenius intentionally enter into JVAs in which its nephrologist partners had greater than forty percent ownership interests, but Fresenius knows, and expects, that the vast majority of revenue for its JV facilities will come from patients referred by these partners. A significant number of the ESRD patients treated at these facilities were beneficiaries of Federal health care programs, for whose treatment the facilities submitted claims for reimbursement. Because Fresenius entered into these JVAs based at least in part to induce nephrologists to refer patients to its own clinics, and intentionally violated the strictures set forth in 42 C.F.R. §§ 1001.952(a)(2)(i) & 1001.952(a)(2)(vi), all of these claims violated the AKS and constitute false claims within the meaning of the FCA.

351.   Fresenius had JVAs with many of the same physician groups with which it had entered into MDAs.  Those JVAs were parceled out according to the groups' ability to make significant referrals to Fresenius.  For example, Fresenius had multiple JVAs with Balboa

Nephrology, a group that also held medical director positions at many Fresenius clinics.  *See supra* ¶¶ 236-238.  The JV between Fresenius and Balboa, Fresenius Medical Care Balboa II, was formed on October 1, 2013, with a total offering amount of $9,721,630, and a 49 percent ownership investment by Balboa, or $4,763,599.  The Directors listed include four Fresenius employees— Joe Ruma, Vito Orlando, Aria Charves, and Tad Beatty—as well as three Balboa physicians: Shaun Edelstein, Dylan Steer, and Steven Steinberg.

352.    Another JV between Fresenius and Balboa, Fresenius Medical Care Balboa V, was formed on February 25, 2020, with a total offering amount of $6,072,604, with a 49 percent ownership investment by Balboa, or $2,975,576.  The Directors listed include five Fresenius employees—Ryan Valle, Jason Bauer, Ana Silveira, Rinav Gandhi, and Louie Gabiola—as well as three Balboa physicians: Shaun Edelstein, Dylan Steer, and Bijal Patel.

353.    Fresenius entered into other JVs with Balboa, such as Interwell Health, a care coordination company whose Board of Directors includes Bill Valle, the CEO of FMCNA, and Dr. Dylan Steer, President of Balboa Nephrology.   In return for the lucrative investment opportunities described above for Balboa physicians with Fresenius, Balboa has agreed to refer hundreds of patients to Fresenius outpatient dialysis clinics, after which Fresenius submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients.  All such claims, which were tainted by kickbacks, were false.

354.    The symbiotic relationship between Fresenius and Balboa caused concerns among some onlookers.  Witness No. 11, a Balboa Dialysis Admissions Coordinator from March 2006 to November 2015, *see supra* ¶ 145, recalled that when Balboa sealed its JV with Fresenius in 2013, she was immediately skeptical.  "When they became a JV, the appearance that the doctors were 'choosing' [the dialysis facility] for the patients wasn't a good look for me."  By "choosing," she

meant selecting the dialysis clinic to which the Balboa patient would be referred for thrice-weekly treatments—in this case, a Fresenius clinic. Witness No. 11 saw that someone at Fresenius' office "was just placing with whatever Fresenius clinic she could. It was not a good feeling."

355.   Fresenius' funneling of Balboa patients upon their discharge from Sharp Hospital into one of its outpatient clinics often left Balboa doctors in the dark about where their patients were going. "Many times, a doctor would call and say, 'hey where did my patient go?!', and I would have to call the Fresenius HSS and find where the patient went. And she would say, 'oh, we placed him here.'"

356.   Witness No. 11 recalled that not all Balboa doctors were part of the JV with Fresenius. "You had to be a partner to buy in." Under the JVA, Balboa turned over accounting and billing to Fresenius. "Fresenius owned the books. Balboa got a report monthly, but they didn't own the accounting, the billing." In Witness No. 11's experience, the JV incentivized Balboa doctors to refer patients to Fresenius clinics.

357.   In 2013, for example, Balboa physicians referred 2,175 patients for dialysis at Fresenius facilities, an increase of 274 dialysis patients over the previous year. Fresenius' internal tracking documents show that Balboa's commercial mix was 10.5%, which means that over 1,900 of the patients that Balboa referred to Fresenius clinics were beneficiaries of Federal health benefit programs such as Medicare and Medicaid. Fresenius submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients. All such claims, which were tainted by kickbacks, were false.

358.   Fresenius had a similar symbiotic relationship with NANI, an Illinois nephrology group which is described in more detail herein, *see supra* ¶¶ 245-255. Not only are NANI nephrologists paid exorbitant amounts under MDAs at a number of Fresenius outpatient clinics

throughout Illinois, Indiana, and elsewhere, but many of the Fresenius clinics are co-owned by lucrative JVs between Fresenius and NANI.  For example, NANI has a JV with Fresenius South Elgin (49% NANI, 51% Fresenius) through Neptune Group III, and Fresenius Palatine (49% NANI, 51% Fresenius) also through Neptune Group III.

359.    NANI is likewise a participant in Interwell, a national JV partnership founded in 2018 between FMCNA and other nephrology practices across the United States.  NANI physician Manish Tanna, the medical director for the Fresenius Palatine clinic, is on the Interwell Board of Directors.   In return for the profitable investment opportunities for NANI physicians with Fresenius, NANI has agreed to refer thousands of patients to Fresenius' outpatient dialysis clinics. Fresenius submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients.  All such claims, which were tainted by kickbacks, were false.

360.    ENA, a North Carolina nephrology group described in more detail herein, *see supra* ¶¶ 278-284, is likewise a participant in Interwell.   In return for the profitable investment opportunities described above for ENA physicians with Fresenius, ENA has agreed to refer thousands of patients to Fresenius outpatient dialysis clinics.  Fresenius submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients. All such claims, which were tainted by kickbacks, were false.

361.    Fresenius also had multiple MDAs and JVAs with Dallas Nephrology Associates ("DNA"), a very large nephrology group in Dallas Texas, *see supra* ¶¶ 286-287.  Witness No. 24 worked at DNA as Director of Revenue Management from 2016 to 2018, handling all billing for services rendered to patients by DNA doctors, including for DNA doctors who were in JVAs with Fresenius.  While "patients had the option" to choose where they went for dialysis treatment, Witness No. 24 recalled that DNA physicians "tried to … make sure patients were in Fresenius

units." DNA's JV physicians funneled thousands of patients to Fresenius clinics. Fresenius submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients. All such claims, which were tainted by kickbacks, were false.

> **2. Fresenius Manipulated the Valuation for Joint Ventures to Decrease Physicians' Contribution and Increase Their Profits**

362.  Although the investment safe harbor requires that "[t]he amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operation service rendered) of that investor," Fresenius did not ensure that joint venture partners' return on investment was proportional to the amount of capital investment.

363.  There were two ways in which Fresenius violated this restriction on investment interests:

- by undervaluing the profitability of the joint venture to reduce investors' necessary capital contribution; and

- by entering into post-contractual arrangements which would substantially reduce the investors' actual risk and significantly increase their financial rewards.

364.  For example, some particularly powerful doctors' groups with the ability to make significant referrals negotiated preferential JVAs that lowered their annual capital contributions. This is corroborated by Witness No. 25, Vice President, Finance, for Joint Ventures from February 2018 to November 2020. Witness No. 25 was the point person for all physicians who had an ownership interest in Fresenius dialysis clinics through JVAs, administering all the agreements for some 400 JVAs, overseeing financial reporting, board decks, working capital management, capital calls, and calculating distributions to JV partners.

365.     While the JVAs generally used the same template contract, Witness No. 25 recalls that the section of the JVAs regarding what additional capital contributions Fresenius required of doctors' groups was negotiable.  "If that's needed, it could be negotiated for the physicians not to be asked to contribute more money."

366.     Doctors' groups in JVs receive a pro-rata share of the money coming into Fresenius clinics for services.  "The groups would receive whatever their ownership percentage was in that business," regardless of whether they made their capital contributions.

367.     Witness No. 25 added that Fresenius managers and executives (including its operations managers) met with the board of managers at physicians' groups quarterly via conference calls.  The purpose of the meetings was to review quarterly results of the individual JV's business to evaluate the revenue stream, which included examining the extent to which joint venture partners were making expected referrals.  During those meetings, Fresenius provided a monthly/quarterly financial package to the doctors' groups, including profitability of the JVAs.

### 3.     Fresenius Locked Joint Ventures into Non-Competition Agreements to Ensure Patient Referrals

368.     As it has with its medical director agreements, Fresenius used non-compete clauses in its JVAs to lock partners into referring patients to a Fresenius facility.  Fresenius understood the non-compete agreements were a significant barrier to the physicians' referring patients to its competitors or establishing their own dialysis centers.  Therefore, Fresenius required that medical directors who were offered the opportunity to enter into JVAs also had to sign a non-compete covenant.

369.     Having selected physicians who could refer patients, and then having enticed those physicians to partner with Fresenius in a dialysis JV, according to Witness No. 22, *see supra* ¶ 344, "they're locked in."  Fresenius inserted provisions in the agreements that made it substantially

more difficult for the physicians to leave the JV, compete with Fresenius in any way, or enter into any transactions with Fresenius' competitors.

370.    Despite OIG guidance warning against the use of non-compete clauses in JVAs, Fresenius' agreements routinely included non-competition provisions and other restrictions on its referring physician partners.

371.    OIG's April 2003 Special Advisory Bulletin also warned that indicia of a suspect contractual joint venture—a JV that could violate the AKS—include a "captive referral base" where the newly-created business predominantly or exclusively serves the owner's existing patient base (or patients under the control or influence of the owner).

372.    Fresenius' JVs had these suspect indicia.  Fresenius' non-competition clauses for its JVs lasted for the life of the agreement and included an extension for a period of time after the agreement ended (*i.e.*, a "tail"), usually 2 to 3 years.  As a result of these contractual restrictions, Fresenius effectively ensured its JVs as the exclusive option for each physician JV partner to refer patients.

373.    According to Witness No. 15, *see supra* ¶ 149, under the JVAs with nephrologist partners, Fresenius included non-compete clauses that spanned 15 to 20 miles.  In her experience as an MBD in the Tampa/St. Petersburg, Florida territory, Fresenius always retained a 51% ownership stake in its JVs, with the nephrologist group owning 49% or less.  Fresenius thus had the controlling interest in the agreements.

374.    Witness No. 10, *see supra* ¶ 140, recalled that the physicians Fresenius partnered with in its JVs were contractually precluded from serving as medical directors at DaVita facilities, though they could serve as medical directors for multiple Fresenius facilities.  At the direction of Fresenius management, Witness No. 10 drafted these contracts many times in his career and did

not always send them to Fresenius' legal department for approval.  The company had a template contract and he would assemble the various provisions or review a contract one of his team members had drawn up, then sign off on it himself.  At the direction of Fresenius' management, its employees would "sign [the contracts] locally."

375.    Through the circumstances alleged above, including the provision of substantial financial incentives to physicians in the form of lucrative JVAs that were designed to induce and secure referrals, Fresenius violated the AKS.  Through these practices, Fresenius essentially paid physicians for referrals, payments that violate the AKS and are not protected by any safe harbor. Claims submitted for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this scheme are false claims within the meaning of the FCA. Fresenius has failed to comply with the requirements of the investment safe harbor, by *inter alia*, tying the terms of the investments to the previous or expected volume of referrals, failing to require physicians to pay FMV for their shares in the joint ventures and by failing to ensure that no more than 40% of the investment comes from referral sources.

## COUNT I

### FALSE CLAIMS ACT
### Violation of 31 U.S.C. §§ 3729(a)(1)(A)

376.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 365 of this First Amended Complaint.

377.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§  3729 *et seq*.

378.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States government for payment or approval.

Each claim for reimbursement violated 31 U.S.C. § 3729(a)(1)(A) and caused the Federal government to pay Defendant funds to which it was not entitled.

379.    The government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant, has paid and continues to pay Defendant for claims that are tainted by remuneration relationships that violate the AKS,  reimbursement to which Fresenius is not entitled.

380.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## COUNT II

### FALSE CLAIMS ACT
### Violation of 31 U.S.C. §§ 3729(a)(1)(B)

381.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 365 of this First Amended Complaint.

382.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§  3729 *et seq*.

383.    By virtue of the acts described above, Defendant made, used, or caused to be made or used false records and statements material to a false or fraudulent claim.  Each claim for reimbursement supported by false records and statements violated 31 U.S.C. § 3729 (a)(1)(B) and caused the Federal government to pay Defendant funds to which it was not entitled.

384.    The government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant, has paid and continues to pay Defendant for claims that are tainted by remuneration relationships that violate the AKS,  reimbursement to which Fresenius is not entitled.

## COUNT III

**FALSE CLAIMS ACT**
**Violation of 31 U.S.C. §§ 3729(a)(1)(C)**

385.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 365 of this First Amended Complaint.

386.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

387.    By virtue of the acts described above, Fresenius conspired with the other persons and entities identified in this Complaint (and others), especially the physicians to whom it paid remuneration in exchange for referrals, to knowingly present or cause to be presented, false or fraudulent claims to the United States government for payment or approval, and made, used, or caused to be made or used false records and statements material to false claims.  Each claim for reimbursement violated 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B) and caused the Federal government to pay Defendant funds to which it was not entitled.

388.    The government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant, has paid and continues to pay Defendant for claims that are tainted by remuneration relationships that violate the AKS,  reimbursement to which Fresenius is not entitled.  By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff-relator Flanagan respectfully requests that the Court enter judgment in his favor and in favor of the United States of America against Defendant FMCNA, imposing treble damages and penalties of twenty-three thousand three hundred thirty-one dollars ($23,331) per false claim, and awarding Relator thirty percent of the recovery as well as his costs

and attorneys' fees incurred in this action, together with pre-judgment and post-judgment interest, and such other further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Relator hereby demands trial by jury on all issues so triable.

Dated: February 5, 2021                    Respectfully submitted,


*/s/ W. Scott Simmer*
W. Scott Simmer, Esq. (Bar No. 814711)
Noah M. Rich, Esq. (Bar No. 814636)
BARON & BUDD, PC
The Watergate, 10th Floor
600 New Hampshire Ave. NW
Washington, DC 20037
202-333-4562
ssimmer@baronbudd.com
nrich@baronbudd.com

Admitted *pro hac vice*

*/s/ Jamie M. Bennett*
Jamie M. Bennett, Esq. (Bar No. 08468)
BENNETT LAW FIRM
8 Creek Side Court
Middle River, MD 21220
443-844-4629
jbennettlawfirm@gmail.com

# EXHIBIT A

| 1 | | 2 | | | 3a PAT.<br>CNTL # | | | 4  TYPE<br>OF BILL |
|---|---|---|---|---|---|---|---|---|
| | | | | | b. MED.<br>REC. # | | | |
| | | | | | 5 FED. TAX NO. | | 6  STATEMENT COVERS PERIOD<br>FROM        THROUGH | 7 |

| 8 PATIENT NAME | a | | 9 PATIENT ADDRESS | a | | | | |
|---|---|---|---|---|---|---|---|---|
| b | | | b | | | c | d | e |

| 10 BIRTHDATE | 11 SEX | 12  DATE | ADMISSION<br>13 HR  14 TYPE  15 SRC | 16 DHR | 17 STAT | 18 | 19 | CONDITION CODES<br>20  21  22  23  24  25  26  27  28 | 29 ACDT<br>STATE | 30 |
|---|---|---|---|---|---|---|---|---|---|---|

| 31   OCCURRENCE<br>CODE       DATE | 32   OCCURRENCE<br>CODE      DATE | 33   OCCURRENCE<br>CODE      DATE | 34   OCCURRENCE<br>CODE      DATE | 35   OCCURRENCE SPAN<br>CODE   FROM    THROUGH | 36   OCCURRENCE SPAN<br>CODE   FROM    THROUGH | 37 |
|---|---|---|---|---|---|---|

| 38 | | | | 39   VALUE CODES<br>CODE    AMOUNT | 40   VALUE CODES<br>CODE    AMOUNT | 41   VALUE CODES<br>CODE    AMOUNT |
|---|---|---|---|---|---|---|
| | | | a | | | |
| | | | b | | | |
| | | | c | | | |
| | | | d | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATE / HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 | |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | 1 |
| 2 | | | | | | | | 2 |
| 3 | | | | | | | | 3 |
| 4 | | | | | | | | 4 |
| 5 | | | | | | | | 5 |
| 6 | | | | | | | | 6 |
| 7 | | | | | | | | 7 |
| 8 | | | | | | | | 8 |
| 9 | | | | | | | | 9 |
| 10 | | | | | | | | 10 |
| 11 | | | | | | | | 11 |
| 12 | | | | | | | | 12 |
| 13 | | | | | | | | 13 |
| 14 | | | | | | | | 14 |
| 15 | | | | | | | | 15 |
| 16 | | | | | | | | 16 |
| 17 | | | | | | | | 17 |
| 18 | | | | | | | | 18 |
| 19 | | | | | | | | 19 |
| 20 | | | | | | | | 20 |
| 21 | | | | | | | | 21 |
| 22 | | | | | | | | 22 |
| 23 | *PAGE ___ OF ___* | | *CREATION DATE* | | TOTALS ▶ | | | 23 |

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL<br>INFO | 53 ASG<br>BEN. | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 NPI | |
|---|---|---|---|---|---|---|---|
| A | | | | | | 57<br>OTHER<br>PRV ID | A |
| B | | | | | | | B |
| C | | | | | | | C |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. | |
|---|---|---|---|---|---|
| A | | | | | A |
| B | | | | | B |
| C | | | | | C |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME | |
|---|---|---|---|
| A | | | A |
| B | | | B |
| C | | | C |

| 66<br>DX | 67 | A | B | C | D | E | F | G | H | 68 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | I | J | K | L | M | N | O | P | Q |
| | | a | b | c |

| 69 ADMIT<br>DX | 70 PATIENT<br>REASON DX      a    b    c | 71 PPS<br>CODE | 72<br>ECI | | | 73 |
|---|---|---|---|---|---|---|
| 74  PRINCIPAL PROCEDURE<br>CODE      DATE | a.  OTHER PROCEDURE<br>CODE      DATE | b.  OTHER PROCEDURE<br>CODE      DATE | 75 | 76 ATTENDING   NPI<br>LAST              FIRST | | QUAL |
| c.  OTHER PROCEDURE<br>CODE      DATE | d.  OTHER PROCEDURE<br>CODE      DATE | e.  OTHER PROCEDURE<br>CODE      DATE | | 77 OPERATING   NPI<br>LAST              FIRST | | QUAL |

| 80 REMARKS | 81CC<br>a | | 78 OTHER   NPI<br>LAST              FIRST | | QUAL |
|---|---|---|---|---|---|
| | b | | 79 OTHER   NPI<br>LAST              FIRST | | QUAL |
| | c | | | | |
| | d | | | | |

| UB-04 CMS-1450 | APPROVED OMB NO. 0938-0997 | **NUBC** National Uniform Billing Committee | THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF. |
|---|---|---|---|